**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**3COM CORPORATION,**

                    **Plaintiff,**

          **-against-**

**CAPITAL 4, INC., F. DAVIS**
**DAWSON, and ISH VILLA-LOBOS,**

                    **Defendants.**

Civ. No.   O7Civ. 8707 (JSR)

**COMPLAINT**

Plaintiff 3COM CORPORATION ("3Com"), for its complaint against defendants

CAPITAL 4, INC. ("Capital 4"), F. DAVIS DAWSON ("Dawson") and ISH VILLA-LOBOS

("Villa-Lobos"), alleges as follows:

## NATURE OF ACTION

1.      3Com brings this action for damages and injunctive and declaratory relief

against defendant Capital 4 for Capital 4's wrongful conduct in failing to meet its contractual

obligations under a License Agreement and related agreements concerning the provision of

network and telecommunications services to customers, in improperly using 3Com's marks to

mislead customers and enter into unauthorized contracts with customers, in defaming 3Com to

customers, and in misrepresenting the viability of its business and the manner in which it

conducted its business in order to fraudulently induce 3Com to provide support and funding for

Capital 4's failing business.  3Com also brings claims against defendants F. Davis Dawson and

Ish Villa-Lobos, principals of Capital 4, to pierce the corporate veil based on their complete

control of Capital 4 and use of Capital 4's corporate form to perpetrate a fraud on 3Com by

making false and deliberately misleading statements about Capital 4's financial condition to

induce 3Com it to infuse huge amounts of cash into Capital 4 to keep it operating while all along

Dawson and Villa-Lobos knew and intended that the company would default on its obligations to

customers and to 3Com.

## PARTIES

2.      Plaintiff 3Com is a Delaware corporation with a principal place of

business in Marlborough, Massachusetts.  3Com designs and manufactures IP telephone

equipment, LAN switches, and routers for sale worldwide.

3.      Defendant Capital 4 is a Texas corporation with a principal place of

business in Houston, Texas.  Capital 4 is in the business of contracting with customers for the

provision of local and long distance telephone services, internet access, equipment and repair

services.

4.      Defendant F. Davis Dawson is an individual residing in Austin, Texas.

Upon information and belief, Dawson is a principal of Capital 4 with a one half ownership

interest in the company.

5.      Defendant Ish Villa-Lobos is an individual residing in Houston, Texas.

Upon information and belief, Villa-Lobos is a principal of Capital 4 with a one half ownership

interest in the company.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. §§ 1331, 1332, 1338 and 1367.

7.      The matter in controversy exceeds the sum or value of $75,000.00,

exclusive of interest and costs, and is between citizens of different States.

8.    This Court has personal jurisdiction over the defendant Capital 4 pursuant to § 7.2 of the Operations Agreement between the parties, which provides that each party "irrevocably submits to the exclusive jurisdiction and venue of any state court or United States federal court located in New York, New York," for actions arising out of or relating to the Operations Agreement.  A copy of the Operations Agreement ("Op. Agmt.") is attached as Exhibit 1.

9.    This Court has personal jurisdiction over the defendants Dawson and Villa-Lobos pursuant to § 7.2 of the Operations Agreement between Capital 4 and 3Com based on the defendants Dawson and Villa-Lobos's use of Capital 4's corporate form to perpetrate a fraud on 3Com, entitling 3Com to pierce the corporate veil as to Dawson and Villa-Lobos.

10.    Venue is proper pursuant to § 7.2 of the Operations Agreement between the parties.  See Op. Agmt. § 7.2, attached as Exhibit 1.

## FACTS

11.    In or about 1999, 3Com was a network and telecommunications equipment supplier to Capital 4's predecessor in interest, Infinitel, Inc.

12.    Upon information and belief, in or about 2000, Dawson and Villa-Lobos formed Capital 4 and merged Infinitel into it.  Upon information and belief, Dawson and Villa-Lobos jointly own and exercise sole control over Capital 4.

13.    Following Infinitel's merger with Capital 4 in or about 2000, 3Com became a network and telecommunications equipment supplier for Capital 4, selling equipment to Capital 4 for use in Capital 4's "Power of $Zero" program through which Capital 4 provided network and telecommunications services and new equipment to customers.

14.    Under the Power of $Zero program, Capital 4 sold network and telecommunications services to new customers under agreements that required the customer to pay a fixed monthly fee for a fixed period of time (usually six years) for a package of services. The services included local and long distance telephone, internet, and/or voice-over-internet services (collectively, "Public Access Services"), and, at the customer's option, lease of equipment, installation, and long term equipment servicing.  The monthly fee for such services was based on the customer's reported actual monthly expenses for such services delivered by existing providers.

15.    Capital 4 uses third party carriers such as Level 3, Big City, Texlink, Verizon, MCI, and Sprint to provide Public Access Services to its customers.

16.    Under the Power of $Zero program, customers had the option to receive, at little or no additional cost to the customer, (1) new networking and telephone equipment; (2) a cash rebate; or (3) new networking and telephone equipment and a partial cash rebate.  Thus, depending on the option selected, some customers received from Capital 4 new equipment as well as Public Access Services for a fixed monthly fee.

17.    Capital 4 purchased from 3Com and then resold 3Com networking and telephone equipment as part of the Power of $Zero telecommunications packages sold to customers who elected an option with new equipment.

18.    In order to finance the cost of the new equipment and/or cash rebates provided to customers, Capital 4 monetized the value of the contracts it entered into with customers by arranging with a financial institution (the "Lender") for a loan to the customer of the discounted present value of a portion of each customer contract.

19.    Upon information and belief, Capital 4 monetized the value of the contracts by presenting the Lender with an invoice for the value of the equipment to be provided as part of the transaction.[1]  The Lender then made a loan to the customer of the present value of the lease and the customer became obligated to the Lender to make monthly payments on the loan.

20.    Upon information and belief, the customer's monthly payment to the Lender constituted a portion of the fixed monthly fee the customer was paying under the Power of $Zero program, which portion was referred to as the monetization percentage.  Thus, if 80% of the customer's fixed monthly fee was attributable to the lease payment due to the Lender, the transaction was considered 80% monetized.  In such circumstances, 20% of the customer's fixed monthly fee remained to pay for the Public Accesses Services contracted for under the customer's Power of $Zero agreement with Capital 4.

21.    Upon information and belief, the proceeds obtained by monetization were available for some or all of the following purposes:  (a) to pay for the new equipment being provided in the transaction or to buy out a lease of the existing equipment; (b) to fund any cash rebate the customer had elected to receive; (c) to cover the cost of installation, warranty and service of new equipment; (d) to pay any commissions owed to third party resellers; (e) to fund the cost of Public Access Services to the extent that the non-monetized portion of the customer's fixed monthly fee was not sufficient to do so; (f) to cover Capital 4's operating expenses; (g) to contribute to profit to the extent all other expenses were paid.

---

[1] Where new equipment was not part of the transaction, the customer's existing equipment was used to secure the loan from the Lender.  If the customer's existing equipment was leased rather than owned, this required Capital 4 to buy out the lease.

22.     Upon information and belief, Capital 4 and 3Com executed a "Strategic Alliance Agreement" dated January 31, 2005.  A copy of the Strategic Alliance Agreement ("SAA") is attached as Exhibit 2.[2]

23.     On or about March 10, 2005, Capital 4 and 3Com entered into a "Rules of Engagement Addendum to the Strategic Alliance Agreement."  A copy of the Rules of Engagement Addendum ("ROEA") is attached as Exhibit 3.

24.     Under the Strategic Alliance Agreement and Rules of Engagement Addendum, 3Com undertook to participate more actively in the Power of $Zero program by assisting Capital 4 to market the program and to establish relationships with other resellers of 3Com products ("3Com Value Added Resellers" or "3Com VARs") so that such 3Com VARs could also sell the Capital 4 Power of $Zero program.

25.     The parties operated under the Strategic Alliance Agreement and Rules of Engagement Addendum until the fall of 2006.  During this period, Capital 4 entered into numerous Power of $Zero contracts with customers under which it promised to provide customers Public Access Services and, for those customers who so elected, new 3Com equipment, for a fixed monthly fee (the "Capital 4 POZ Customer Agreements").  3Com was not a party to the Capital 4 POZ Customer Agreements, and, pursuant to the express terms of the Strategic Alliance Agreement and Rules of Engagement Addendum, 3Com did not have any liability for providing the Public Access Services promised thereunder, which were the sole responsibility of Capital 4.  See SAA §§ 1, 9.b.; ROEA §§ 1, 4.a., 4.b., attached as Exhibits 2 and 3.

---

[2] 3Com does not have in its possession an executed copy of the Strategic Alliance Agreement, however, upon information and belief the attached version is the one that was executed by the parties.

26.     The Capital 4 POZ Customer Agreements were executed on paper bearing the Capital 4 logo.  Capital 4's use of 3Com's logos, marks and/or names in connection with the Power of $Zero program, including, *inter alia*, in marketing materials, contracts and supporting documentation, was governed and limited by the Strategic Alliance Agreement and Rules of Engagement Addendum and explicitly required prior written consent from 3Com.  See ROEA ¶ 6.c., attached as Exhibit 3.  3Com did not consent to Capital 4's use of 3Com's logos, marks and/or names on any Capital 4 Power of $Zero Customer Agreements.

27.     3Com owns Registration No. 2,541,487 for, *inter alia*, International Classes 9 and 42 in the United States Patent and Trademark Office for the design mark 3COM (with stylized word and three-ring design) for computer consultation, computer network design for others, and providing information via a global computer network, and for telephone apparatus and telephony system hardware and software.  A copy of this registration is attached as Exhibit 4.

28.     3Com owns Registration No. 2,486,291 for, *inter alia*, International Classes 9 and 42 in the United States Patent and Trademark Office for the three-ring design mark for computer consultation, computer network design for others, and providing information via a global computer network, and for telephone apparatus and telephony system hardware and software.  A copy of this registration is attached as Exhibit 5.

29.     3Com owns Registration No. 2,364,947 for, *inter alia*, International Class 9 in the United States Patent and Trademark Office for the word mark 3COM for telephone apparatus.  A copy of this registration is attached as Exhibit 6.

30.     3Com owns Registration No. 3,240,781 for, *inter alia*, International Classes 9 and 42 in the United States Patent and Trademark Office for the word mark 3COM

(with stylized word and three-ring design) for computer consultation, computer network design for others, and providing information via a global computer network, and for telephones telephony systems. A copy of this registration is attached as Exhibit 7.

31.     In the second half of 2005, 3Com and Capital 4 entered into negotiations to modify the terms of the strategic alliance then in place. As result of those negotiations, 3Com and Capital 4 began to consider a new agreement under which 3Com would develop and implement its own Power of $Zero program.

32.     Because 3Com was aware that Capital 4 had had cash flow problems based on Capital 4's prior need to have 3Com extend it credit, 3Com requested that Capital 4 provide financial data showing aggregate income and expenses associated with Capital 4's Power of $Zero program as a whole, as well as detailed data for a representative sample of Power of $Zero customers to enable 3Com to undertake a due diligence review of the financial aspects of Capital 4's Power of $Zero program.

33.     In or about late 2005 or early 2006 Dawson and Villa-Lobos provided 3Com with aggregate financial data on the Power of $Zero program and detailed financial data on a sample of seven customers. Dawson specifically represented to 3Com's management that the aggregate financial data was accurate and that the sample data was representative of the financial viability of Capital 4's Power of $Zero portfolio.

34.     In the course of the negotiations, which extended and continued into 2006, Dawson and Villa-Lobos repeatedly asserted that, notwithstanding Capital 4's cash flow issues, the Power of $Zero program overall was profitable. They acknowledged that while some individual transactions were "underwater", *i.e.*, losing money for Capital 4, others were

sufficiently profitable to make the entire portfolio of Capital 4 Power of $Zero transactions profitable.

35.     Later in the negotiations, Dawson and Villa-Lobos also represented to 3Com that Capital 4 was operating at a loss of about $300,000 per month for net Public Access Services expenses, but that these liabilities were being reduced at a rate of about $30,000 per month, such that in 10 months Capital 4 would no longer be operating at a loss.

36.     In reliance on Dawson and Villa-Lobos' representations regarding Capital 4's financial condition, the accuracy of the financial data they had provided, and their claimed ability to eliminate their liabilities within a year, 3Com decided to go forward with a new agreement with Capital 4.

37.     On or about November 10, 2006, Capital 4 and 3Com entered into a License Agreement and an Operations Agreement, copies of which are attached hereto as Exhibits 8 and 1 respectively.

38.     The License Agreement gave 3Com the right to "use, exploit, and commercialize" the Power of $Zero in return for a licensing fee paid to Capital 4. See Lic. Agmt. p.1., attached as Exhibit 8.  The License and Operations Agreements contemplated that 3Com would begin selling Public Access Services and network and telecommunications equipment directly to its customers through its network of 3Com VARs using its own Power of $Zero program.  For these sales, 3Com, rather than Capital 4, would enter into an agreement with a customer to provide the Public Access Services and equipment for a fixed monthly fee (the "3Com POZ Customer Agreements").  See Lic. Agmt. §2.1, attached as Exhibit 8.

39.     Pursuant to the terms of the Operations Agreement, Capital 4 was to provide 3Com with certain services related to the processing, arranging, and payment for Public

Access Services to be provided under the new 3Com POZ Customer Agreements (the "Back Office Services"). The Operations Agreement provided for the transition of these Back Office Services from Capital 4 to 3Com over a period of time (the "Transition Period"). It further contemplated that the Transition Period would end on a certain date (the "Cut Date"), after which 3Com would provide its own Back Office Services. Finally, it contemplated that Capital 4 could sell the 3Com Power of $Zero program for 3Com as a 3Com VAR, but only with 3Com's approval of each transaction. For 3Com Power of $Zero transactions in which Capital 4 acted as a 3Com VAR that were entered into during the Transition Period, Capital 4 agreed to provide Back Office Services for the life of the agreement, not merely during the Transition Period. See Op. Agmt. §§ 2.3, 2.4 and 2.5, attached as Exhibit 1.

40.    In conjunction with the License Agreement and based on Dawson and Villa-Lobos' representations regarding Capital 4's finances, 3Com agreed to make a $5,000,000 prepayment of the licensing fees or royalties that 3Com would be paying Capital 4 under the License Agreement. See Lic. Agmt. § 2.7.3 attached as Exhibit 8.

41.    3Com made the $5,000,000 prepayment of royalties to Capital 4 in two installments, paid in November 2006 and a few months thereafter. Upon information and belief, after receiving the prepayment of royalties, Dawson and Villa-Lobos raised the salaries Capital 4 was paying them despite their knowledge that Capital 4 was undercapitalized.

42.    Pursuant to License and Operations Agreements, 3Com began entering into 3Com POZ Customer Agreements with customers. The 3Com POZ Customer Agreements were executed on paper branded with the 3Com name and logo ("3Com Paper"), as contemplated by the License Agreement and Operations Agreement. See Lic. Agmt. §§ 3.1, 3.3.3, attached as Exhibit 8. The License and Operations Agreements also provided for branding

of other 3Com Power of $Zero documentation and materials with 3Com's name and trademark. See Lic. Agmt. §§ 3.1, 3.3.3, attached as Exhibit 8.

43.     The License Agreement and Operations Agreement prohibited Capital 4 from using 3Com trademarks and logos except as required to effect its responsibilities under the License Agreement, and only with 3Com's express written consent. See Lic. Agmt. §§ 3.1, 3.3.3, 1.2, attached as Exhibit 8; See Op. Agmt. § 2.5.4, attached as Exhibit 1.

44.     Subsequently, the License and Operations Agreements were amended by the First Contract Addendum to the License Agreement and Operation Agreement, executed April 1, 2007 ("First Contract Addendum"), a copy of which is attached as Exhibit 9.

45.     The parties subsequently executed Amendment No. 1 to the First Contract Addendum on May 8, 2007, a copy of which is attached hereto as Exhibit 10.

46.     In or about late July, 2007, 3Com learned that Capital 4 was seriously delinquent on many of its outstanding payment obligations to third party Public Access Services providers. 3Com made this alarming discovery when it began receiving reports from 3Com VARs who stated that they had received inquiries from Power of $Zero customers who had been warned by their Public Access Service providers that they were in danger of having their service terminated due to non-payment.

47.     Only when 3Com inquired about the delinquencies and the threatened loss of service to numerous Power of $Zero customers did Capital 4 confirm its dire financial condition and its inability to fulfill its obligations to pay for Public Access Services for its own Power of POZ customers, as well as for 3Com POZ customers for whom Capital 4 was providing Back Office Services.

48.    Upon acknowledging its financial crisis, Capital 4 sought an immediate infusion of cash to meet its daily obligations, which included payments to Public Access Service providers to prevent them from shutting off customers' Public Access Services. Capital 4 initially requested over $200,000 to cover two days worth of expenses. As of August 7, 2007, 3Com had loaned Capital 4 $204,690.87 pursuant to a promissory note signed by Capital 4. A copy of the Promissory Note is attached as Exhibit 11.

49.    On or about August 7, 2007, the parties executed the First Contract Amendment, a copy of which is attached as Exhibit 12. The First Contract Amendment amended the Operations Agreement by deleting and replacing sections 4.3 and 4.4 of the Operations Agreement.

50.    Thereafter, Capital 4 requested additional infusions of cash on an almost daily basis in order to meet its daily financial obligations, which included paying Public Access Service providers immediately in order to prevent them from shutting off customers' services. 3Com made additional cash loans to Capital 4 under promissory notes on the following dates in the following amounts:

| August 8, 2007 | $62,495.42 |
| August 10, 2007 | $133,546.27 |
| August 14, 2007 | $35,096.54 |
| August 15, 2007 | $63,893.02 |
| August 16, 2007 | $40,848.57 |
| August 16, 2007 | $59,429.31 |

Copies of the promissory notes are attached collectively as Exhibits 13 - 18, respectively.

51.    Thereafter, despite 3Com's infusion of $600,000 into Capital 4 under promissory notes, as well as $5,000,000 in prepaid royalties, Capital 4 remained unable to meet its ongoing obligations under the POZ Customer Agreements and failed to make payments owed to Public Access Service providers. Capital 4 has failed to pay for Public Access Services for 3Com POZ customers for which Capital 4 acted as a 3Com VAR and for 3Com POZ Customers for which Capital 4 was providing "Back Office Services."

52.    Based on Capital 4's admitted financial crisis, its failure to meet its obligations to customers and to 3Com to pay for Public Access Services, and the consequent likelihood of a Material Adverse Effect on 3Com, 3Com POZ Customers, and the Power of $Zero program, on or about August 20, 2007, 3Com invoked the "Go Dark" provision of the Operations Agreement as amended by the First Contract Amendment, and demanded that Capital 4 immediately comply with the provisions thereof. See First Contract Amendment § 4.3, "Go Dark" Solution, attached as Exhibit 12.

53.    Capital 4 did not dispute the appropriateness of 3Com's invoking the "Go Dark" provision.

54.    Despite Capital 4's agreement to proceed under the "Go Dark" provision and the express requirements of that provision, Capital 4 has failed to provide 3Com with information it has requested which is essential to allow 3Com to evaluate the problem and determine whether it wants to exercise its right to take assignment of certain agreements under the parties' agreements. See First Contract Amendment § 4.3, "Go Dark" Solution, attached as Exhibit 12. The necessary information includes agreements with customers, Public Access Service providers, and Lenders for the accounts on which Capital 4 is delinquent.

55.     Subsequent to invoking the "Go Dark" provision, 3Com learned that Capital 4 had, without 3Com's consent or approval of the transactions, entered additional agreements with new Power of $Zero customers on 3Com Paper bearing the heading "3Com Power of $Zero Customer Agreement" (the "Unauthorized Agreements") in direct violation of the parties' agreements, including the License and Operations Agreements. See Lic. Agmt. §§ 3.1, 3.3.3, attached as Exhibit 8; see Op. Agmt. § 2.5.4, attached as Exhibit 1.

56.     Specifically, 3Com has become aware of the following Unauthorized Agreements which were entered into by Capital 4 on 3Com Paper without 3Com's approval:

(a)     An April 26, 2007 agreement with Arkay Packaging Corporation, a copy of which is attached as Exhibit 19;

(b)     A February 20, 2007 agreement with Individual Assurance Co., d/b/a Life, Health & Accident, a copy of which is attached as Exhibit 20;

(c)     A June 20, 2007 agreement with Words Mail Service of Texas, a copy of which is attached as Exhibit 21;

(d)     A March 6, 2007 agreement with USA Brokerage, Inc., a copy of which is attached as Exhibit 22;

(e)     A June 28, 2007 agreement with Lord of the Streets Episcopal Church, a copy of which is attached hereto as Exhibit 23;

(f)     A November 30, 2006 agreement with Tara Energy, a copy of which is attached as Exhibit 24;

(g)     A February 9, 2007 agreement with West Georgia Family Medicine, a copy of which is attached as Exhibit 25;

(h)     A February 27, 2007 agreement with Lake Windcrest Golf, a copy of which is attached as Exhibit 26;

(i)     A March 27, 2007 agreement with Absolute Best Care Home Health, a copy of which is attached as Exhibit 27;

(j)     A March 2, 2007 agreement with Southern Patio, a copy of which is attached as Exhibit 28;

(k)     A February 21, 2007 agreement with Greater Birmingham Association of Builders, a copy of which is attached as Exhibit 29;

(l)    A March 8, 2007 agreement with Hawkeye Insurance, a copy of which is attached as Exhibit 30;

(m)    A February 27, 2007 agreement with Drake Interiors, a copy of which is attached as Exhibit 31;

(n)    A March 1, 2007 agreement with KCOH Radio CP4INF0123, a copy of which is attached as Exhibit 32.

57.    3Com's approval process for proposed Power of $Zero agreements includes a review by 3Com of a "Reconciliation Report," provided by Capital 4 which discloses the monetization level for the transaction and analyzes the profitability of the transaction. See Lic. Agmt. § 1.13, attached as Exhibit 8.

58.    Capital 4 failed to provide a Reconciliation Report for any of the Unauthorized Agreements.

59.    3Com further learned that Capital 4 had also entered into POZ agreements with customers in which Capital 4 executed agreements on its own behalf on using 3Com's logos and trademarks (the "Misbranded Agreements"). Such agreements had not been disclosed to 3Com and 3Com had never authorized the use of 3Com's logos and trademarks in this manner for deals to which 3Com was not even purported to be a party.

60.    Some customers who entered into Unauthorized Agreements have contacted 3Com to complain that they have been informed that their Public Access Services are going to be terminated due to non-payment.

61.    Some customers who entered into Misbranded Agreements have been confused by the use of 3Com logos and trademarks, leading them to believe that 3Com was the contracting party, and have complained that they have been informed that their Public Access Services are going to be terminated due to non-payment. See September 28, 2007 e-mail from J. Tipton to R. Ardolino et al., attached as Exhibit 33.

62.     Upon learning of the existence of Unauthorized and Misbranded Agreements, 3Com immediately requested that Capital 4 provide it with detailed information identifying all customers with whom it had entered into Unauthorized Agreements, including providing copies of the Unauthorized Agreements and all related agreements with Public Access Service Providers and Lenders.

63.     Upon information and belief, Capital 4 employees have at times used business cards branded with 3Com's name and logo without 3Com's knowledge or consent. Upon information and belief, customers have been confused into thinking that they had been visited by and had discussions with 3Com employees, when in fact the individuals were employees of Capital 4.

64.     Despite the fact that 3Com is not liable for the Public Access Services promised by Capital 4 under any Unauthorized Agreements (nor under any Misbranded Agreements), 3Com desires to avoid situations in which customers who signed Unauthorized Agreements lose Public Access Services and suffer consequent interruption of and irreparable damage to their businesses.

65.     Capital 4 failed and refused to cooperate with 3Com in promptly providing information necessary to evaluate the extent of the problem, identify the customers, Public Access Service Providers, and Lenders involved, and work with the various entities to avert the looming crisis occasioned by Capital 4's failure to meet its obligations under the parties' agreements.

66.     Instead of working to solve the problem, Capital 4 has repeatedly delayed providing information to 3Com and continually demanded that 3Com provide Capital 4 with

large infusions of cash to enable it to pay the delinquent amounts due to Public Access service providers.

67.    The information Capital 4 has provided to 3Com is incomplete, delinquent and sometimes inaccurate.

68.    In addition to refusing to cooperate with 3Com to address and resolve the crisis facing Power of $Zero customers whose Public Access Services were to be (or had been) shut off, Capital 4 sought instead to stonewall while simultaneously publicly blaming 3Com for Capital 4's own financial downfall.

69.    To this end, on or about September 18, 2007, Capital 4 transmitted a letter to all 3Com Value Added Resellers, setting forth an inaccurate history of the dealings between Capital 4 and 3Com and falsely stating that:

    (1)    "3Com claimed it had not invoked the Go Dark"

    (2)    "3Com abandoned its customers and VARs…"

    (3)    "[a]pparently 3Com wanted to force Capital 4 into bankruptcy, and was surprised when Capital 4 did not file…"

    (4)    3Com was "denying its contractual obligations" and that "3Com has done absolutely nothing…to remedy the situation."

A copy of the September 18, 2007 letter is attached as Exhibit 34.

70.    On or about September 25, 2007, Capital 4 sent a document entitled "Important Notice" to customers.  A copy of the September 25, 2007 "Important Notice" is attached as Exhibit 35.

71.    In the "Important Notice," Capital 4 admits it can no longer meet its financial obligations, but disparages and defames 3Com by asserting that such failure is 3Com's fault and falsely claiming that 3Com's refusal to bail out Capital 4 constitutes a breach of the parties' agreements.  In particular, Capital 4 falsely stated that, "[a]ll aspects of the [Power of

$Zero] solution were turned over to 3Com [as of] November 10, 2006" and that "3Com's unwillingness to continue to support Capital 4 has resulted in [Capital 4's] inability to pay the underlying dial tone service providers and its business future is in jeopardy." See Important Notice, attached as Exhibit 35.

72.     Capital 4 continues to assert that it is unable to pay for Public Access Services for POZ customers. In addition, Capital 4 owes 3Com approximately $400,000 for equipment 3Com sold and delivered to Capital 4 and for which 3Com has not received payment from Capital 4.

73.     Capital 4 has also failed to pay the buyout costs for certain 3Com Power of $Zero customers' leases of existing equipment, even though 3Com gave Capital 4 funds for this specific purpose and directed Capital 4 to use the funds to do so, and Capital 4 specifically represented that such funds would be used for this specific purpose.

74.     Upon information and belief, Dawson and Villa-Lobos materially misrepresented Capital 4's financial condition. More particularly, upon information and belief, both the aggregate financial information and detailed customer sample information provided during the course of the negotiation of the License Agreement was incomplete and/or inaccurate at the time it was provided so as to be deliberately misleading.

75.     Upon information and belief, Dawson and Villa-Lobos also intentionally and materially misrepresented the detailed financial information provided for the sample of customers, by, inter alia, underreporting the costs for Public Access Services for those customers, and by falsely stating that sample was representative.

76.     Upon information and belief, Dawson and Villa-Lobos' statements regarding the scope and nature of Capital 4's monthly liabilities of $300,000 and their ability to

reduce such liabilities by $30,000 per month were false and were known to Dawson and Villa-Lobos to be false at the time they were made.  More particularly, upon information and belief, those liabilities far exceeded the amounts asserted by Dawson and Villa Lobos and those liabilities were increasing, not decreasing, at the time the statements were made.

77.    Of the $5,000,000 in prepaid royalties paid by 3Com, Capital 4 retains approximately $4,900,000 in prepaid royalties which it is not entitled to retain, and upon information and belief, Dawson and Villa-Lobos have misappropriated portions of the prepaid royalties by increasing the compensation paid to them by Capital 4.

78.    Upon information and belief, Capital 4 has in its possession 3Com equipment valued between $150,000 and $200,000.

79.    The Defendants' actions are causing irreparable harm to 3Com's reputation, business, sales, and relationships with its VARs.

80.    The Defendants' actions have damaged and are continuing to damage 3Com.

**COUNT I**
**(Breaches of Contract)**

81.    3Com repeats and realleges the allegations set forth in each of the preceding paragraphs as though set forth in full in this Count.

82.    3Com and Capital 4 are parties to a License Agreement dated November 10, 2006.  See Lic. Agmt., attached as Exhibit 8.

83.    3Com performed all of its obligations pursuant to the License Agreement.

84.    Capital 4 breached the License Agreement with 3Com in a number of respects, including but not limited to those described herein.

85.    The License Agreement defined the Power of $Zero Marketing Tools as "the processes and methodologies … used in connection with demonstrating and effecting the POZ Solution and the POZ Program." See Lic. Agmt. § 1.2, attached as Exhibit 8.

86.    Capital 4 agreed that it would not use the Power of $Zero Marketing Tools "in any manner which may injure or cause loss to 3Com." See Lic. Agmt. § 1.2, attached as Exhibit 8.

87.    Notwithstanding that agreement Capital 4 did use the Power of $Zero Marketing Tools in a manner which injured and caused loss to 3Com by inducing customers to sign agreements presented by Capital 4 on 3Com paper, bearing 3Com's name, trademark and logo, without 3Com's authorization or consent; by failing to pay for Public Access Services for Power of $Zero Customers; and by failing to pay for buyout of Power of $Zero customers' leases of existing equipment.

88.    Additionally, Capital 4 agreed to provide a "VAR Reconciliation Report," which is a statement identifying the fees paid to the 3Com VAR, the cash payments made to the customer, the fee payable to Capital 4 as licensor, and any other disbursements to be made from the monetized funds.  See Lic. Agmt. § 1.13, attached as Exhibit 8.

89.    Capital 4 agreed further that the "VAR Reconciliation Report must be approved by 3Com for each transaction…" See Lic. Agmt. § 1.13, attached as Exhibit 8.

90.    In breach of the obligations it undertook in section 1.13 of the License Agreement, Capital 4 failed to provide 3Com with VAR Reconciliation Reports in connection with certain transactions.

91.    Capital 4 agreed further that it would only use 3Com's trademarks and logos "upon express written consent of 3Com." See Lic. Agmt. § 3.3.3, attached as Exhibit 8.

92.     Capital 4 breached its agreement with 3Com when it used 3Com's trademarks and logos without 3Com's written consent or knowledge when entering the Unauthorized Agreements and Misbranded Agreements and providing Capital 4 employees with business cards branded with 3Com's trademarks and logos.

93.     Capital 4 also agreed that "[w]ithout prior written consent of the other Party, neither Party will disclose to any third party … any of the terms, conditions, status, negotiations, timing or other facts with respect to this or any other agreements between the parties unless, in each case, such disclosure (after consulting with the other Party in advance about such disclosure) is required by applicable law." See Lic. Agmt. § 3.4, attached as Exhibit 8.

94.     Capital 4 breached the License Agreement by transmitting a letter to all 3Com Value Added Resellers, setting forth an inaccurate history of the dealings between Capital 4 and 3Com and stating in part, that:

      (1)     "3Com claimed it had not invoked the Go Dark..."

      (2)     "3Com abandoned its customers and VARs…"

      (3)     "[a]pparently 3Com wanted to force Capital 4 into bankruptcy, and was surprised when Capital 4 did not file…"

      (4)     3Com was "denying its contractual obligations" and that "3Com has done absolutely nothing …to remedy the situation."

See September 18, 2007 letter from S. Hughes to D. Whitehouse, attached as Exhibit 34.

95.     The statements Capital 4 made in its September 18, 2007 letter to 3Com and all 3Com Value Added Resellers both disclosed and misrepresented "facts with respect to [the License Agreement and the] other agreements between the parties." See Lic. Agmt. § 3.4, attached as Exhibit 8.

96.     Capital 4 did not seek, and did not receive, 3Com's written or other consent prior to making the false disclosures concerning the contractual relationship between the parties and thereby breached section 3.4 of the License Agreement.

97.     3Com and Capital 4 are parties to an Operations Agreement dated November 10, 2006.  See Op. Agmt., attached as Exhibit 1.

98.     3Com performed all of its obligations pursuant to the Operations Agreement.

99.     Capital 4 breached the Operations Agreement with 3Com in a number of respects, including but not limited to those described herein.

100.     Capital 4 agreed to "provide, and ... be solely responsible and liable for ... (1) Public Access Services to be delivered under the 3Com Power of $Zero Program; (2) obligations under the POZ VAR Agreements; and (3) the 3Com Power of $Zero Customer Agreements entered into prior to the Actual Cut Date."  See Op. Agmt. § 2.5.1, attached as Exhibit 1.

101.     Capital 4 breached its agreement to provide customers with the Public Access Services, to perform its obligations under the POZ VAR Agreements, and to assume liability for the 3Com Power of $Zero Customer Agreements entered into prior to the Actual Cut Date.

102.     Capital 4 agreed that it was "prohibited from contacting 3Com VARs, Partners engaged in the 3Com POZ recruiting process, or 3Com POZ Program Customers unless 3Com grants written authorization..."  See Op. Agmt. § 2.5.3, attached as Exhibit 1.

103.    Capital 4 breached the Operations Agreement by transmitting its September 25, 2007 Important Notice to 3Com POZ Customers without 3Com's written or other authorization.  See Important Notice, attached as Exhibit 35.

104.    Capital 4 agreed that "[f]or all POZ Customer Agreements entered into prior to 3Com outsourcing all POZ Back Office Services, 3Com and Capital 4 must approve each POZ transaction prior to execution by the Customer." See Op. Agmt. § 3.11, attached as Exhibit 1.

105.    Capital 4 breached the Operations Agreement by entering into POZ Customer Agreements prior to 3Com outsourcing all POZ Back Office Services without seeking or obtaining 3Com approval of the underlying transactions.

106.    Further, Capital 4 agreed, in the Operations Agreement and the First Contract Amendment dated August 7, 2007, that "should [it] become insolvent, declare bankruptcy or otherwise fail to comply with any of the covenants" in the Operations Agreement, it "shall provide immediate written notice and/or allow notice to be provided by Public Access Service providers, as the case may be … to 3Com…" See First Contract Amendment § 4.3.2, attached as Exhibit 12.

107.    In breach of its agreement, Capital 4 failed to provide 3Com with notice that Capital 4 had become insolvent.

108.    3Com provided Capital 4 with a notice of default on August 20, 2007.

109.    Capital 4 has not cured its breaches of the License Agreement, the Operations Agreement and/or the First Contract Amendment.

110.    As a direct and proximate result of Capital 4's acts and omissions constituting breaches of the License Agreement, the Operations Agreement and/or the First

Contract Amendment, 3Com has sustained and will continue to sustain loss of value of its business and associated goodwill, loss of revenue, and other monetary damages in an amount which is presently indeterminable.

111.    Capital 4's acts and omissions in breach of the License Agreement, the Operations Agreement and/or the First Contract Amendment are irreparably damaging to 3Com and will continue to so damage 3Com unless enjoined by this court.  Therefore, 3Com is without an adequate remedy at law.

## COUNT II
### (Breach of the Duty of Good Faith and Fair Dealing)

112.    3Com repeats and realleges the allegations set forth in each of the preceding paragraphs as though set forth in full in this Count.

113.    Capital 4's conduct described herein, including, without limitation, its refusal to provide certain customer, provider, and financial information required under the parties' agreements and/or requested by 3Com, its provision of false and deliberately misleading financial information, its failure to make payments due to Public Access Service providers, its failure to obtain 3Com's authorization for certain Power of $Zero transactions, and its misuse of 3Com's marks and logos, constitutes a breach of the duty of good faith and fair dealing.

114.    Capital 4's refusal to provide 3Com with the requested information has the effect of injuring 3Com's right to receive the fruits of the License Agreement, the Operations Agreement, and/or the First Contract Amendment.

115.    3Com has suffered irreparable harm as a result of Capital 4's breach of the duty of good faith and fair dealing attendant to the License Agreement, the Operations Agreement and/or the First Contract Amendment.

116.    3Com has suffered monetary damages as a result of Capital 4's breach of the duty of good faith and fair dealing attendant to the License Agreement, the Operations Agreement and/or the First Contract Amendment.

## COUNT III
**(Defamation)**

117.    3Com repeats and realleges the allegations set forth in each of the preceding paragraphs as though set forth in full in this Count.

118.    On September 18, 2007, Capital 4 transmitted a letter to 3Com with a copy to all 3Com Value Added Resellers.  See September 18, 2007 letter from S. Hughes to D. Whitehouse, attached as Exhibit 34.

119.    Capital 4's letter set forth an inaccurate history of the dealings between Capital 4 and 3Com, and the letter contained false and defamatory statements.

120.    One of the false statements Capital 4 published to all 3Com Value Added Resellers is the statement that: "3Com claimed it *had not* invoked the Go Dark…"  See September 18, 2007 letter from S. Hughes to D. Whitehouse (emphasis in original), attached as Exhibit 34.

121.    In its September 18 letter, Capital 4 falsely published to 3Com's Value Added Resellers that "3Com abandoned its customers and VARs…"  See September 18, 2007 letter from S. Hughes to D. Whitehouse, attached as Exhibit 34.

122.    In the September 18 letter, Capital 4 falsely published to 3Com Value Added Resellers that "[a]pparently 3Com wanted to force Capital 4 into bankruptcy, and was surprised when Capital 4 did not file…"  See September 18, 2007 letter from S. Hughes to D. Whitehouse, attached as Exhibit 34.

123.    Capital 4 also falsely published to 3Com's Value Added Resellers that 3Com was "denying its contractual obligations" and that "3Com has done absolutely nothing (other than Mr. Dechant telling the VARs to call their customers) to remedy the situation." See September 18, 2007 letter from S. Hughes to D. Whitehouse, attached as Exhibit 34.

124.    On September 25, 2007, Capital 4 sent a letter entitled "Important Notice to customers which falsely stated that Capital 4's failure to meet its obligations to pay for Public Access Services was 3Com's fault and falsely claimed that 3Com's refusal to bail out Capital 4 constituted a breach of the parties' agreements.  In particular, Capital 4 falsely stated that, "[a]ll aspects of the [Power of $Zero] solution were turned over to 3Com [as of] November 10, 2006" and that "3Com's unwillingness to continue to support Capital 4 has resulted in [Capital 4's] inability to pay the underlying dial tone service providers and its business future is in jeopardy." See Important Notice, attached as Exhibit 35.

125.    Capital 4's false statements were published to third parties without privilege or authorization.

126.    Capital 4 acted either negligently or willfully when it published the false statements described herein.

127.    3Com has suffered and will continue to suffer harm to its trade, business or profession as a result of the false statements published by Capital 4.

128.    As a direct and proximate result of Capital 4's defamatory statements, 3Com has sustained and will continue to sustain loss of value of its business and associated goodwill, loss of revenue, and other monetary damages in an amount which is presently indeterminable.

129.    Capital 4's defamatory statements are irreparably damaging to 3Com and will continue to so damage 3Com unless enjoined by this court.  Therefore, 3Com is without an adequate remedy at law.

## COUNT IV
### (Fraud)

130.    3Com repeats and realleges the allegations set forth in each of the preceding paragraphs as though set forth in full in this Count.

131.    3Com and Capital 4 have had a longstanding relationship of trust and confidence, which gave rise to particular duties on the part of each.

132.    As a result of its relationship with 3Com, Capital 4 had the duty to provide 3Com with complete and correct information, particularly in connection with the due diligence 3Com conducted prior to entering into the License Agreement and the Operations Agreement with Capital 4.

133.    In connection with 3Com's due diligence relating to the License Agreement and the Operations Agreement, Capital 4, by and through its principals Dawson and Villa-Lobos, presented 3Com with certain financial data showing aggregate income and expenses associated with Capital 4's Power of $Zero program as a whole, as well as detailed data for a representative sample of Power of $Zero customers.

134.    Dawson falsely represented to 3Com that the aggregate financial data was accurate and that the sample data was representative of the financial viability of Capital 4's Power of $Zero portfolio.

135.    Capital 4's principals Dawson and Villa-Lobos falsely represented to 3Com that Capital 4 was operating at a loss of approximately $300,000 per month but was reducing that loss by $30,000 a month and would be able to eliminate the loss within a year.

136.    The representations of Capital 4, Dawson and Villa were false and deliberately misleading at the time they were made.

137.    Capital 4, Dawson and Villa-Lobos knew or should have known that these false representations to 3Com were incorrect.

138.    Capital 4, Dawson and Villa-Lobos knew and intended that 3Com would rely and act upon their false and misleading statements.

139.    3Com reasonably relied to its detriment on Capital 4's misrepresentations.

140.    3Com has been irreparably harmed and has sustained money damages as a result of Capital 4's misrepresentation.

<u>COUNT V</u>
**(Infringement of Federally Registered Trademarks)**

141.    3Com repeats and realleges the allegations set forth in each of the preceding paragraphs as though set forth in full in this Count.

142.    Since long prior to its involvement with Capital 4, 3Com has marketed and sold telephone apparatus and telephony system hardware and software, and related computer and telecommunications-based services, under the 3COM mark (work mark and stylized word mark) and a three-ring design mark (collectively, the "3Com Marks").

143.    3Com's products and services marketed and sold under the 3Com Marks are widely and substantially advertised, promoted, offered and distributed throughout the United States and the world, are widely recognized by consumers and those in the trade, and are in substantially exclusive use by 3Com.

144.    3Com's products and services marketed and sold under 3Com's Marks are popular and successful and represent valuable good will owned by 3Com.

145.    The 3Com Marks are distinctive, are well known in the trade, and have acquired secondary meaning.

146.    3Com owns Registration No. 2,541,487 for, *inter alia*, International Classes 9 and 42 in the United States Patent and Trademark Office for the design mark 3COM (with stylized word and three-ring design) for computer consultation, computer network design for others, and providing information via a global computer network, and for telephone apparatus and telephony system hardware and software.  See Registration, attached as Exhibit 4.

147.    3Com owns Registration No. 2,486,291 for, *inter alia*, International Classes 9 and 42 in the United States Patent and Trademark Office for the three-ring design mark for computer consultation, computer network design for others, and providing information via a global computer network, and for telephone apparatus and telephony system hardware and software.  See Registration, attached as Exhibit 5.

148.    3Com owns Registration No. 2,364,947 for, *inter alia*, International Class 9 in the United States Patent and Trademark Office for the word mark 3COM for telephone apparatus.  See Registration, attached as Exhibit 6.

149.    3Com owns Registration No. 3,240,781 for, *inter alia*, International Classes 9 and 42 in the United States Patent and Trademark Office for the word mark 3COM (with stylized word and three-ring design) for computer consultation, computer network design for others, and providing information via a global computer network, and for telephones telephony systems.  See Registration, attached as Exhibit 7.

150.    3Com's Registration Nos. 2,541,487; 2,486,291; and 2,364,947 are incontestable.

151.    3Com provides the statutory notice of its use of the 3Com Marks in accordance with Lanham Act § 29, 15 U.S.C. § 1111.

152.    Capital 4 has made commercial use in interstate commerce of the 3Com Marks by entering into Customer Agreements with its customers in the "Power of $Zero" program bearing the identical 3Com Marks without 3Com's approval or consent and by using the identical 3Com Marks on business cards without 3Com's approval or consent.

153.    Capital 4's conduct is likely to cause confusion, to cause mistake, or to deceive consumers into believing that those Customer Agreements originated from 3Com, or were affiliated or connected with, or sponsored or approved by, 3Com.

154.    Capital 4's conduct constitutes trademark infringement in violation of Lanham Act § 32, 15 U.S.C. § 1114.

155.    Capital 4 committed these acts willfully and with the intent to trade on the reputation and good will of 3Com.

156.    As a direct proximate result of Capital 4's acts, 3Com has sustained and will continue to sustain loss of value of its business and associated good will, loss of revenue, and other monetary damages in an amount which is presently indeterminable.

157.    Capital 4's infringing acts are irreparably damaging to 3Com and will continue to so damage 3Com unless enjoined by this Court.  Therefore, 3Com is without an adequate remedy at law.

## COUNT VI
### (Trademark Infringement, False Designation of Origin and Unfair Competition Under Federal Law)

158.    3Com repeats and realleges the allegations set forth in each of the preceding paragraphs as though set forth in full in this Count.

- 30 -