e.  **Cooperation**.  The Parties shall endeavor in good faith to provide the reciprocal, cooperative, and proactive engagement of their marketing, business development, sales, and consulting teams.  The Parties shall discuss, and may mutually agree upon and develop, additional communication strategies with respect to this Agreement.

## 6.    Press Releases.

Except as may be required by law, neither party shall, without the other party's prior written consent, which shall not be unreasonably withheld: (a) make any news release, public announcement, denial or confirmation of this Agreement or its subject matter; or (b) in any manner advertise or publish the fact that they have contracted hereunder.  Notwithstanding the above, Capital 4 and 3Com shall publicize their relationship throughout the term in accordance with a mutually agreed upon joint public relations plan.  The Parties shall jointly prepare and mutually approve press releases and other public announcements, which may describe specific services, products, and go-to-market cooperation.  The initial press release announcing this Agreement shall be mutually agreed upon before, or promptly after, the Effective Date, and shall be issued as soon as practicable following the Effective Date.  Each party shall use commercially reasonable efforts to cause its senior executives to participate in all initial press releases. Except as expressly authorized in this Section ("Press Releases"), neither Capital 4 nor 3Com shall make or release any press release or other public announcement with respect to this Agreement, nor disclose, advertise, or publish the existence or the terms or conditions of this Agreement, financial or otherwise, without the prior written consent of the other party.

Unless agreed otherwise in writing, each Party shall bear their own individual marketing costs and expenses.

## 7.    Warranties.

    a.  The Parties represent and warrant that the services each performs pursuant to this Agreement shall be completed in a professional, workmanlike manner, with the degree of skill and care that is required by current, good and sound professional procedures and practices, and in conformance with the highest industry standards for the completion of such services prevailing at the time.

    b.  Each Party represents that (a) it has full right and power to enter into and perform according to the terms of this Agreement; (b) its performance of activities pursuant to this Agreement shall not violate any agreement or obligation between it and a third party; (c) it shall comply with all applicable local, state and federal laws, statutes and regulations; (d) its products or services, when used in accordance with the terms of this Agreement, do not infringe any copyright, trademark, or to the best of its knowledge, any U.S. patent issued as of the Effective Date, held by any third party; and (e) it has all government licenses, permits, or other authorizations necessary to conduct its business.

    c.  EACH PARTY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

*Strategic Alliance Agreement – Page 4 of 10*

8. **Personnel; Property.**

    a. **No Solicitation.** Each Party agrees that during the term it shall not solicit or attempt to induce any of the other Party's employees or independent contractors who are directly involved in the relationship set forth in this Agreement, to terminate or breach an employment, contractual, or other relationship with such Party. Notwithstanding the foregoing, nothing in this Agreement shall prevent either Party from talking to, or entering into agreements with, the other Party's employees or independent contractors who approach such Party responding to advertising that the Party has circulated to the general public.

    b. **Taxes.** Each Party shall be responsible for its own tax liabilities and tax reporting resulting from any activities related to this Agreement.

    c. **Insurance.** During the term, each Party shall carry and maintain liability insurance coverage to satisfactorily protect its obligations hereunder. Upon a request, a Party shall provide the other a Certificate of Insurance evidencing its insurance coverage.

9. **Indemnity.**

    a. Each Party, (the "Indemnifying Party") shall defend, indemnify and hold harmless the other Party and all of its directors, officers, employees, shareholders, principals, partners, representatives, and agents (each an "Indemnified Party") from and against claims, losses, judgments, costs, or expenses (collectively the "Claims") in connection with any claim by a third party arising out of or resulting from: (a) actual or alleged infringement or misappropriation by the Indemnifying Party of the copyright, patent, trademark, or other intellectual property right of such third party; (b) negligence or willful misconduct of the Indemnifying Party; (c) the services performed or actions taken by the other party in connection with this Agreement, or (d) breach of the terms or conditions of this Agreement. Neither Party's indemnification obligation shall extend to claims to the extent resulting from the negligence or willful misconduct of the Indemnified Party.

    b. 3Com shall not be liable for any aspect of the Public Access Services or any claims or transactions relating to Capital 4's performance of the Public Access Services for the 3Com Re-sellers or their customers. Capital 4, (the "Indemnifying Party") shall defend, indemnify, and hold harmless 3Com and all of its directors, officers, employees, shareholders, principals, partners, representatives and agents (each an "Indemnified Party") from and against claims, losses, judgments, costs, or expenses (collectively "Claims") in connection with any claim by a third party arising out of, or resulting from, such Public Access Services.

    c. In all cases, the Indemnified Party shall provide prompt written notice of a Claim to the Indemnifying Party. The Indemnifying Party shall have sole control of the defense and settlement of such Claim, provided that the Indemnifying Party shall not settle any such Claim without the prior written consent of the Indemnified party, which shall not be unreasonably withheld, delayed, or conditioned. The Indemnified Party shall reasonably cooperate with the Indemnifying Party in the defense and settlement of such claim.

10. **Ownership of Information**

*Strategic Alliance Agreement – Page 5 of 10*

Each Party shall retain all right, title, and interest in, and to its own information and content exchanged and shared under this Agreement, its own promotional and marketing materials, and its own website (excluding the other Party's content). Nothing herein shall be construed as giving one Party the right, title, or interest in the other Party's information.

11.    **Confidentiality.**

   a.    **Confidential Information.** This Section 11 shall govern the exchange, protection, and disclosure of confidential or proprietary information pursuant to this Agreement. Each Party (the "Disclosing Party") may from time to time during the term of this Agreement disclose to the other Party (the "Receiving Party") certain information regarding the Disclosing Party's business, including without limitation its assets, liabilities, capitalization, structure, market, customers, price strategy, price lists, profitability, operations, manner of doing business, processes, patents, copyrights, trademarks, data, technical documentation, business practices, Trade Secrets, and other strategic information that is confidential to the Disclosing Party (collectively the "Confidential Information").    (Trade Secrets, as used herein, shall mean all Confidential Information which derives economic value, actual or potential, from not being generally known to, yet being readily ascertainable by proper means, other persons who can obtain economic value or benefit from its use or disclosure; and is the subject of efforts that are reasonable, under the circumstances, to maintain its secrecy.) The Parties each regard all of its Confidential Information to be proprietary and strictly confidential, and require that all such information remain secret, confidential, and proprietary to that Party in all possible respects. In order to be protected as "Confidential Information" pursuant to this Section 11, such information, if disclosed in writing, shall be marked or identified as "confidential" or a similar designation; or, if orally or visually disclosed, shall be identified as "the confidential information of the disclosing party" at the time of disclosure, and then summarized in writing and provided to the recipient in such written form or via a transmittal sheet provided for this purpose within thirty (30) days after such oral or visual disclosure.

   b.    **Protection of Confidential Information.** The Receiving Party may only use the Confidential Information received from the Disclosing Party for the purpose of performing under this Agreement, and shall not use the Confidential Information for any other purpose. The Receiving Party may only disclose the Confidential Information of the Disclosing Party to the employees and contractors of the Receiving Party who have a need to know such Confidential Information for purposes of the Receiving Party's performance under this Agreement, and may only make such disclosure to employees and contractors who are under a written duty of confidentiality, which sufficiently allows the Receiving Party to comply with its obligations imposed by this Section, and protects the Confidential Information provided by the Disclosing Party. The Receiving Party shall protect the Disclosing Party's Confidential Information from unauthorized use, access, or disclosure in the same manner as the Receiving Party protects its own Confidential Information of a similar nature, but with no less than reasonable care. The obligations of confidentiality shall continue for a period of five (5) years after the date of disclosure. The confidentiality obligations under this Section 11 shall survive the termination of this Agreement. The Receiving Party shall immediately notify the Disclosing Party

of any violation of this Agreement by virtue of the disclosure of Confidential Information, and shall cooperate with the Disclosing Party to regain possession of any Confidential Information. Nothing in the Agreement shall be deemed to constitute an implied license in favor of the Receiving Party as to any proprietary rights of Confidential Information provided by the Disclosing Party, including, without limitation, patents, copyrights, trademarks, or Trade Secrets. This Agreement creates a relationship of trust and confidence between the Disclosing Party and the Receiving Party, and will be construed and enforced accordingly. If the Receiving Party (including its agents or representatives) breaches or threatens to breach any portion of this Agreement, the Disclosing Party may enforce this Agreement in an action for damages or injunctive relief, or both, it being specifically recognized, understood, and agreed by the Parties that the Disclosing Party's remedies at law may be inadequate to fully protect its interests. If an action for Temporary Restraining Order, Temporary Injunction, or Permanent Injunction is filed, the Receiving Party hereby irrevocably waives any requirement that the Disclosing Party post any bond or any other security.

c. **Agreement to Not Compete.** The Parties agree that Capital 4's Power of $Zero Model of selling, which consists of specific positioning of the compounding value of the services and the associated marketing and quote tools, was developed only for the use by Capital 4 or its authorized agents. 3Com agrees that it learned of the Power of $Zero Model of selling from Capital 4, and agrees that 3Com will not directly develop the Power of $Zero Model of selling during the term of this Agreement and for one (1) year following termination or expiration of this Agreement. The Parties further agree that this restriction (1) applies only to 3Com voice products, and (b) does not apply to any leasing arrangements that 3Com may establish for its voice products.

d. **Exceptions.** The Receiving Party's obligations with respect to any Confidential Information received from the Disclosing Party shall terminate if and when the Receiving Party can document that such Confidential Information: (a) was already lawfully known to the Receiving Party at the time of disclosure by the Disclosing Party; (b) is disclosed to the Receiving Party by a third party who had the right to make such disclosure without any confidentiality restrictions; (c) is, or through no fault of the Receiving Party has become, generally available to the public; (d) is independently developed by the Receiving Party without use of, or reference to, the Disclosing Party's Confidential Information. In addition, the Receiving Party will be allowed to disclose Confidential Information of the Disclosing Party to the extent that such disclosure is (i) approved in writing by the Disclosing Party, (ii) necessary (i.e. there are no reasonable alternatives that would avoid disclosure) for the Receiving Party to enforce its rights under this Agreement; or (iii) required by law or by the order or a court of similar judicial or administrative body, provided that the Receiving Party notifies the Disclosing Party of such required disclosure promptly and in writing and cooperates with the Disclosing Party, at the Disclosing Party's request and expense, in any lawful action to contest or limit the scope of such required disclosure.

12.    **Attorneys' Fees.**

In any action to enforce this Agreement, the prevailing Party shall be entitled to recover all court costs and expenses, and reasonable attorneys' fees, in addition to any other relief to which it may be entitled.

**13.    Severability.**
In the event any provision of this Agreement shall be deemed to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  The Parties agree to replace any invalid provision with a valid provision, which most closely approximates the intent and economic effect of the invalid provision.

**14.    Limitation of Liability.**
EXCEPT FOR THE PARTIES' INDEMNIFICATION OBLIGATIONS IN SECTION 9, THE CONFIDENTIALITY OBLIGATIONS UNDER SECTION 11, NEITHER PARTY SHALL HAVE ANY LIABILITY WITH RESPECT TO ITS OBLIGATIONS UNDER THIS AGREEMENT OR OTHERWISE FOR CONSEQUENTIAL, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL, OR PUNITIVE DAMAGES OF ANY KIND, ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT, INCLUDING LOSS OF PROFIT, OR LOSS OF BUSINESS OPPORTUNITY, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**15.    Assignment.**
Neither Party shall assign this Agreement without the prior written approval of the other Party, which shall not be unreasonably withheld.  Any attempted assignment or transfer without such consent shall be null and void.

**16.    Waiver or Delay.**
A waiver of any default hereunder, or of any term or condition of this Agreement, shall not be deemed to be a continuing waiver or a waiver of any other default or any other term or condition, but shall apply solely to the instance to which such waiver is directed.

**17.    Notices.**
All notices, requests, and other communications hereunder shall be in writing, and shall be addressed to Capital 4 or to the undersigned 3Com representative, and shall be considered given when (a) delivered personally, (b) sent by confirmed facsimile, (c) delivered by nationally-recognized overnight courier with written verification receipt, or (d) delivered by postage prepaid first class, certified mail, return receipt requested.

**18.    Governing Law and Forum Selection.**
This Agreement shall be construed in accordance with, and all disputes hereunder shall be governed by, the laws of the State of New York.

**19.    Injunctive Relief.**
Each Party acknowledges and agrees that the obligations and promises under this Agreement are of a unique, intellectual nature giving them particular value.  Each Party further

*Strategic Alliance Agreement – Page 8 of 10*

acknowledges and agrees that each Party's breach of any of the promises or agreements contained in this Agreement may result in irreparable and continuing damage to the other Party for which there will be no adequate remedy at law and, in the event of such breach, such Party will be entitled to seek injunctive relief, or a decree of specific performance, or both, and such other and further relief as may be proper (including monetary damages if appropriate).

**20.    Compliance with Laws.**
General:  Capital 4 and 3Com shall comply fully with all applicable federal, state and local laws in the performance of this Agreement.
Export Control:  Each Party agrees that it will comply with all applicable export control laws.

**21.    Counterparts.**
This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**22.    Construction.**
This Agreement has been negotiated by the Parties and their respective counsel and will be interpreted fairly in accordance with its terms and shall not be construed in favor of, or against, either party.

**23.    Relationship of the Parties**
In all matters relating to this Agreement, the Parties shall act as independent contractors. Neither Party shall represent that it has any authority to assume or create any obligation or warranty, expressed or implied, on behalf of the other Party, or to represent the other Party as agent or employee, or in any other capacity.   Neither Party shall have any obligation, expressed or implied, except as set forth herein.

**24.    Entire Agreement; Modification.**
This Agreement, including its exhibits, is the complete, final, and exclusive statement of the terms of the Agreement between the Parties, and supersedes any and all other prior and contemporaneous negotiations and agreements, whether oral or written, between them, relating to the subject matter hereof.  This Agreement may not be varied, modified, altered, or amended except in writing signed by the Parties.

Executed and effective on this ____ day of _____, 2004.

_____

3Com Corporation.

By: _____

Title: _____

_____

Capital 4, Inc.

By:    F. David Dawson

Title:   President

# EXHIBIT 3

RULES OF ENGAGEMENT ADDENDUM
TO
STRATEGIC ALLIANCE AGREEMENT
EXECUTED ON JANUARY 31, 2005
BY
CAPITAL 4, INC.
("CAPITAL 4")
AND
3COM CORPORATION
("3COM")

Upon execution, the Parties agree to the following Rules of Engagement (the "ROE") Addendum to the Strategic Alliance Agreement. All of the terms and conditions in the Strategic Alliance Agreement shall apply to this ROE Addendum, unless specifically modified herein.

The Parties have developed this ROE Addendum to allow each 3com Selected Partner/Reseller, 3Com, and Capital 4 to derive economic benefit from the relationship established from: (1) working together to utilize the Power of $Zero™ Solution to market and selling 3Com Products (by and through 3Com directly, and by and through 3Com's network of partners or resellers (the "3Com Selected Partners/Resellers")); and (2) encouraging Capital 4 to establish a direct relationship between Capital 4 and 3Com Selected Partners/Resellers, allowing each 3Com Selected Partner/Reseller to utilize the Power of $Zero™ Solution in marketing 3Com Products.

**1.    Purpose.**
The purpose of this ROE Addendum is to set forth how 3Com and Capital 4 shall work together to: (1) market the Public Access Services offered by Capital 4 through the Power of $Zero™ Solution and development of the "Capital 4 System", which shall be designed to provide all administrative responsibilities in order to implement the Power of $Zero™ Solution in marketing 3Com Products nationally through the 3Com Selected Partners/Resellers, including reporting requirements and data summaries; (2) allow Capital 4 to establish a direct relationship with 3Com Selected Partners/Resellers, allowing each 3Com Selected Partner/Reseller to utilize the Power of $Zero™ Solution in marketing 3Com Products; and (3) allow 3Com to utilize the Power of $Zero™ Solution in marketing 3Com Products directly.

**2.    Territory.**
The Territory of this ROE Addendum shall be North America.

**3.    Term and Termination.**
   a.  This ROE Addendum shall have a term consistent with the Alliance Agreement, unless terminated earlier according to the terms outlined herein and in the Alliance Agreement.

b. Either Party can terminate this ROE Addendum at its convenience, at any time, with or without cause, by sending the other party thirty (30) days written notice.

c. If the Alliance Agreement or this ROE Addendum expires or is terminated, Capital 4 may, without any interference from 3Com, continue all direct contractual relationships established with any 3Com Selected Partner/Reseller or a 3Com Selected Partner/Reseller's End Users, including any End User secured through 3Com's direct marketing using the Power of $Zero™ Solution; however, with respect to the End Users, Capital 4 must strictly adhere to the exclusivity requirements established in Section 4 for at least three (3) years after expiration or termination of the Alliance Agreement or the ROE Addendum, and shall only market and promote 3Com Products.

4.    **Capital 4's Obligations.**

a. **Exclusive Use of 3Com Products.** Capital 4 agrees to promote and use 3Com Products in all of Capital 4's Public Access Services offerings and operations for the term of this ROE Addendum if new data or voice technologies are to be installed with customers as provided by 3Com or 3Com's distribution channel. Capital 4 agrees to work with 3Com on an exclusive basis to: (1) market the Public Access Services offered by Capital 4 through the Power of $Zero™ Solution with End Users as introduced by 3Com and each 3Com Selected Partner/Reseller; and (2) allow 3Com to utilize the Power of $Zero™ Solution in marketing selected 3Com Products.

b. **Capital 4 Agreement with 3Com Selected Partner/Resellers.** Capital 4 will be solely responsible for establishing an independent direct relationship between Capital 4 and each 3Com Selected Partner/Reseller for Public Access Services, and it must be clearly stated in such an Agreement that Capital 4 shall be fully responsible and liable for any and all issues related to Capital 4's Public Access Services program.

Capital 4 shall have ownership rights and all liabilities in connection with any Power of $Zero™ Customer Agreements with regards to Public Access Services executed by any End Users secured through each 3Com Selected Partner/Reseller, or by 3Com directly, provided, however, that Capital 4 first approves each such Power of $Zero™ Customer Agreement.. Capital 4 shall have the right and responsibilities to provide, and shall be solely responsible and liable for providing, all Public Access Services to be delivered under Power of $Zero™ Solution and the Power of $Zero™ Customer Agreement. In that regard, Capital 4 shall invoice, and be entitled to all proceeds from such invoices, the End User for the delivery of Public Access Services sold through the Power of $Zero™ Solution. With respect to each such End User, Capital 4 shall also exclusively own all other rights associated with the maintenance and delivery of Public Access Services, excluding warranty and repair service as set forth above.

c. **Capital 4 Contact with 3Com Selected Partner/Resellers.**  Capital 4 will refrain from contacting 3Com Partners/Resellers unless 3Com has given Capital 4 written authorization per Section 4(b) of the Alliance Agreement.

d. **3Com Finance Review.**  Capital 4 agrees to fully cooperate in good faith with 3Com's finance review process to establish that Capital 4 meets 3Com's financial due diligence standards at or before execution of this ROE Addendum and annually thereafter.

e. **Escrow.**  Provided that the developer of the Capital 4 System has been paid in full for the initial phase, Capital 4 will within five (5) business days after execution of this ROE Addendum, deposit the complete Capital 4 System Source Code ("Source Code") into a 3Com-defined escrow.  The code shall be updated as reasonably necessary, and at minimum, should be updated upon completion of the development and with every new version put into production.  The development code shall remain in escrow for the duration of this ROE Addendum, or until after the payment to 3Com is extinguished, according to the method outlined in Section 4(f).

f. **Consequences of Termination of the ROE Addendum.**  In the event that Capital 4 without cause terminates the relationship under this ROE Addendum, Capital 4 shall either:
   1. Notify 3Com within ten (10) days of the termination of this ROE Addendum, that it elects to refund to 3Com all of the "Out of Pocket" marketing or development expenses agreed to in writing under this ROE Addendum , and refund the out of pocket expenses to 3Com within thirty (30) days after such termination, or
   2. Agree to the release of the Source Code by Capital 4's failure to notify 3Com within ten (10) days of the termination, and the failure to pay 3Com all of 3Com's out of pocket expenses with thirty (30) days.

   In the event that 3Com terminates the relationship under this ROE Addendum, Capital 4 shall not be required to pay any additional funds to 3Com, and the Source Code shall be released from escrow and delivered to Capital 4.

g. **Exclusivity.**  The relationship that Capital 4 has with 3Com under the Alliance Agreement and this ROE Addendum is exclusive as to 3Com and all of the 3Com Selected Partners/Resellers; precluding Capital 4 from marketing any other similar commercial relationship of any kind with any data or voice technologies manufacturer or any competitor of 3Com and from marketing any other type of telephone equipment during the Term of this ROE, and for three (3) years after expiration or termination of the Alliance Agreement or this ROE.

h. **POS Reporting.**  Once the second phase of the Capital 4 System is completed, approved, and funded by 3Com, Capital 4 shall provide 3Com with weekly POS Reporting, including End User data, in connection with the 3Com Products purchased under this ROE Addendum.  The POS Reporting will be submitted to

3Com utilizing 3Com's then current process, procedures and formats, which 3Com will provide to Capital 4.

i. **Training 3Com Program Representative.** To effect consistency and accuracy in the explanation of the Power of $Zero™ Solution, Capital 4 shall be solely responsible for training the 3Com Power of $Zero™ Program Representative and the Program Representative's designees, providing Capital 4's overall knowledge and experience base, in order to effectively teach the Program to others. The 3Com Power of $Zero™ Program Representative, and his designees, shall assume primary responsibility for training all other 3Com personnel, including 3Com Selected Partners/Resellers, to assure proficiency and accuracy in marketing the Power of $Zero™ Solution.

5.    **3Com's Obligations.**
   a. **Marketing.**  3Com agrees to work with Capital 4 to:  (1) exclusively market the Public Access Services offered by Capital 4 through the Power of $Zero™ Solution; and (2) utilize the Power of $Zero™ Solution in marketing selected 3Com Products.

   b. **Authorization to Contact 3Com Selected Partners/Resellers.**    3Com will provide Capital 4 with written authorization according to Section 4(b) of the Alliance Agreement.

   c. **Exclusivity.**  The relationship that 3Com has with Capital 4 is exclusive; precluding 3Com from (1) entering into a similar relationship for Public Access Services which is similar to the Power of $Zero™ Solution; or (2) developing a similar Public Access Service on its own, which would compete with Capital 4 (regardless of whether Capital 4 is actively operating in a particular market) during the Term of this ROE, and for a period of three (3) years following the expiration or termination of this ROE, unless prior approval has been received from Capital 4.

   d. **Customer of Capital 4 Services.**   Following the execution of this ROE Addendum and only after 3Com IT approval for each approved 3Com location, 3Com shall consider a Power of $Zero™ Customer Agreement with Capital 4, under which 3Com shall become a Capital 4 Customer with respect to 3Com's Public Access Services.

   e. **Funding for the Capital 4 System.**  Capital 4 has invested significant resources in the initial deployment of its Customer Management System (the "Capital 4 System"), an open source, central processing system developed and operated by Capital 4 to support the national rollout of the Power of $Zero™ Solution. Within five days of Capital 4 setting up Source Code in Escrow, as described in Section 4(e), 3Com will fund the initial one-third of the Corra Technology, Inc. of Parsippany, N.J. ("Corra") Work Order 001 (attached as Exhibit 1) for development and customization of the Capital 4 System, by paying Capital 4

$67,025.00. Thereafter, the Capital 4 System shall be reviewed by 3Com, and additional payment not to exceed a cumulative total of $200,000.00 shall be paid by 3Com to Corra when approved thorough 3Com's established and internally published approval system. The payments from 3Com under this ROE Addendum for completion of the developed software shall not exceed a total of $500,000.00.

f.  **Rolling out the Solution.** 3Com shall assume primary responsibility for rolling out the 3Com Power of $Zero™ Solution, through its network of Partners/Resellers (selecting certain Partners/Resellers to participate), presenting the Power of $Zero™ Solution.

g.  **Program Representative and Support.** 3Com shall designate a "3Com Power of $Zero™ Program Representative" (initially, Glenn Ewing), who shall have responsibility for coordinating with Capital 4, and implementing the 3Com Power of $Zero™ Solution and Program and marketing 3Com Products in accordance with this ROE.

h.  **3Com Products and Pricing.** The transactions contemplated by this ROE require that 3Com deliver the 3Com Products used by the 3Com Selected Partners/Resellers in connection with the Power of $Zero™ Solution, at the discount off of the list price attached as Exhibit 1. 3Com may deliver the 3Com Products directly to Capital 4 or through a 3Com distributor.

6.  **Additional Agreements and Mutual Obligations.**
   a.  **Exclusive License to 3Com.** Since the Capital 4 System is an integral part of the success of the program established in this ROE Addendum, Capital 4 hereby grants, for the term of this ROE Addendum, 3Com and each 3Com Selected Partner/Reseller, at no additional fees, an unlimited, irrevocable exclusive license to utilize:
      1) the designed, developed and owned intellectual property described as the marketing strategy known as the "Power of $Zero™ Solution" and ""Power of $Zero™ Program" and "Capital 4 System", as defined and described below (the "Capital 4 Intellectual Property");
      2) the following marks: "Power of $Zero™", "Power of $Zero™ Solution", "Power of $Zero™ Program", "$Zero Additional Cost", "$Zero Cost Warranty", "$Zero Cost", and "$Zero", both in the name and in the stylized design form used by Capital 4 (collectively the "Capital 4 Trademarks"); and
      3) the Capital 4 System, as defined and describe below,
   solely in its marketing, distribution, advertising, and promotion of 3Com Products under this Alliance Agreement and this ROE Addendum.

For the Term of the ROE Addendum, 3Com shall also retain developmental rights to increase the Capital 4 System's functionality.

3Com's agrees to use the Capital 4 Intellectual Property and the Capital 4 Trademarks in accordance with the detailed policies regarding branding and trademark usage established by Capital 4 and submitted to 3Com in writing

3Com agrees: (1) not to alter, erase, or overprint any of the Capital 4 Trademark notice provided to 3Com by Capital 4; (2) attach any trademarks or additional word or symbols to the Capital 4 Intellectual Property or the Capital 4 Trademarks without Capital 4's consent; and (3) affix the Capital 4 Trademarks to any product or item not covered by this ROE. 3Com agrees not to alter the Capital 4 Intellectual Property or the Capital 4 Trademarks in any way, except as specifically agreed by Capital 4's written consent.

3Com recognizes ownership and value associated with the Capital 4 Intellectual Property and Capital 4 Trademarks, and the goodwill attached to the Capital 4 Intellectual Property and Capital 4 Trademarks. 3Com agrees that any goodwill that accrues as a result of 3Com's use of the Capital 4 Intellectual Property and the Capital 4 Trademarks inures to solely the benefit of Capital 4, and 3Com does not acquire any rights in the Capital 4 Intellectual Property or Capital 4 Trademarks as a result of such use.

3Com agrees not to contest the Capital 4 Intellectual Property or the Capital 4 Trademarks or make application for registration for any of the Capital 4 Intellectual Property or the Capital 4 Trademarks without Capital 4's prior written consent.

3Com agrees not to use, employ, or attempt to register any form of intellectual property, including trademarks or tradenames, which 3Com or Capital 4 reasonably believes are confusingly or deceptively similar to the Capital 4 Intellectual Property or Capital 4 Trademarks licensed by Capital 4 to 3Com. 3Com further agrees not to use the Capital 4 Intellectual Property or Capital 4 Trademarks as part of a domain name, business name, or in connection with any product other than as authorized by this ROE. 3Com represents and warrants that it will not use the Capital 4 Intellectual Property or Capital 4 Trademarks in any manner that may cause confusion among customers, or disparages or discredits Capital 4's name, or its products or services.

Upon expiration or termination of this ROE, 3Com shall immediately cease use of any of the Capital 4 Intellectual Property or Capital 4 Trademarks.

b. **Capital 4/ 3Com Website.** To effect consistency and accuracy in the explanation and presentation of the Power of $Zero™ Solution, a 3Com/Capital 4 website shall be developed, at Capital 4's expense, and will include a portal to explain all aspects of the Power of $Zero™ Solution. The portal shall present information in a concise, automated format, primarily through video streaming, as initially directed by Capital 4 and the 3Com Power of $Zero™ Program Representative, and as agreed by the Parties. Prior to go-live, 3Com IT must approve security

measures for the website. Development of the portal shall be completed by no later than March 31, 2005. The 3Com Selected Partners/Resellers and End Users (who have been provided an E-Brochure) shall have access to the portal, as agreed by the Parties.

c.  **Use of 3Com Logos, Marks and Names.**  Upon obtaining prior written consent from the 3Com in each specific instance, Capital 4 will have the limited right to use the logos, trademarks, service marks and trade names of 3Com solely in connection with the terms and conditions of the Alliance Agreement and this ROE Addendum. Capital 4's use of 3Com's logos, marks and names shall be in accordance with 3Com's standard trademark, service mark, trade name and logo usage policies and guidelines, which may be updated from time to time at 3Com's sole discretion, which 3Com will make available upon request. Capital 4 acknowledges that except for the limited use rights expressly set forth hereunder, Capital 4 is not granted any ownership in or license to use the trademarks, service marks, trade names or logos of 3Com (including any non-English translations of them). Capital 4 shall have no rights in the logos, marks or names of 3Com except as expressly set forth herein. Capital 4 shall not use (i) 3Com's logos, marks or names, or (ii) any other logo, mark or name likely to cause confusion with 3Com's logos, marks or names or any portion of its own trade name, trademark, service mark or logo for its own products or services. Capital 4 shall not adopt, register, or attempt to register any logo, mark or name of the other party, or those of its suppliers, (including non-English translations of them) in any jurisdiction unless expressly approved in writing by 3Com in advance. Capital 4 shall not market the products and services of 3Com in any way that implies that such products or services are its own proprietary products or are proprietary products of any third party.

d.  **Pace.**  The Parties shall establish a pace (the "Pace") at which 3Com and Capital 4 shall identify each Partner/Reseller who is eligible to become a selected Partner/Reseller (the "3Com Selected Partner/Reseller") in order to utilize the Power of $Zero™ Solution in marketing 3Com's Products. It is the Parties' intention that the Pace shall ultimately allow for the existence of one or more 3Com Selected Partner/Resellers in each of the approximately 35 NFL target markets (the "Target Markets").

e.  **Fees.**  In Capital 4's Agreement with De Lage Landen ("DLL"), it must be established that:
   1)  Each 3Com Selected Partner/Reseller in a Target Market shall be entitled to a fee (the "Fee") to be paid by DLL (and other funding sources, as selected and approved by Capital 4, and approved by 3Com) to the 3Com Selected Partner/Reseller for each End User that executes a Power of $Zero™ Customer Agreement, and all other required documentation, including any Rental Agreements. Subject to the approval by Capital 4 of each such contract, the Fee shall be up to 15% of the customer's net usable BMRR for Public Access Services, less the product, install and warranty,

to be paid by DLL to 3Com converted to present value using a term as approved by Capital 4.

2) DLL or any other designated funding source as approved by Capital 4 shall also pay 3Com the price of any 3Com Product purchased by Capital 4 (and associated with the transaction). DLL shall be solely responsible for paying the Fee to the 3Com Selected Partner/Reseller.

f. **Marketing Funds.** 3Com will sponsor marketing programs to further the sale of the Power of $Zero Program. All existing MDF or rebates currently in effect will be canceled and replaced by the discounts in Exhibit 1 under this ROE Addendum.

g. **Rental Agreement.** The equipment to be installed at the customer's site under the Power of $Zero™ Solution will be financed under a Rental Agreement, under which, DLL will remain the owner of the equipment. Capital 4 must give 3Com immediate notice if the Rental Agreement between Capital 4 and DLL changes, terminates or expires, or if Capital 4 enters into any Rental Agreements with any other leasing company.

**7.    Entire Agreement; Modification.**

This ROE Addendum is the complete, final, and exclusive statement of the terms of the ROE Addendum between the Parties. This ROE Addendum and the Alliance Agreement constitute the terms of the entire contractual relationship solely between 3Com and Capital 4. To the extent of a conflict between the ROE Addendum and the Agreement, the Alliance Agreement controls. The Alliance Agreement and this ROE Addendum between the Parties supersedes any and all other prior and contemporaneous negotiations and agreements, whether oral or written, between them, relating to the subject matter hereof. This ROE Addendum may not be varied, modified, altered, or amended except in writing signed by the Parties.

**Executed and Effective** on this 10th day of March, 2005.

3Com Corporation
By: Jim Williams
Title:  Vice-President and General
       Manager – Americas Sales

Capital 4, Inc.
By:    F. Davis Dawson
Title:  President

**Exhibit 1**
**Discounts and Products**

The discounts and products are available under this ROE Addendum are only for purchases by Capital 4, which go through DLL only.

Appendix A of the Voice Solutions Reseller Agreement executed on November 23, 1999 is deleted, and replaced with the following language:

"A. Capital 4, or "Reseller" shall have access to the "Products" on the following 3Com "Price Lists", as modified by 3Com from time to time:
1. 3Com's then-current United States and Canada Price List, and
2. 3Com's then-current NBX Price List located at:
    http://pa.3com.com/secure/global/globvsk.nsf/07/nbx_pricing.

Web site urls may change from time to time as specified in the 3Com Partner Access web site. The Price Lists at the time the order is received by 3Com will be deemed the then-current Price List.

B. To calculate Capital 4's pricing, Capital 4 will apply the discounts specified for each Category to the Products that fall within each Category in the Price Lists.

| CATEGORY/TABLE: | CAT B | CAT D | CAT F | CAT G | CAT J |
|---|---|---|---|---|---|
| Network Integrator | 44% | 20% | 30% | 42% | 38% |

C. Instead of the Category Discounts in Section B, Capital 4 will receive the Special Pricing of 50% off of List Price for the specific SKUs outlined in the chart below, subject to the terms in the referenced criteria*

| SKU | Description | Discount off of List Price |
|---|---|---|
| 3C10600A | NBX V3000 IP Telephony Solution | 50% |
| 3C10200 | SS3 NBX V5000 Chassis | 50% |
| 3C10117C | NBX Analog Terminal Card – Worldwide version | 50% |

*Rules of Engagement Addendum – Page 9 of 10*

| 3C10116D | NBX T1/PRI Card (R4.3 version) | 50% |
|---|---|---|
| 3C10402A | 3Com 3102 Business Phone | 50% |
| 3C10412 | NBX Group 2 Phone License | 50% |
| 3C10405A | NBX 3105 Attendant Console | 50% |
| 3C10224-US | Phone Power Supply 120/60-24VDC | 50% |
| 3C17205 | SuperStack 3 Switch 4400 PWR | 50% |
| 3C17300 | SuperStack 3 Switch 4226T 24-Port Plus 2 10/100/1000 | 50% |

*Criteria for the Special Pricing:
   a.  This Special Pricing cannot be combined with SPQ pricing.
   b.  No Rebates or MDF will be earned on Products sold with this Special Pricing.
   c.  Products sold with this Special Pricing can only be sold under the Power of $Zero™ Solution.

3Com has the right at any time on 30 days' notice to (i) change discounts or discount categories for its Products, or (ii) adjust list prices. Reseller is free to set it's own prices for resale."

Capital 4 and 3Com agree that any additional updates to the product and discounts outlined above will be made as an amendment to the Voice Solutions Reseller Agreement, and not within this ROE Addendum.

# EXHIBIT 4



United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Tue Oct 2 04:05:14 EDT 2007*

`TESS HOME`  `NEW USER`  `STRUCTURED`  `FREE FORM`  `BROWSE DICT`  `SEARCH OG`  `BOTTOM`  `HELP`

Logout | Please logout when you are done to release system resources allocated for you.

## Record 1 out of 1

`TARR Status`  `ASSIGN Status`  `TDR`  `TTAB Status`  *( Use the "Back" button of the Internet Browser to return to TESS)*



# 3COM

| | |
|---|---|
| **Word Mark** | 3 COM |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: [ Electronic personal organizers; ] telephone apparatus, namely, telephones and speaker phones, [ facsimile transmission and receiving machines, telephone answering machines, ] voice mail machines [ and video phones ] ; local area networking and internet protocol telephony system hardware and [ operating ] software; voice mail software; [ pc digital cameras, network attached cameras; home personal internet computer units and wireless internet computer units; ] computer network hardware and peripherals, namely, network interface cards, [ modems, modem cards, ] wireless modems, cable modems, DSL modems, terminal adapters, computer terminal hubs, local area network switches, wide area network switches, routers, servers, concentrators, power systems, consisting of uninterruptable and redundant power units, and DC voltage converters; electrical connectors, computer cables and fiber optic cables; and computer software for use in managing monitoring and diagnosing computer networks. FIRST USE: 20000911. FIRST USE IN COMMERCE: 20000911.

IC 041. US 100 101 107. G & S: Educational services, namely, conducting classes and workshops in the fields of computers, computer software, computer networks, computer networking peripherals, data communications and related technologies; and providing educational information via a global computer network in the fields of computers, computer software, computer networks, computer networking peripherals, data communications and related technologies. FIRST USE: 20000911. FIRST USE IN COMMERCE: 20000911.

IC 042. US 100 101. G & S: Computer consultation; computer network design for others; and providing information via a global computer network in the fields of computers, computer software, computer networks, computer networking peripherals, data communications and related technologies. FIRST USE: 20000911. FIRST USE IN COMMERCE: 20000911. |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 14.03.04 - Clamps, hardware; Connectors (clamps, collars); Rings, hardware
26.01.13 - Circles, two (not concentric); Two circles
26.01.16 - Circles touching or intersecting |

| | |
|---|---|
| Serial Number | 75960766 |
| Filing Date | March 17, 2000 |
| Current Filing Basis | 1A |
| Original Filing Basis | 1B |
| Published for Opposition | March 6, 2001 |
| Registration Number | 2541487 |
| Registration Date | February 19, 2002 |
| Owner | (REGISTRANT) 3Com Corporation CORPORATION DELAWARE 350 Campus Drive Marlborough MASSACHUSETTS 017523064 |
| Attorney of Record | Kimberly G. Russell |
| Prior Registrations | 0468252;2104935;2228064;2249136;2249139;2251145;2316277;AND OTHERS |
| Description of Mark | The stippling is for shading purposes only. |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Affidavit Text | SECT 15. SECT 8 (6-YR). |
| Live/Dead Indicator | LIVE |



# EXHIBIT 5



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 29 04:07:00 EDT 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout Please logout when you are done to release system resources allocated for you.

Start List At: [    ] OR Jump to record: [    ]    **Record 30 out of 56**

TARR Status    ASSIGN Status    TDR    TTAB Status    *( Use the "Back" button of the Internet Browser to return to TESS)*



| **Goods and Services** | IC 041. US 100 101 107. G & S: Educational services, namely, conducting classes and workshops in the fields of computers, computer software, computer networks, computer networking peripherals, data communications and related technologies; and providing educational information via a global computer network in the fields of computers, computer software, computer networks, computer networking peripherals, data communications and related technologies. FIRST USE: 20000911. FIRST USE IN COMMERCE: 20000911

IC 009. US 021 023 026 036 038. G & S: [ Electronic personal organizers; ] telephone apparatus, namely, telephones and speaker phones, [ facsimile transmission and receiving machines, telephone answering machines, ] voice mail machines [ and video phones; ] local area networking and internet protocol telephony system hardware and software; voice mail software; [ pc digital cameras, network attached cameras; home personal internet computer units and wireless internet computer units; ] computer network hardware and peripherals, namely, network interface cards, [ modems, modem cards, ] wireless modems, cable modems, DSL modems, terminal adapters, computer terminal hubs, local area network switches, wide area network switches, routers, servers, concentrators, power systems, consisting of uninterruptable and redundant power units, and DC voltage converters; electrical connectors, computer cables and fiber optic cables; and computer software for use in managing monitoring and diagnosing computer networks. FIRST USE: 20000911. FIRST USE IN COMMERCE: 20000911

IC 042. US 100 101. G & S: Computer consultation; computer network design for others; and providing information via a global computer network in the fields of computers, computer software, computer networks, computer networking peripherals, data communications and related technologies. FIRST USE: 20000911. FIRST USE IN COMMERCE: 20000911 |

**Mark**

| | |
|---|---|
| **Drawing Code** | (2) DESIGN ONLY |
| **Design Search Code** | 17.03.03 - Rings, jewelry |
| **Serial Number** | 75960802 |
| **Filing Date** | March 17, 2000 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | January 30, 2001 |
| **Registration Number** | 2486291 |
| **Registration Date** | September 4, 2001 |
| **Owner** | (REGISTRANT) **3Com** Corporation CORPORATION DELAWARE 350 Campus Drive Marlborough MASSACHUSETTS 017523064 |
| **Attorney of Record** | Kimberly Russell |
| **Description of Mark** | The stippling is a feature of the mark. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT 6

Trademark Electronic Search System (TESS)                                    Page 1 of 2

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 29 04:07:00 EDT 2007*

`TESS HOME` `NEW USER` `STRUCTURED` `FREE FORM` `BROWSE DICT` `SEARCH OG` `BOTTOM` `HELP` `PREV LIST` `CURR LIST`
`NEXT LIST` `FIRST DOC` `PREV DOC` `NEXT DOC` `LAST DOC`

`Logout` Please logout when you are done to release system resources allocated for you.

`Start` List At: [          ] OR `Jump` to record: [          ] **Record 10 out of 15**

`TARR Status` `ASSIGN Status` `TDR` `TTAB Status` *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | 3COM |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: electronic personal organizers; telephone apparatus, namely, telephone apparatus, namely, telephones and speakerphones, facsimile transmission and receiving machines, telephone answering machines, voice mail machines, and video phones; computer network hardware and peripherals, including network interface cards, modems, modem cards, wireless modems, terminal adapters, hubs, local area network switches, wide area network switches, routers, servers, concentrators, power systems, consisting of uninterruptible and redundant power units and DC voltage converters; electrical connectors, computer cables and fiber optic cables; and computer software for use in managing, monitoring and diagnosing computer networks. FIRST USE: 19980100. FIRST USE IN COMMERCE: 19980100 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 75365153 |
| **Filing Date** | September 29, 1997 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | March 30, 1999 |
| **Registration Number** | 2364947 |
| **Registration Date** | July 4, 2000 |
| **Owner** | (REGISTRANT) 3COM CORPORATION CORPORATION DELAWARE 5400 Bayfront Plaza Santa Clara CALIFORNIA 95052 |
| **Attorney of** | THAD CHALOEMTIARANA |

**Record**
**Type of Mark**  TRADEMARK
**Register**  PRINCIPAL
**Affidavit Text**  SECT 15. SECT 8 (6-YR).
**Live/Dead Indicator**  LIVE

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT 7

Trademark Electronic Search System (TESS)

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 29 04:07:00 EDT 2007*

[TESS HOME] [NEW USER] [STRUCTURED] [FREE FORM] [BROWSE DICT] [SEARCH OG] [BOTTOM] [HELP] [PREV LIST] [CURR LIST]
[NEXT LIST] [FIRST DOC] [PREV DOC] [NEXT DOC] [LAST DOC]

[Logout] Please logout when you are done to release system resources allocated for you.

[Start] List At: [        ] OR [Jump] to record: [        ] **Record 1 out of 15**

---

[TARR Status] [ASSIGN Status] [TDR] [TTAB Status] *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

**Word Mark**  3COM

**Goods and Services**

IC 042. US 100 101. G & S: Computer consultation; computer network design for others; and providing information via a global computer network in the fields of computers, computer software, computer networks, computer networking peripherals; providing on-site technical support services, namely, troubleshooting computer hardware and software problems. FIRST USE: 19850200. FIRST USE IN COMMERCE: 19850200

IC 041. US 100 101 107. G & S: Educational services, namely, conducting classes and workshops in the fields of computers, computer software, computer networks, computer networking peripherals, telecommunications, and data communications; providing news in the nature of current event reporting. FIRST USE: 19840100. FIRST USE IN COMMERCE: 19840100

IC 037. US 100 103 106. G & S: Installation and maintenance of computer systems, communications systems and the equipment related to those systems. FIRST USE: 19850200. FIRST USE IN COMMERCE: 19850200

IC 009. US 021 023 026 036 038. G & S: COMPUTER HARDWARE, FIRMWARE FOR NETWORK MANAGEMENT; COMPUTERS, COMPUTER PERIPHERALS; COMPUTER HARDWARE AND FIRMWARE FOR CONNECTIVITY DEVICES, NAMELY, GATEWAYS, BRIDGES, HUBS, ROUTERS, CABLING, COMMUNICATION SYSTEM COMPONENTS, NAMELY, COMMUNICATION HUBS AND SWITCHES; WIRELESS COMMUNICATION EQUIPMENT AND APPARATI AND DIGITAL SIGNAL PROCESSORS, COMPUTER NETWORK HUBS, SWITCHES AND ROUTERS, AND ETHERNET SWITCHES; REMOTE ACCESS EQUIPMENT, NAMELY, NETWORK EQUIPMENT IN THE FIELD OF WIDEBAND COMMUNICATIONS; TELEPHONES, INTERNET PROTOCOL TELEPHONY SYSTEMS, NAMELY, COMPUTER TELEPHONY SOFTWARE THAT ENABLES TELEPHONE ACTIVITIES TO BE PERFORMED THROUGH A COMPUTER; PC CARD CABLES,HUB AND SWITCH CABLES, RPS CABLES, WAN ACCESS CABLES, FIREWALLS AND FILTERS, NETWORK INTERFACE CARDS, NETWORK JACKS, POWER SUPPLIES WIRELESS LAN ANTENNAS AND CABLES, PC CARDS, INTERFACE CARDS AND MODULES; COMPUTER SOFTWARE FOR DIAGNOSING, INSTALLING, SUPPORTING, MANAGING, CONFIGURING, CONNECTING, INTEROPERATING, UPGRADING AND CONTROLLING COMPUTER HARDWARE,

FIRMWARE, AND SOFTWARE; COMPUTER SOFTWARE FOR USE IN THE FIELD OF EDUCATION, NAMELY, FOR TRANSMI'ITING AND MANAGING DATA COMMUNICATIONS AMONG USERS; TELECOMMUNICATION GOODS, NAMELY, CALL PROCESSORS, CHASSIS, DISK MIRRORING KITS, MULTI-LINE TELEPHONES, ATTENDANT CONSOLES, ANALOG DEVICE CONNECTIONS, INTERFACE CARDS, AND POWER MODULES. FIRST USE: 19800904. FIRST USE IN COMMERCE: 19800904

| | |
|---|---|
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 78978109 |
| **Filing Date** | December 23, 2002 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | October 11, 2005 |
| **Registration Number** | 3240781 |
| **Registration Date** | May 8, 2007 |
| **Owner** | (REGISTRANT) 3Com Corporation CORPORATION DELAWARE 350 Campus Drive Marlborough MASSACHUSETTS 017523064 |
| **Attorney of Record** | Raymond I. Geraldson, Jr. |
| **Prior Registrations** | 1320456;2228064;2249139;2316227;2364947 |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP   PREV LIST   CURR LIST

NEXT LIST   FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY