UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3COM CORPORATION,

               Plaintiff,

      -against-

CAPITAL 4, INC., F. DAVIS
DAWSON, and ISH VILLA-LOBOS,

             Defendants.

Civ. No.

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Daniel E. Rosenfeld
KIRKPATRICK & LOCKHART
  PRESTON GATES ELLIS LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
(617) 261-3100

Douglas F. Broder
KIRKPATRICK & LOCKHART
  PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

**Table of Contents**

Page

I.   PRELIMINARY STATEMENT ............................................................................. 2

II.  STATEMENT OF FACTS .................................................................................. 3

     A.   The Parties ............................................................................................... 3

     B.   3Com's Early Relationship with Capital 4 and the Power of $Zero Program ......... 3

     C.   The Strategic Alliance Agreement and Rules of Engagement Addendum ............. 5

     D.   The License and Operations Agreements ................................................... 6

     E.   The $5,000,000 in Prepaid Royalties ......................................................... 9

     F.   Performance under the Licensing and Operations Agreements ........................ 9

III. ARGUMENT ................................................................................................ 17

     A.   Standard for Issuance of Preliminary Injunctive Relief ................................ 17

     B.   3Com is Likely to Succeed on the Merits of its Claims ................................ 18

          1.   3Com is Likely to Succeed on the
               Merits of its Breach of Contract Claim ............................................. 18

          2.   3Com is Likely to Succeed
               on the Merits of its Defamation Claim ............................................. 20

          3.   3Com is Likely to Succeed on the Merits of its Trademark and Unfair
               Competition Claims ...................................................................... 22

               a.   Trademark Infringement Under
                    the Lanham Act, 15 U.S.C. § 1114 ........................................... 23

               b.   Lanham Act Infringement, Unfair Competition and False
                    Designation of Origin, 15 U.S.C. § 1125 .................................. 32

               c.   State Law Infringement,
                    Unfair Competition and Dilution Claims .................................. 32

     C.   3Com Is Suffering Irreparable Harm
          Due To Capital 4's Continuing Wrongful Conduct ...................................... 33

          1.   Breach of Contract ....................................................................... 34

        2.      Trademark and Unfair Competition..........................................................36

        3.      Defamation.............................................................................................38

    D.    The Balance Of Equities Tips In Favor Of An Injunction Against Capital 4........39

IV.    CONCLUSION................................................................................................................ 40

**Table of Authorities**

Federal Cases

1-800-Contacts, Inc. v. WhenU.com, Inc., 414 F.3d 400 (2d Cir. 2005) ...................................... 24

Boule v. Hutton, 328 F.3d 84 (2d Cir. 2003) .................................................................................. 22

Cartier v. Symbolix, Inc., 454 F.Supp.2d 175 (S.D.N.Y. 2006) .................................................... 24

Cartier, Inc. v. Four Star Jewelry Creations, Inc., 348 F. Supp. 217 (S.D.N.Y. 2003) ........... 35

CBS, Inc. v. Springboard Int'l Records, 429 F. Supp. 563 (D.C.N.Y. 1977) .............................. 40

Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200 (2d Cir. 1979) .............................................................................................................................. 31

Dunkin' Donuts, Inc. v. N. Queens Bakery, Inc., 216 F. Supp. 2d 31 (E.D.N.Y. 2001) .............. 29

Ecolab Inc. v. Paolo, 753 F. Supp. 1100 (E.D.N.Y. 1991) ........................................................... 41

Geisel v. Poynter Prods., Inc., 283 F.Supp. 261 (D.C.N.Y. 1968) ............................................... 39

Global Telesystems, Inc. v. KPNQwest, N.V., 151 F. Supp. 2d 478 (S.D.N.Y. 2001) ................ 18

Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072 (2d Cir. 1993) ............................. 25

Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286 F.Supp.2d 284 (S.D.N.Y. 2003) ............... 24, 30

In re Alert Holdings, Inc. v. Interstate Protective Servs., Inc., 148 B.R.194 (S.D.N.Y. 1992) ..................................................................................................................... 21, 23, 35, 41

Kadant, Inc. v. Seeley Machine, Inc., 244 F. Supp.2d 19 (N.D.N.Y. 2003) ................................ 39

Kraft General Foods, Inc. v. Allied Old English, Inc., 831 F. Supp. 123 (S.D.N.Y. 1993) ... 39, 40

Lois Sportswear, U.S.A. v. Levi Strauss & Co., 799 F.2d 867 (2d Cir. 1986) ............................. 25

Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108 (2d Cir. 2006) ....................... 34

Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 155 L. Ed. 2d 1, 123 S. Ct. 1115 (2003) .................................................................................................................................... 34

Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc., 874 F.2d 95 (2d Cir. 1989)  18, 20, 21, 36

Mushroom Makers, Inc. v. R.G. Barry Corp., 441 F.Supp. 1220 (S.D.N.Y. 1977) .................... 34

My-T Fine Corp. v. Samuels, 69 F.2d 76 (2d Cir. 1934) ............................................................... 30

Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43 (2d Cir. 2000) .............................................. 31

Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 618 F.2d 950 (2d Cir. 1980) ...................... 30

Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961), cert. denied, 368
    U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) ...................................................................... 31

PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266 (2d Cir. 1987) ........................... 30

Register.com, Inc. v. Verio, Inc., 126 F. Supp. 2d 238 (S.D.N.Y. 2000) .................................... 37

Register.com, Inc. v. Verio, Inc., 356 F.3d 393 (2d Cir. 2004) .................................................... 36

Res. Developers, Inc. v. Statue of Liberty - Ellis Island Found., Inc., 926 F.2d 134 (2d
    Cir. 1991) ............................................................................................................................ 28

Roberts v. Atlantic Recording Corp., 892 F. Supp. 83 (S.D.N.Y. 1995) ..................................... 18

Savin Corp. v. Savin Group, 391 F.3d 439 (2d Cir. 2004) .......................................................... 30

Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955 (2d Cir. 1996) ................................ 24

Stein Industries, Inc. v. Jarco Industries, Inc., 934 F.Supp. 55 (E.D.N.Y. 1996) ...................... 39

Ticor Title Ins. Co. v. Cohen, 173 F.3d 63 (2d Cir. 1999) .......................................................... 36

Tom Doherty Associates, Inc. v. Saban Entm't, Inc., 60 F.3d 27 (2d Cir. 1995) ........................ 36

Vitabiotics v. Krupka, 606 F. Supp. 779 (E.D.N.Y. 1984) .............................................. 29, 30, 34

Warner Bros. Inc. v. Dae Rim Trading, Inc., 877 F.2d 1120 (2d Cir. 1989) ............................... 17

Wisdom Import Sales Co., LLC v. Labatt Brewing Co. Ltd., 339 F.3d 101 (2d Cir. 2003) .. 17, 36

State Cases

Liberman v. Geltstein, 80 N.Y. 2d 429, 590 N.Y.S. 2d 857 (1992) .............................................. 20

Ruder & Finn Inc. v. Seaboard Surety Co., 52 N.Y. 2d 663 (1981) ............................................. 21

Skymark Holdings, Ltd., v. Silicone Zone Int'l Ltd., 5 Misc. 3d 285 (N.Y. Sup. 2004) .............. 19

Trojan Elec. & Machine Co., Inc. v. Heusinger, 162 A.D. 2d 859 (3d Dept. N.Y 1990) ............ 38

Federal Statutes

15 U.S.C. § 1065 ........................................................................................................................... 24

15 U.S.C. § 1114 ........................................................................................................................... 22

15 U.S.C. § 1125 ............................................................................................................. 31, 32

15 U.S.C. § 1125(a) ............................................................................................................. 32

## I.    **PRELIMINARY STATEMENT**

Plaintiff, 3Com Corporation ("3Com"), hereby submits this memorandum of law, together with the Declarations of Glenn Ewing ("Ewing Decl."), Dean M. Whitehouse ("Whitehouse Decl."), Lawrence S. Langmore ("Langmore Decl."), and Christopher Jodoin ("Jodoin Decl.") in support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ordering the Defendant, Capital 4, Inc. ("Capital 4") to provide 3Com with necessary information about customers and contracts related to Capital 4's previous wrongful use of 3Com's trademarks and Capital 4's complete failure to meet its obligations to provide customers with telecommunications services ("Public Access Services") including telephone, internet, and wireless service, and enjoining Capital 4 from further defaming and disparaging 3Com in the marketplace and from further misusing 3Com's registered trademarks to deceive customers into believing they have entered into contracts with 3Com when they have not.

As described in greater detail below, Capital 4 has breached its contractual obligations to 3Com under a License Agreement and related agreements concerning Capital 4's provision of network and telecommunications services to customers by, among other things, failing to provide the Public Access Services Capital 4 agreed to provide to customers.  Capital 4 has defamed 3Com to customers, in further breach of Capital 4's agreements with 3Com.  Capital 4 has also improperly used 3Com's trade name and trademarks to mislead customers into entering into contracts bearing 3Com's name without 3Com's authorization.  Capital 4 also fraudulently misrepresented to 3Com the viability of Capital 4's business and the manner in which Capital 4 conducted its business in order to fraudulently induce 3Com to invest in Capital 4's business.  In this regard, defendants F. Davis Dawson and Ish Villa-Lobos, principals of Capital 4, are individually liable to 3Com because they completely controlled Capital 4 during the time in

- 2 -

which Capital 4 engaged in this wrongful conduct and further, they each used Capital 4's

corporate form to perpetrate a fraud on 3Com by fraudulently inducing 3Com to infuse

substantial amounts of cash into Capital 4, ostensibly to keep Capital 4 operating, despite

Dawson's and Villa-Lobos' appropriation of 3Com's funds to their own individual uses and

intending all along for Capital 4 to default on its obligations and to pressure 3Com to assume

responsibility for Capital 4's obligations to Capital 4's customers.

## II.    STATEMENT OF FACTS

### A.    The Parties

Plaintiff 3Com is a Delaware corporation headquartered in Marlborough, Massachusetts.

3Com designs and manufactures IP telephone equipment, LAN switches, and routers for sale

worldwide.  Defendant Capital 4 is a Texas corporation with a principal place of business in

Houston, Texas.  Capital 4 is in the business of contracting with customers for the provision of

local and long distance telephone services, internet access, equipment and repair services.

Capital 4 is, upon information and belief, jointly owned and controlled by defendants Dawson

and Villa-Lobos, who hold the titles of President and Chairman, respectively in Capital 4.

### B.    3Com's Early Relationship with Capital 4 and the Power of $Zero Program

In or about 1999, 3Com was supplying network and telecommunications equipment to

Infinitel, Inc., Capital 4's predecessor in interest.  Ewing Decl. ¶ 4.  Following Infinitel's merger

with Capital 4 in or about 2000, 3Com became a network and telecommunications equipment

supplier for Capital 4, selling equipment to Capital 4 for use in Capital 4's "Power of $Zero"

program.  Ewing Decl. ¶ 5; Jodoin Decl. ¶ 4.

Under the Power of $Zero program, Capital 4 sold network and telecommunications

services to new customers under agreements that required the customer to pay a fixed monthly

fee for a fixed period of time (usually six years) for a package of services.  Ewing Decl. ¶ 7.  The

- 3 -

services included local and long distance telephone, internet, and/or voice-over-internet services (collectively, "Public Access Services"),[1] and, at the customer's option, lease of equipment, installation, and long term equipment servicing. Id. The monthly fee for such services was based on the customer's reported actual monthly expenses for such services delivered by existing providers. Id. Customers were given the option to receive at little or no additional expense to the customer, (1) new networking and telephone equipment; (2) a cash rebate; or (3) new networking and telephone equipment and a partial cash rebate. Ewing Decl. ¶ 9. When a customer elected to receive new equipment, Capital 4 purchased equipment from 3Com (or some other supplier) and included it as part of the Power of $Zero telecommunications package. Ewing Decl. ¶ 10.

In order to finance the cost of the new equipment and/or cash rebates provided to customers, Capital 4 monetized the value of the customer's contract by arranging with a financial institution (the "Lender") for a loan to the customer of the discounted present value of a portion of each customer contract. Ewing Decl. ¶ 11. Upon information and belief, Capital 4 monetized the value of the contracts by presenting the Lender with an invoice for the value of the equipment to be provided as part of the transaction.[2] Ewing Decl. ¶ 12. The Lender then made a loan to the customer of the present value of the lease and the customer became obligated to the Lender to make monthly payments on the loan. Id. Upon information and belief, the customer's monthly payment to the Lender constituted a portion of the fixed monthly fee the customer was paying under the Power of $Zero program, which portion was referred to as the monetization

---

[1] The Public Access Services were provided by third party carriers such as such as Level 3, Big City, Texlink, Verizon, MCI, and Sprint. Ewing Decl. ¶ 8.

[2] Where new equipment was not part of the transaction, the customer's existing equipment was used to secure the loan from the Lender. If the customer's existing equipment was leased rather than owned, this required Capital 4 to buy out the lease. Ewing Decl. ¶ 13.

percentage.  Ewing Decl. ¶ 14.  Thus, if 80% of the customer's fixed monthly fee was

attributable to the lease payment due to the Lender, the transaction was considered 80%

monetized.  Id.  In such circumstances, 20% of the customer's fixed monthly fee remained to pay

for the Public Accesses Services contracted for under the customer's Power of $Zero agreement

with Capital 4.  Id.

Upon information and belief, the proceeds obtained by monetization were available to

Capital 4 for some or all of the following purposes:  (a) to pay for the new equipment being

provided in the transaction or to buy out a lease of the existing equipment; (b) to fund any cash

rebate the customer had elected to receive; (c) to cover the cost of installation, warranty and

service of new equipment; (d) to pay any commissions owed to third party resellers; (e) to fund

the cost of Public Access Services to the extent that the non-monetized portion of the customer's

fixed monthly fee was not sufficient to do so; (f) to cover Capital 4's operating expenses; (g) to

contribute to profit to the extent all other expenses were paid.  Ewing Decl. ¶ 15.

### C.    The Strategic Alliance Agreement and Rules of Engagement Addendum

Capital 4 and 3Com entered into a "Strategic Alliance Agreement" dated January 31,

2005[3] and a "Rules of Engagement Addendum to the Strategic Alliance Agreement" executed

March 10, 2005, under which 3Com undertook to participate more actively in the Power of

$Zero program by assisting Capital 4 to market the program and to establish relationships with

other resellers of 3Com products ("3Com Value Added Resellers" or "3Com VARs") so that

they could also sell the Capital 4 Power of $Zero program.  Ewing Decl. ¶¶ 16-18; Ex. 1

---

[3] 3Com does not have in its possession an executed copy of the Strategic Alliance Agreement,
but believes the unsigned version attached to the Declaration of Glenn Ewing is the one that was
executed by the parties.  See Ewing Dec. ¶ 16 and Ex. 1.

(Strategic Alliance Agreement or "SAA") and Ex. 2 (Rules of Engagement Addendum to the Strategic Alliance Agreement or "ROEA") attached thereto.  <u>See also</u> Langmore Decl. ¶ 4.

The parties operated under the Strategic Alliance Agreement and Rules of Engagement Addendum until the fall of 2006, during which time Capital 4 entered into numerous Power of $Zero contracts with customers, promising to provide customers Public Access Services and, for those customers who so elected, new 3Com equipment, for a fixed monthly fee for a fixed term (the "Capital 4 POZ Customer Agreements").  Ewing Decl. ¶ 19.  3Com was not a party to the Capital 4 POZ Customer Agreements, and, pursuant to the express terms of the Strategic Alliance Agreement and Rules of Engagement Addendum, 3Com was not liable for providing the Public Access Services promised thereunder, which were the sole responsibility of Capital 4. Ewing Decl. ¶ 19; Ex. 1 (SAA) §§ 1, 9(b); Ex. 2 (ROEA) §§ 1, 4.a., 4.b.

Capital 4 used paper bearing its own name and logo for the Capital 4 POZ Customer Agreements.  Ewing Decl. ¶ 20.  The Strategic Alliance Agreement and Rules of Engagement Addendum governed and limited Capital 4's use of 3Com's logos, marks and/or names[4] in connection with the Power of $Zero program, including, *inter alia*, in marketing materials, contracts and supporting documentation, and any such use required prior written consent from 3Com.  Ewing Decl. ¶ 20 and Ex. 2 (ROEA) § 6.c.  3Com did not consent to Capital 4's use of 3Com's logos, marks and/or names on any Capital 4 Power of $Zero Customer Agreements.  <u>Id.</u>

### D.    <u>The License and Operations Agreements</u>

In the second half of 2005, 3Com and Capital 4 entered into negotiations to modify the terms of their strategic alliance.  Jodoin Decl. ¶ 6.  As result of those negotiations, 3Com and

---

[4] As more fully detailed below, 3Com owns federally registered design and word trademarks for its name and its three-ring logo.  <u>See</u> Whitehouse Decl. ¶¶ 4-7 and Exhs. 1-4 (registrations).

Capital 4 began to consider a new agreement under which 3Com would develop and implement its own Power of $Zero program.  Id.

      3Com was aware that Capital 4 had had cash flow problems because Capital 4 had previously requested that 3Com extend it credit and desired to undertake a due diligence review of the financial aspects of Capital 4's Power of $Zero program.  Jodoin Decl. ¶ 7.  3Com therefore requested that Capital 4 provide financial data showing aggregate income and expenses associated with Capital 4's Power of $Zero program as a whole, as well as detailed data for a representative sample of Power of $Zero customers for 3Com's due diligence review.  Id.  In or about late 2005 or early 2006 Villa-Lobos directed Dawson to provide and Dawson in fact provided 3Com with aggregate financial data on the Power of $Zero program and detailed financial data on a sample of seven customers.  Ewing Decl. ¶ 21; Jodoin Decl. ¶ 8.  Dawson represented to 3Com's management that the aggregate financial data was accurate and that the sample data also demonstrated the financial viability of Capital 4's Power of $Zero portfolio.  Id.

      In the course of the negotiations, which continued into 2006, Dawson repeatedly asserted that, notwithstanding Capital 4's cash flow issues, the Power of $Zero program overall was profitable.  Jodoin Decl. ¶ 9.  They acknowledged that while some individual transactions were "underwater", *i.e.*, losing money for Capital 4, others were sufficiently profitable to make the entire portfolio of Capital 4 Power of $Zero transactions profitable.  Id.  Later in the negotiations, Dawson also represented to 3Com that Capital 4 was operating at a loss of about $300,000 per month for net Public Access Services expenses, but that these liabilities were being reduced at a rate of about $30,000 per month, such that in 10 months Capital 4 would no longer be operating at a loss.  Ewing Decl. ¶ 22.

In reliance on Dawson's representations regarding Capital 4's financial condition and the accuracy of the financial data Capital 4 had provided, 3Com decided to go forward with a new agreement with Capital 4. Jodoin Decl. ¶ 10. On or about November 10, 2006, 3Com and Capital 4 entered into a License Agreement and an Operations Agreement, and partly based on Capital 4's representations regarding Capital 4's finances, 3Com agreed to make a $5,000,000 prepayment of the licensing fees or royalties that 3Com would be paying Capital 4 under the License Agreement. Jodoin Decl. ¶ 11. The License Agreement gave 3Com the right to "use, exploit, and commercialize" the Power of $Zero in return for a licensing fee paid to Capital 4. Whitehouse Decl. ¶ 9 and Ex. 5 (Lic. Agmt. at p. 1). The License and Operations Agreements contemplated that 3Com would begin selling Public Access Services and network and telecommunications equipment directly to its customers through its network of 3Com VARs using its own Power of $Zero program. Id. For these sales, 3Com, rather than Capital 4, would enter into an agreement with a customer to provide the Public Access Services and equipment for a fixed monthly fee (the "3Com POZ Customer Agreements"). See Lic. Agmt. § 2.1, Whitehouse Decl. Ex. 9.

Pursuant to the terms of the Operations Agreement, Capital 4 was to provide 3Com with certain services related to the processing, arranging, and payment for Public Access Services to be provided under the new 3Com POZ Customer Agreements (the "Back Office Services"). Whitehouse Decl. ¶ 10. The Operations Agreement provided for the transition of these Back Office Services from Capital 4 to 3Com over a period of time (the "Transition Period"). Id. It further contemplated that the Transition Period would end on a certain date (the "Cut Date"), after which 3Com would provide its own Back Office Services. Id. Finally, it contemplated that Capital 4 could sell the 3Com Power of $Zero program for 3Com as a 3Com VAR, but only with

3Com's approval of each transaction.  Id.  For 3Com Power of $Zero transactions in which

Capital 4 acted as a 3Com VAR that were entered into during the Transition Period, Capital 4

agreed to provide Back Office Services for the life of the agreement, not merely during the

Transition Period. See Whitehouse Decl. Ex. 6 (Op. Agmt. at §§ 2.3, 2.4, 2.5).

### E.    The $5,000,000 in Prepaid Royalties

In conjunction with the License Agreement and based on Dawson's representations

regarding Capital 4's finances, 3Com made a $5,000,000 prepayment of the licensing fees or

royalties that 3Com would be paying Capital 4 under the License Agreement. Jodoin Decl. ¶ 11.

Upon information and belief, after Capital 4 received the $5,000,000 Dawson and Villa-Lobos

gave themselves raises even though they knew that Capital 4 was undercapitalized.  Langmore

Decl. ¶ 23.

### F.    Performance under the Licensing and Operations Agreements

3Com began entering into 3Com POZ Customer Agreements, which were executed by

customers on paper branded with the 3Com name and logo ("3Com Paper"), as contemplated by

the License and Operations Agreements.  Whitehouse Decl. ¶ 11 and Ex. 5 (Lic. Agmt. at §§ 3.1;

3.3.3).  Those Agreements also provided for branding of other 3Com Power of $Zero

documentation and materials with 3Com's name and trademark.  Id.  The Agreements prohibited

Capital 4 from using 3Com trademarks and logos except as required to effect its responsibilities

under the License Agreement, and only with 3Com's express written consent.  Whitehouse Decl.

¶ 12; Ex. 5 (Lic. Agmt. at §§ 3.1; 3.3.3); Ex. 6 (Op. Agmt. at § 2.5.4).

The parties subsequently amended the License and Operations Agreements with the First

Contract Addendum to the License Agreement and Operations Agreement, executed April 1,

2007 ("First Contract Addendum"), and Amendment No. 1 to the First Contract Addendum on

May 8, 2007. Whitehouse Decl. ¶¶13-14; Ex. 7 (First Contract Addendum) and Ex. 8 (Amendment No. 1 to First Contract Addendum).

In or about late July, 2007, 3Com learned that Capital 4 was seriously delinquent on many of its outstanding payment obligations to third party Public Access Services providers. Ewing Decl. ¶ 24; Whitehouse Decl. ¶ 15; Langmore Decl. ¶ 5. 3Com made this alarming discovery when it began receiving reports from 3Com VARs who stated that they had received inquiries from Power of $Zero customers who had been warned by their Public Access Service providers that they were in danger of having their service terminated due to non-payment. Id.

When 3Com contacted Capital 4 to inquire about the delinquencies and the threatened loss of service to numerous Power of $Zero customers, Capital 4 confirmed its dire financial condition and its inability to fulfill its obligations to pay for Public Access Services for its own POZ customers, as well as for 3Com POZ Customers for whom Capital 4 was providing Back Office Services. Langmore Decl. ¶ 6; Whitehouse Decl. ¶ 16. Capital 4 then informed 3Com that it needed an immediate infusion of cash to meet its daily obligations, which including paying Public Access Service providers so they would refrain from shutting off customers' Public Access Services. Langmore Decl. ¶ 7; Whitehouse Decl. ¶ 17. Capital 4 initially requested over $200,000 to cover two days worth of expenses. Id. 3Com loaned Capital 4 $204,690.87 under a promissory note dated August 7, 2007. Id.; see Promissory Note, Langmore Decl. Ex. 1; Whitehouse Decl. Ex. 9. At the time of the loan, the parties also executed the First Contract Amendment, which amended the Operations Agreement by changing the so-called "Go Dark" provision and the provision on termination for cause by 3Com. Whitehouse Decl. ¶ 19 and Ex. 10 (First Contract Amendment).

Thereafter, Capital 4 requested additional infusions of cash on an almost daily basis in order to meet its daily financial obligations, which included paying Public Access Service providers immediately in order to prevent them from shutting off customers' services. Langmore Decl. ¶ 8; Whitehouse Decl. ¶ 20. 3Com made additional cash loans to Capital 4 under promissory notes on the following dates in the following amounts:

| | |
|---|---|
| August 8, 2007 | $62,495.42 |
| August 10, 2007 | $133,546.27 |
| August 14, 2007 | $35,096.54 |
| August 15, 2007 | $63,893.02 |
| August 16, 2007 | $40,848.57 |
| August 16, 2007 | $59,429.31 |

Id. and Langmore Decl. Ex. 2-7; Whitehouse Decl. Ex. 11-16.

Despite 3Com's infusion of $600,000 into Capital 4 between August 6 and 16, 2007, which was in addition to the $5,000,000 in prepaid royalties that Capital 4 had received, Capital 4 remained unable to meet its ongoing obligations under the POZ Customer Agreements and failed to make payments owed to Public Access Service providers. Langmore Decl. ¶ 9; Whitehouse Decl. ¶ 21. This failure to pay for Public Access Services has affected not only Capital 4 Power of $Zero customers, but also 3Com Power of $Zero customers for whom Capital 4 had acted as a 3Com VAR and 3Com Power of $Zero Customers for whom Capital 4 was providing "Back Office Services." Id. Numerous Power of $Zero customers were being threatened with shut off of their Public Access Services. Ewing Decl. ¶ 25; Whitehouse Decl. ¶ 22.

Based on Capital 4's admitted financial crisis, its failure to meet its obligations to customers and to 3Com to pay for Public Access Services, and the consequent likelihood of a "Material Adverse Effect" on 3Com, 3Com Power of $Zero customers, and the Power of $Zero program, on or about August 20, 2007, 3Com invoked the "Go Dark" provision of the

Operations Agreement as amended by the First Contract Amendment, and demanded that Capital

4 immediately comply with the provisions thereof, which required Capital 4 to make

commercially reasonable efforts to meet its obligations and protect the program and to provide

3Com with certain detailed information.  Whitehouse Decl. ¶ 23 and Ex. 10 (First Contract

Amendment at § 4.3).  Capital 4 did not dispute the appropriateness of 3Com's invoking the "Go

Dark" provision, but failed to provide 3Com with information required under the "Go Dark"

provision in a timely manner.  Whitehouse Decl. ¶ 24.  Capital 4 has also failed and refused to

provide 3Com with other information 3Com has requested which is essential to allow 3Com to

evaluate the problem occasioned by Capital 4's default and to determine whether 3Com wants to

exercise its right to take assignment of certain agreements under the parties' agreements.

Langmore Decl. ¶10; Whitehouse Decl. ¶ 25 and Ex. 10 (First Contract Amendment at § 4.3).

The necessary information includes agreements with customers, Public Access Service

providers, and Lenders for the accounts on which Capital 4 is delinquent.  Id.

        Subsequent to invoking the "Go Dark" provision, 3Com learned that Capital 4 had,

without 3Com's knowledge, consent or approval of the transactions, entered additional

agreements with new Power of $Zero customers on 3Com Paper bearing the heading "3Com

Power of $Zero Customer Agreement" (the "Unauthorized Agreements") in direct violation of

the parties' agreements, including the License and Operations Agreements.  Ewing Decl. ¶ 26;

Langmore Decl. ¶ 11; Whitehouse Decl. ¶ 26 and Ex. 5 (Lic. Agmt. at §§ 3.1; 3.3.3).  3Com is

currently aware of fourteen Unauthorized Agreements dated between November 30, 2006 and

June 28, 2007 which were entered into by Capital 4 on 3Com Paper without 3Com's approval.

Ewing Decl. ¶ 27; Langmore Decl. ¶ 11; Whitehouse Decl. ¶ 27 and Ex. 17-30 (Unauthorized

Agreements).  The approval process for proposed 3Com Power of $Zero agreements includes a

review by 3Com of a "Reconciliation Report" provided by Capital 4 which discloses the monetization level for the transaction and analyzes the profitability of the transaction. Ewing Decl. ¶ 28; Langmore Decl. ¶ 12; Lic. Agmt., Whitehouse Decl. Ex. 5 at § 1.13. Capital 4 did not provide a Reconciliation Report for any of the Unauthorized Agreements. Ewing Decl. ¶ 29; Langmore Decl. ¶ 13.

3Com has also learned that Capital 4 entered into POZ agreements with customers in which Capital 4 executed agreements on its own behalf using 3Com's logos and trademarks (the "Misbranded Agreements"). Ewing Decl. ¶ 30; Whitehouse Decl. ¶ 28. Such agreements were not disclosed to 3Com and 3Com never authorized the use of 3Com's logos and trademarks in this manner for deals to which 3Com was not even purported to be a party. Id. Customers with Misbranded Agreements have been confused by the use of 3Com's logos and trademarks, believing that they have a contract with 3Com. Whitehouse Decl. ¶ 30. 3Com has been contacted both by customers with Unauthorized Agreements and others with Misbranded Agreements who have communicated with 3Com to complain that they have been informed that their Public Access Services are going to be terminated due to non-payment. Whitehouse Decl. ¶ 29-30 and Ex. 31 (September 28, 2007 e-mail from J. Tipton to R. Ardolino *et al*).

Upon information and belief, Capital 4 employees have at times also used business cards branded with 3Com's name and logo without 3Com's knowledge or consent, causing confusion for customers who were led to believe that they had been visited by and had discussions with 3Com employees, when in fact the individuals were employees of Capital 4. Ewing Decl. ¶ 31.

Despite the fact that 3Com is not liable for the Public Access Services promised by Capital 4 under any Unauthorized Agreements (nor under any Misbranded Agreements), 3Com desires to avoid situations in which customers who signed Unauthorized Agreements lose Public

Access Services and suffer consequent interruption of and irreparable damage to their

businesses. Whitehouse Decl. ¶ 32. Upon learning of the existence of Unauthorized and

Misbranded Agreements, 3Com immediately requested that Capital 4 provide it with detailed

information identifying all customers with whom it had entered into Unauthorized Agreements,

including providing copies of the Unauthorized Agreements and all related agreements with

Public Access Service Providers and Lenders. Whitehouse Decl. ¶ 31. Capital 4 failed and

refused to cooperate with 3Com in promptly providing information necessary to evaluate the

extent of the problem, identify the customers, Public Access Service Providers, and Lenders

involved, and work with the various entities to avert the looming crisis occasioned by Capital 4's

failure to meet its obligations under the parties' agreements. Langmore Decl. ¶ 14; Whitehouse

Decl. ¶ 33. Instead of working to solve the problem, Capital 4 has repeatedly delayed providing

information to 3Com and continually demanded that 3Com provide Capital 4 with large

infusions of cash to enable it to pay the delinquent amounts due to Public Access service

providers. Langmore Decl. ¶ 15; Whitehouse Decl. ¶ 34. The information Capital 4 has

provided to 3Com is incomplete, delinquent and sometimes inaccurate. Langmore Decl. ¶ 16;

Whitehouse Decl. ¶ 35.

        In addition to refusing to cooperate with 3Com to address and resolve the crisis facing

Power of $Zero customers whose Public Access Services were to be (or had been) shut off,

Capital 4 sought instead to stonewall while simultaneously publicly blaming 3Com for Capital

4's own financial downfall. Whitehouse Decl. ¶ 36. To this end, on September 18, 2007,

Capital 4 transmitted a letter to all 3Com Value Added Resellers, setting forth an inaccurate

history of the dealings between Capital 4 and 3Com and falsely stating that: "3Com claimed it

had not invoked the Go Dark;" "3Com abandoned its customers and VARs;" "[a]pparently

3Com wanted to force Capital 4 into bankruptcy, and was surprised when Capital 4 did not file;"

3Com was "denying its contractual obligations;" and "3Com has done absolutely nothing...to

remedy the situation." Whitehouse Decl. ¶ 37 and Ex. 32 (September 18, 2007 letter from S.

Hughes to D. Whitehouse).

      One week later, Capital 4 sent a letter dated September 25, 2007 and entitled "Important

Notice" to customers. Whitehouse Decl. ¶ 39 and Ex. 33 (September 25, 2007 "Important

Notice"). In the "Important Notice," Capital 4 admits it can no longer meet its financial

obligations, but disparages and defames 3Com by asserting that such failure is 3Com's fault and

falsely claiming that 3Com's refusal to bail out Capital 4 constitutes a breach of the parties'

agreements. See Whitehouse Decl. ¶ 40 and Ex. 33. In particular, Capital 4 falsely stated that,

"[a]ll aspects of the [Power of $Zero] solution were turned over to 3Com [as of] November 10,

2006" and that "3Com's unwillingness to continue to support Capital 4 has resulted in [Capital

4's] inability to pay the underlying dial tone service providers and its business future is in

jeopardy." See "Important Notice," Whitehouse Decl. Ex. 33.

      Capital 4 is apparently in financial ruin. It continues to assert that it is unable to pay for

Public Access Services for POZ customers. Langmore Decl. ¶ 17; Whitehouse Decl. ¶ 41. The

information 3Com has gleaned to date about the state of Capital 4's finances and the decisions

and circumstances that brought Capital 4 to this state suggests that Capital 4's early

representations about its profitability and ability to manage its liabilities were inaccurate.

Langmore Decl. ¶ 19. There are significant discrepancies between the data provided during the

negotiations of the License Agreement and data recently provided by Capital 4. Id. Upon

information and belief, based on 3Com's review of financial data that 3Com has recently

received from Capital 4, Dawson materially misrepresented Capital 4's financial condition.
Jodoin Decl. ¶ 12.

More particularly, the aggregate financial information and detailed customer sample
information that were provided to 3Com during the course of the negotiation of the License
Agreement was inconsistent with corresponding data more recently provided to 3Com by Capital
4. Langmore Decl. ¶ 20. The data Capital 4 provided during the negotiation was also
incomplete. Id. As a result, the information was deliberately misleading at the time it was
provided to 3Com by Capital 4. Id. Upon information and belief, Dawson also materially
misrepresented the detailed financial information provided for the sample of customers.
Langmore Decl. ¶ 21-22; Jodoin Decl. ¶ 13. This apparent misrepresentation is evidenced by the
discrepancy between the costs for Public Access Services reported for the sample of customers
during the negotiation of the License Agreement and the cost of those services for the same
customers as recently reported to 3Com. Id. Moreover, 3Com believes that the statements
Dawson made at the time of the negotiations regarding the scope and nature of Capital 4's
monthly liabilities of $300,000 and the then-current actions that Dawson claimed were reducing
such liabilities by $30,000 per month were false and were known to Dawson to be false at the
time they were made. Ewing Decl. ¶ 32. More particularly, upon information and belief, based
on information 3Com has recently obtained, those liabilities far exceeded the amounts asserted
by Dawson and those liabilities were increasing, not decreasing, at the time the statements were
made. Id.

3Com's reputation, sales and business are being harmed by the defendants' conduct. As
detailed above, customers are confused about 3Com's role in transactions to which it was not
actually a party, and are complaining to 3Com about loss of Public Access Services for which

3Com is not responsible. 3Com has also suffered monetary damages. Of the $5,000,000 in prepaid royalties paid by 3Com, Capital 4 retains approximately $4,900,000 in prepaid royalties which it is not entitled to retain, and upon information and belief, Dawson and Villa-Lobos have misappropriated portions of the prepaid royalties by increasing the compensation paid to them by Capital 4. Langmore Decl. ¶ 24. Upon information and belief, Capital 4 has in its possession 3Com equipment valued between $150,000 and $200,000. Langmore Decl. ¶ 25. In addition, Capital 4 owes 3Com approximately $400,000 for equipment 3Com sold and delivered to Capital 4 and for which 3Com has not received payment from Capital 4. Langmore Decl. ¶ 17. Capital 4 has also failed to pay the buyout costs for certain 3Com Power of $Zero customers' leases of existing equipment, even though 3Com gave Capital 4 funds for this specific purpose and directed Capital 4 to use the funds to do so, and Capital 4 specifically represented that such funds would be used for this specific purpose. Langmore Decl. ¶ 18.

## III.    ARGUMENT

### A.    Standard for Issuance of Preliminary Injunctive Relief

Temporary injunctive relief is designed to maintain the status quo and prevent irreparable harm to a party pending resolution of an underlying dispute. See Warner Bros. Inc. v. Dae Rim Trading, Inc., 877 F.2d 1120, 1124 (2d Cir. 1989). The standard for granting preliminary injunctive relief is well-settled under New York law. A party is entitled to preliminary injunctive relief if it can demonstrate that it will be irreparably harmed in the absence of an injunction, that it has a likelihood of success on the merits or that sufficiently serious questions going to the merits of the case make it a fair ground for litigation, and that a balance of hardships tips decidedly in its favor. See Wisdom Import Sales Co., LLC v. Labatt Brewing Co. Ltd, 339 F.3d 101, 108 (2d Cir. 2003); see also Global Telesystems, Inc. v. KPNQwest, N.V., 151 F. Supp. 2d 478, 481-82 (S.D.N.Y. 2001) (citations omitted). The standard for a temporary restraining order

- 17 -

is the same as that governing the granting of preliminary injunctive relief.  See Roberts v.

Atlantic Recording Corp., 892 F. Supp. 83, 86 (S.D.N.Y. 1995).

       3Com unquestionably meets these requirements, and this Court should therefore enter the

injunctive relief request herein.

     **B.**     **3Com is Likely to Succeed on the Merits of its Claims**

           **1.**     **3Com is Likely to Succeed on the**
                   **Merits of its Breach of Contract Claim**

       3Com has undoubtedly established that it is likely to prove that Capital 4 breached its

agreements with 3Com, including the License Agreement and Operations Agreement, in a

number of ways that cannot be redressed by monetary damages.  To establish its breach of

contract claims, 3Com is required to allege the specific terms of the agreement, consideration,

the fact that it performed its contractual obligations and that Capital 4 breached the agreement(s).

See Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc., 874 F.2d 95, 102 (2d Cir. 1989).

       3Com and Capital 4 entered into written License and Operations agreements detailing

each party's obligations in consideration of the parties' mutual exchange of promises.

Whitehouse Decl. Ex. 5 (Lic. Agmt.) and Ex. 6 (Op. Agmt.).  While 3Com performed its

obligations under those agreements, Capital 4 has breached them in numerous ways.  First,

foremost, and most damaging to 3Com, Capital 4 has failed to pay for Public Access Services to

customers, thereby breaching § 2.5.1 of the Operations Agreement.

       Moreover, in the License Agreement 3Com and Capital 4 agreed, among other things,

that Capital 4 would not use the Power of $Zero Marketing Tools "in any manner which may

injure or cause loss to 3Com."  See License Agreement at § 1.2. (the "License Agreement").  Yet

Capital 4 persuaded customers to sign agreements with Capital 4 by presenting 3Com business

cards and using paper branded with 3Com's name, mark and logo without 3Com's authorization

or consent, then failed to pay for Public Access Services for those Customers, and thereby caused loss 3Com's business and reputation.

The License Agreement further provided that Capital 4 would only use 3Com's trademarks and logos "as required to effect its responsibilities as required under this Agreement, and only upon express written consent of 3Com." See License Agreement at § 3.3.3. Despite that express prohibition on unauthorized use of its trademark and logo, Capital 4 used 3Com's trademark and logo without 3Com's consent, also to obtain agreements with new customers, at least some of whom believed that they were entering agreements with 3Com.

In addition, Capital 4 agreed that "VAR Reconciliation Report[s] must be approved by 3Com for each transaction..." Whitehouse Decl. Ex. 5 (Lic. Agmt. at § 1.13).[5] In breach of this obligation, Capital 4 failed to provide 3Com with any VAR Reconciliation Report in connection with numerous transactions.

The License Agreement also prohibited Capital 4 from "disclos[ing] to any third party ... any of the terms, conditions, status, negotiations, timing or other facts with respect to [the License Agreement] or any other agreements between the parties unless, in each case, such disclosure (after consulting with the other Party in advance about such disclosure) is required by law." See id. at § 3.4. Despite this prohibition on disclosure to third parties, Capital 4 sent a letter on September 18, 2007 ("September 18 Letter") to all 3Com VARs defaming 3Com's services and reputation by stating, among other things, that "3Com abandoned its customers and VARs," that "3Com wanted to force Capital 4 into bankruptcy" and that 3Com was "denying its

---

[5] Section 1.1.3 defined a "VAR Reconciliation Report" as "a funding allocation statement that identifies the Fee to the 3Com VAR, the Cash Payment to Customer, the Licensor Fee, and any other disbursements that are to be made from the Monetized Fund." That section goes on to provide that, "[t]his VAR Reconciliation Report must be approved by 3Com for each transaction that becomes the basis for funding disbursement instructions to any funding source prior to the release of any funds." Whitehouse Decl. Ex. 5 (Lic. Agmt.).

contractual obligations and …has done absolutely nothing . . . to remedy the situation" and making specific reference to its License Agreement with 3Com, as described in § B below. In addition to the defamatory nature of the statements in the September 18 Letter, Capital 4 disclosed facts relating to the License Agreement, in breach of its provisions.

Finally, Capital 4 agreed within the Operations Agreement that it was "prohibited from contacting 3Com VARs, Partners engaged in the 3Com POZ recruiting process, or 3Com POZ Program Customers unless 3Com grants written authorization…" Whitehouse Decl. Ex. 6 (Op. Agmt. at § 2.5.3). In direct contravention of this agreement, Capital 4 sent the September 18 Letter to all of 3Com's VARs, without 3Com's written (or any other) authorization. 3Com is likely to succeed on the merits of all these claims for breach of contract, and is therefore entitled to injunctive relief. See, e.g., Skymark Holdings, Ltd., v. Silicone Zone Int'l Ltd., 5 Misc. 3d 285, 295 (N.Y. Sup. 2004) (holding that a contract to retain confidentiality of certain matters which should be kept in confidence will be enforced by injunction); see also Murphy Door Bed Co., Inc. v. Interior Sleep Systems., Inc., 874 F.2d 95, 102 (2d Cir. 1989) (holding that injunction "was proper because defendants had contracted to refrain from using the Murphy name in the event of a termination of the distribution agreement and did not so refrain.").

## 2.  3Com is Likely to Succeed on the Merits of its Defamation Claim

Under New York law, defamation arises where there is injury to a person's reputation, or one's right to enjoy the good opinion of others. See In re Alert Holdings, Inc. v. Interstate Protective Services, Inc., 148 B.R.194, 206 (S.D.N.Y. 1992) (citing 43 N.Y.Jur 2d. *Defamation and Privacy* §1 at 497). In particular, a libel is "a publication, expressed in printing or writing, which is false and tends to injure one's reputation and thereby exposes him to public hatred, contempt, scorn, obloquy or shame." Id. In order to demonstrate defamation, 3Com need only

- 20 -

show that Capital 4 made a false statement of fact (without privilege or authorization) regarding

3Com that was published to a third party, which caused injury, or "tend[s] to injure [3Com] in its

trade, business or profession." See Liberman v. Geltstein, 80 N.Y. 2d 429, 435, 590 N.Y.S. 2d

857 (1992). 3Com easily establishes a likelihood that it will succeed on the merits of this claim.

Capital 4's September 18 Letter was transmitted to 3Com and was sent by copy to all

3Com VARs. Whitehouse Decl. Ex. 32 (September 18 Letter). Not only did the September 18

letter contain an inaccurate history of the dealings between Capital 4 and 3Com, it contained

patently false, misleading and defamatory statements concerning 3Com and its business dealings

with Capital 4 as well as 3Com's business dealings with its customers and VARs. For instance,

within the September 18 letter, Capital4 falsely published to 3Com's VARs that "3Com

abandoned its customers and VARs," that "3Com wanted to force Capital 4 into bankruptcy" and

that 3Com was "denying its contractual obligations." Each of these statements is patently untrue.

As Capital 4 itself acknowledged in a letter to its customers on September 25, 2007, 3Com and

Capital 4 had been working together over the course of at least 90 days to attempt to reach a

solution to protect customers but had become "entangled in dispute over the situation."

Whitehouse Decl. Ex. 33 ("Important Notice").

In a second defamatory letter which was addressed to Capital 4's customers who had

contracts involving 3Com products, Capital 4 falsely and misleadingly stated, among other

things, that "all aspects of the [POZ] solution were turned over to 3Com [as of] November 10,

2006" and that "3Com's unwillingness to continue to support Capital 4 has resulted in [Capital

4's] inability to pay the underlying dial tone service providers and its business future is in

jeopardy." Id.

All of these statements were made to deflect blame for Capital 4's failure to provide

Public Access Services away from Capital 4 and onto 3Com, actions which undoubtedly create a

poor opinion of 3Com in the minds of its customers (or the customers of 3Com VARs) and will

undoubtedly injure 3Com in its trade, business or profession.  As such, they constitute

defamation per se.  See, e.g., Boule v. Hutton, 328 F.3d 84, 94 (2d Cir. 2003) ("[w]here a

statement impugns 'the basic integrity' of a business, an action for defamation per se lies, and

general damages are presumed") (citing Ruder & Finn Inc. v. Seaboard Surety Co., 52 N.Y. 2d

663, 670 (1981).  Such facts are sufficient to establish a likelihood of success on the merits of

3Com's claim of defamation against Capital 4 and should form the basis for the requested relief.

See In re: Alert, 148 B.R. at 206-207 (granting preliminary injunction to prevent continued

irreparable tarnishment to reputation, goodwill and customer relations).

### 3.    3Com is Likely to Succeed on the Merits of its Trademark and Unfair Competition Claims

3Com is likely to succeed on the merits of its claim that Capital 4 infringed 3Com's

trademarks.  Specifically, Capital 4's use of 3Com's valid, registered marks to procure customer

agreements for the sale of telecommunications networking services without 3Com's knowledge,

approval or consent has caused actual confusion in the marketplace in addition to a strong

likelihood of confusion.  Preliminary injunctive relief is an important remedy for acts of

trademark and unfair competition, and is proper in the present circumstances.  Because

consumers of Capital 4 have been confused as to the source or sponsorship of the goods or

services Capital 4 has offered improperly using 3Com's trademarks and logos.  Whitehouse

Decl. Ex. 31 (September 28, 2007 e-mail from J. Tipton to R. Ardolino et al.)  Accordingly, all

four preliminary injunction factors weigh in favor of this Court's granting a preliminary

injunction.

.

a.   ***Trademark Infringement Under
the Lanham Act, 15 U.S.C. § 1114***

Capital 4 has infringed on 3Com's valid trademarks in a manner compelling preliminary

injunctive relief.  § 32 of the Lanham Act, <u>15 U.S.C. § 1114</u>, provides:

> Any person who shall, without the consent of the registrant—(a) use in commerce
> any reproduction, counterfeit, copy or colorable imitation of a registered mark in
> connection with the sale, offering for sale, distribution, or advertising of any
> goods or services on or in connection with which such use is likely to cause
> confusion, or to cause mistake or to deceive…shall be liable in a civil action by
> the registrant for the remedies hereinafter provided.

In applying this standard, courts in the Second Circuit have required that a plaintiff show two

elements: (1) ownership of a valid mark entitled to protection under the statute, that the

defendant used in commerce without the plaintiff's consent, and in connection with the sale or

advertising of goods or services; and (2) that the defendant's actions are likely to cause

confusion as to the origin or sponsorship of the defendant's goods.  <u>See</u> <u>1-800 Contacts, Inc. v.</u>

<u>WhenU.com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005)</u>; <u>see also</u> <u>Cartier v. Symbolix, Inc., 454</u>

<u>F.Supp.2d 175, 181 (S.D.N.Y. 2006)</u> (citing <u>Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286</u>

<u>F.Supp.2d 284, 287 (S.D.N.Y. 2003)</u> and <u>Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d</u>

<u>955, 960 (2d Cir. 1996)</u> (internal quotations omitted)).

i.   <u>3Com Owns Strong Marks Entitled to Protection</u>

The marks that appear on customer service agreements presented by Capital 4 to

customers without 3Com's knowledge, approval or consent are registered marks.  Specifically,

the following four registered trademarks of 3Com have been infringed by Capital 4:

- Registration No. 2,541,487 for, *inter alia*, International Classes 9 and 42 in the
  United States Patent and Trademark Office for the design mark 3COM (with
  stylized word and three-ring design) for computer consultation, computer network
  design for others, and providing information via a global computer network, and
  for telephone apparatus and telephony system hardware and software ("3COM
  Design Mark with Three Rings").  <u>See</u> Complaint at ¶ 146; Whitehouse Decl. at ¶
  4.

- 23 -

- Registration No. 2,486,291 for, *inter alia*, International Classes 9 and 42 in the United States Patent and Trademark Office for the three-ring design mark for computer consultation, computer network design for others, and providing information via a global computer network, and for telephone apparatus and telephony system hardware and software ("Three-Ring Design Mark"). <u>See</u> Complaint at ¶ 147; Whitehouse Decl. at ¶5.

- Registration No. 2,364,947 for, *inter alia*, International Class 9 in the United States Patent and Trademark Office for the word mark 3COM for telephone apparatus ("3COM Word Mark"). <u>See</u> Complaint at ¶ 148; Whitehouse Decl. at ¶6.

- Registration No. 3,240,781 for, *inter alia*, International Classes 9 and 42 in the United States Patent and Trademark Office for the word mark 3COM for computer consultation, computer network design for others, and providing information via a global computer network, and for telephones telephony systems. <u>See</u> Complaint at ¶ 149; Whitehouse Decl. at ¶7.

Registered trademarks "are presumed to be distinctive and should be afforded the utmost protection." <u>Lois Sportswear, U.S.A. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986)</u>. Further, 3Com's marks are fanciful marks entitled to strong protection even absent a showing of secondary meaning.[6]  <u>Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1076 (2d Cir. 1993)</u>.

---

[6] Three of the four trademarks at issue in this action are incontestable.  Specifically, the 3COM Design Mark with Three Rings (Reg. No. 2,541,487), the Three Rings Design Mark (Reg. No. 2,486,291) and the 3COM Word Mark (Reg. No. 2,364,947) are incontestable because they have been in continuous use for five consecutive years subsequent to their registration and are still in use.  <u>15 U.S.C. § 1065</u>; <u>Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1076 (2d Cir. 1993)</u> (citing 15 U.S.C. §§ 1065 and 1115(a)).  Incontestable trademarks are entitled to a liberal application of the law.  <u>Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986)</u>.

      ii.      Capital 4 Used 3Com's Marks in
                  Commerce without Approval or Consent
                  <u>in Connection with the Sale of Goods and Services</u>

There can be no dispute that, on November 10, 2006, Capital 4 and 3 Com agreed that

Capital 4's ability to use 3Com's marks on "POZ Documentation,"[7] such as customer service

agreements, was limited to instances in which 3Com gave express written consent.  Whitehouse

Decl. Ex 5 (Lic. Agmt. at § 3.1).  Specifically, the License Agreement provides:

> 3Com's name and logo may be used, in accordance with 3Com's corporate policy
> and only with prior written consent, in all POZ Documentation, to be seen or
> executed by a Customer, on all internet and other public accessible platforms, as
> well as all written collateral used in the POZ Program.  All invoices,
> correspondence, and communications generated in connection with the POZ
> Program and issued to the Customer may be branded with 3Com's name and logo,
> and the POZ trademark and logo.

<u>Id.</u>  The License Agreement provides further:

> 3Com hereby grants Capital 4 a non-exclusive, limited license to use and
> reproduce the 3Com trademarks and logos ("Trademarks") solely as required to
> effect its responsibilities as required under this Agreement, and only upon express
> written consent of 3Com.

Whitehouse Decl. Ex. 5 (Lic. Agmt. at § 3.3.3).

There can be no dispute that the customer service agreements Capital 4 presented to

Power of $Zero customers, and which Capital 4 executed, bear 3Com's registered marks and

logos.  Whitehouse Decl. Ex. 17-30 (Unauthorized Agreements).  The Unauthorized Agreements

---

[7] The License Agreement defines "POZ Documentation" as:

> all documentation, instructions, training materials, and user guides, including
> POZ Customer Agreements, POZ Funding Agreements, POZ CRM Software
> Codes, POZ Credit Applications, POZ Vendor Contracts, POZ Billing Solutions,
> POZ Sales Representative Employment Agreements, and POZ VAR Agreements,
> relating to the POZ Solution and the POZ program, whether in printed or
> electronic format, which was or is solely created and  provided by Capital 4 to
> 3Com.

Whitehouse Decl. Ex. 5 (Lic. Agmt. at § 1.3).

for which 3Com has been able to obtain documentation bear all four of these 3Com marks in the upper left corner of the page.  Id.  The Unauthorized Agreements also bear the 3COM word marks in their titles.  Id.  Further, the Unauthorized Agreements reflect the untrue statement that "3Com and Customer enter into this 3Com Power of $Zero Customer Agreement…"  Id.  Such a statement incorporates the 3COM word mark.

The terms of the Unauthorized Agreements reveal that there is no question that Capital 4 used 3Com's trademarks in connection with the sale of goods and services.  In connection with the Unauthorized Agreements, customers were led to believe that they had agreed to make a monthly payment in exchange for the agreement, that "3Com, or its authorized partners, shall provide, maintain, an support all of Customer's eligible Public Access Services…"  Id.  Certain of the Unauthorized Agreements also include an agreement that the customer would be provided with 3Com telecommunications and networking equipment.  Id.  By offering to enter into such Unauthorized Agreements and by inducing customers to execute such Unauthorized Agreements, Capital 4 was necessarily using 3Com's registered marks and logos in connection with the sale of goods and services.

Finally, 3Com did not give Capital 4 its approval or consent to present the Unauthorized Agreements to customers bearing 3Com's name and/or logo, as §§ 3.1 and 3.3.3 of the License Agreement required.  Ewing Decl. ¶ 27; Whitehouse Decl. ¶ 26-27.  The License Agreement limited Capital 4's license to use 3Com's marks on customer agreements to those instances in which 3Com had provided Capital 4 with prior written consent.  3Com did not provide such written consent in connection with the Unauthorized Transactions, and as a result, Capital 4's use of 3Com's marks and logos exceeded its permitted use and unlawfully infringed on 3Com's marks.

iii.    Capital 4's Intentional Misuse of Marks
        Identical to 3Com's Weighs in Favor of
        <u>a Presumption of Likelihood of Confusion</u>

Confusion in the marketplace should be presumed to result from Capital 4's intentional

misuse of 3Com's trademarks.  Courts in the Second Circuit draw "a powerful inference … that

the defendant has succeeded in confusing the public" where a defendant has intentionally used a

mark in a manner that will deceive consumers.  <u>Res. Developers, Inc. v. Statue of Liberty - Ellis</u>

<u>Island Found., Inc., 926 F.2d 134, 140 (2d Cir. 1991)</u> (observing that intentional deception by a

defendant shifts the burden of showing of actual confusion onto the defendant, who is obligated

to demonstrate the absence of confusion).  This case merits the application of such a

presumption.  Here, Capital 4 did not use a mark similar to 3Com's, but instead intentionally

used 3Com's marks themselves in executing agreements with consumers, which was prohibited

by the parties' agreements.  As a result, and at Capital 4's behest, customers executed documents

which purported to constitute 3Com's agreement with those customers, when, in fact, 3Com had

not approved such transactions.  Accordingly, the presumption applied in <u>Res. Developers, Inc.</u>

should be applied here to "shift[] to the defendant to demonstrate the absence of consumer

confusion." <u>Res. Developers, 926 F.2d at 140</u>.

Moreover, even absent the shifting of the burden of showing customer confusion, logic

supports a finding that confusion in this case should be presumed.  Capital 4 used 3Com's mark

to enter into agreements with customers.  In such a case, the likelihood of confusion is obvious:

the targeted customers could not have thought anything other than that they were entering into

agreements with 3Com when, in fact, 3Com had not provided Capital 4 the express written

authorization Capital 4 was required to obtain prior to presenting such agreements to customers.

Capital 4's unauthorized use of 3Com's name and marks warrants the presumption of confusion

and resulting issuance of an injunction.  The case of <u>Dunkin' Donuts, Inc. v. N. Queens Bakery,</u>

Inc., 216 F. Supp. 2d 31, 43-44 (E.D.N.Y. 2001) is instructive.  In that case, the defendant

continued to use the plaintiff's marks despite being in violation of the defendant's franchise

agreement with the plaintiff, which provided that such use was unauthorized.  The court

observed that, under the circumstances, "[t]here is a great likelihood of confusion when the

infringer uses the exact trademark' as the plaintiff" and noted that "[i]n such cases, likelihood of

confusion is inevitable."  Id. (internal citations and quotations omitted).  The court observed

further that "cases where a defendant uses an identical mark on competitive goods hardly ever

find their way into the appellate reports.  Such cases are open and shut."  Id. (internal quotations

and citations omitted).

In another similar case, Vitabiotics v. Krupka, 606 F. Supp. 779 (E.D.N.Y. 1984),

plaintiff, a vitamin manufacturer, brought suit for trademark infringement against a former

distributor who continued to use the plaintiff's trademark after the applicable distributorship

agreement terminated and the license expired.  The defendant admittedly used plaintiff's mark on

self-manufactured products and it was undisputed that "vitamins were sold [by defendants] in the

United States in packaging indicating that they were manufactured by [plaintiff]."  Vitabiotics,

606 F. Supp. at 783.  Applying the standard that, for injunctive relief, a party claiming trademark

infringement must show a likelihood of confusion, the court dispensed with the Polaroid analysis

and, based on the undisputed evidence, granted summary judgment for the plaintiff, holding that

"plaintiff has shown the requisite likelihood of public confusion under the Lanham Act."  Id. at

785.  This Court should adopt the sound reasoning applied in the Vitabiotics case and presume

that Capital 4's customers were likely to be confused by Capital 4's improper use of 3Com's

name and trademarks and logos on customer agreements.[8]

iv.    Application of the Polaroid Factors Weighs
in Favor of a Finding that Confusion is Likely

In any event, an application of the Polaroid factors to the facts presented here dictates that

the likelihood of customer confusion is high.  There is a likelihood of confusion when "an

appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply

confused, as to the source of the goods in question," Savin Corp. v. Savin Group, 391 F.3d 439,

456 (2d Cir. 2004) (internal quotations omitted), or when consumers "are likely to believe that

the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the

mark." Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204-05 (2d

Cir. 1979).

In determining whether there is a likelihood of confusion, courts apply the well-

established Polaroid factors: (1) strength of the plaintiff's mark, (2) similarity of competing

marks, (3) competitive proximity of the products, (4) likelihood that plaintiff will "bridge the

---

[8] See also Register.com v. Verio, Inc., 356 F.3d 393, 405 (2d Cir. 2004) (observing in affirming the issuance of an injunction on trademark claim by registrar of internet domain names against website servicer, that "[defendant's] use of [plaintiff's] name alone was sufficient basis for the injunction"); PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 272-3 (2d Cir. 1987) (holding that where the "egregious nature of [defendant]'s actions" was such that "[t]he only possible conclusion to be derived from [it] was that consumers actually were deceived by the misrepresentations," plaintiff "should not have been required to provide evidence of actual consumer confusion" in a false advertising context); Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 618 F.2d 950, 954 (2d Cir. 1980) (issuing injunction where defendant intentionally copied plaintiff's trade dress and where, as a result, plaintiff was "presumed to have intended to create a confusing similarity of appearance and ... [was] presumed to have succeeded"); My-T Fine Corp. v. Samuels, 69 F.2d 76, 77 (2d Cir. 1934) (issuing an injunction on the basis that defendant's "intent raise[d] a presumption that customers will be deceived," despite absence of evidence of confusion in the record); Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286 F.Supp.2d 284, 287 (S.D.N.Y. 2003) (observing that "the Court need not undertake a factor-by-factor analysis under Polaroid because counterfeits, by their very nature cause confusion" and because "confusing the customer is the whole purpose of creating counterfeit goods").

- 29 -

gap" and offer a product like the defendants' product, (5) actual confusion, (6) defendants' good faith, (7) quality of defendants' product, and (8) sophistication of the buyers. Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Application of the Polaroid factors is not mechanical, and the ultimate focus remains on whether customers are likely to be confused. Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000). In this case, application of the Polaroid factors points to a finding of likelihood of confusion.

Strength of 3Com's Marks. As noted above, the 3Com trademarks appearing on documentation generated by Capital 4 in connection with the Unauthorized Agreements are registered trademarks, three of which are incontestable. Whitehouse Decl. Exh. 4-6 (registrations). The marks are inherently and presumed to be distinctive. Accordingly, this factor weighs in favor of 3Com.

Similarity of Marks Used by Capital 4. The marks used by Capital 4 in connection with the Unauthorized Agreements are identical to 3Com's registered marks. Whitehouse Decl. Ex. 17-30 (Unauthorized Agreements) and Whitehouse Decl. Ex. 4-6 (registrations). This factor weighs in favor of 3Com as well.

Competitive Proximity of the Products. There is no question that the goods and services which purport to be offered and sold to customers pursuant to the Unauthorized Agreements are materially identical to the goods and services sold to customers by 3Com generally. Whitehouse Decl. Ex. 17-30 (Unauthorized Agreements). Accordingly, this factor weighs in favor of a finding of likelihood of confusion.

Likelihood that Capital 4 will "Bridge the Gap." This factor also weighs in favor of a finding of a likelihood of confusion because there is no question that Capital 4 and 3Com were,

in fact, marketing and selling the Power of $Zero solution jointly. Whitehouse Decl. Ex. 5 (Lic. Agmt.) As a result, Capital 4 misused 3Com's trademarks in connection with its marketing and sale of nearly identical products and services sold by 3Com individually. Whitehouse Decl. Ex. 17-30 (Unauthorized Agreements). Accordingly, there is no gap for Capital 4 to bridge—the products and services it has sold in connection with the Unauthorized Agreements are the same products and services that 3Com would sell to customers without any additional business arrangement with Capital 4.

Actual Confusion. Customers have been confused by Capital 4's unauthorized use of 3Com's marks. Specifically, customers who executed the Unauthorized Agreements contacted 3Com when Capital 4 failed to fulfill its obligations to those customers and an interruption in the customers' Public Access Services ensued. Whitehouse Decl. Ex. 31 (September 28, 2007 e-mail from J. Tipton to R. Ardolino et al.). As a result, this factor weighs decidedly in favor of a finding of likelihood of confusion.

Capital 4 Intentionally Traded on 3Com's Marks. Capital 4 used marks identical to 3Com's name and trademarks in connection with its offer of customer service agreements to customers and potential customers. Such use of 3Com's marks was in violation of the parties' licensing agreement, which expressly required that Capital 4 refrain from using 3Com's trademarks on customer agreements prior to obtaining 3Com's written consent. Whitehouse Decl. Ex. 5 (Lic. Agmt. at §§ 3.1 and 3.3.3). And Capital 4 intentionally engaged in a use of 3Com's marks that exceeded that which was permitted. Accordingly, this factor weighs in favor of a finding of likelihood of confusion.

Capital 4 Failed to Provide the Services Promised. It is undisputed that Capital 4 has ceased to provide the Public Access Services promised under the Unauthorized Agreements.

Whitehouse Decl. Ex. 33 ("Important Notice"). Accordingly, this factor also weighs in favor of a finding of likelihood of confusion.

Sophistication of Buyers. This factor weighs in favor of a finding of likelihood of confusion because no matter how sophisticated any particular buyer may be, when presented with an agreement bearing 3Com's name and trademark, the customer would have no reason to doubt that 3Com had, in fact, approved the transaction contemplated. Additionally, as noted above, customers presented with the Unauthorized Agreements were, in fact, confused.

Based on 3Com's showing that: (1) it owns valid marks entitled to protection under the statute, that the Capital 4 used those marks in commerce without 3Com's consent, and in connection with the sale of goods or services; and (2) that Capital 4's actions have caused and are likely to cause confusion as to the origin or sponsorship of 3Com's goods, the Court should find that 3Com is likely to prevail on its trademark infringement claim.

      b.     ***Lanham Act Infringement, Unfair Competition and False Designation of Origin, 15 U.S.C. § 1125***

The standards governing 3Com's trademark infringement claim under the Lanham Act also govern 3Com's unfair competition and false designation claims. Mushroom Makers, Inc. v. R.G. Barry Corp., 441 F.Supp. 1220, 1234 (S.D.N.Y. 1977). Accordingly, 3Com's showing of a likelihood of success on the merits of that claim is equally determinative of the likelihood of success on 3Com's unfair competition and false designation of origin claims arising under the Lanham Act. 15 U.S.C. § 1125.[9]

      c.     ***State Law Infringement, Unfair Competition and Dilution Claims***

---

[9] 3Com's showing also warrants the issuance of an injunction on 3Com's Lanham Act dilution claim because 3Com's marks are famous within the meaning of the statute. See Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 434, 155 L. Ed. 2d 1, 123 S. Ct. 1115 (2003); Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 118 (2d Cir. 2006)

Similarly, the standards governing trademark infringement under the Lanham Act also govern 3Com's state law claims.  See, e.g., Vitabiotics, Ltd., v. Krupka, 606 F.Supp. 779, 784 (E.D.N.Y. 1984) (holding that defendant's unauthorized sale of vitamins under exactly the same unregistered trademark and with the same trade dress as used by the plaintiff in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) "entitle[d] plaintiff to summary judgment … for common law unfair competition under the law of New York"); Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 119 (2d Cir. 2006) (remanding for decision on plaintiff's New York state law dilution claim but affirming the denial of preliminary injunctive relief on a federal dilution claim for lack of a showing of actual dilution); Cartier, Inc. v. Four Star Jewelry Creations, Inc., 348 F. Supp. 2d 217, 251 (S.D.N.Y. 2003) (observing that "[i]n general, the standard for a showing of trade dress infringement under New York law is similar to that of the Lanham Act," and permanently enjoining defendants from further infringement of plaintiff's trade dress under Lanham Act and New York common law).

### C.    3Com Is Suffering Irreparable Harm Due To Capital 4's Continuing Wrongful Conduct

Irreparable harm has been found to exist, under New York law, where an entity is suffering a "continuing wrong which cannot adequately be redressed by final relief on the merits."  In re Alert Holdings, Inc. v. Interstate Protective Servs., Inc., 148 B.R.194 (S.D.N.Y. 1992).  In particular, New York courts have noted that harm to "operations, reputation and goodwill" is considered "irreparable."  See id.  The harm 3Com has suffered and will continue to suffer to its goodwill, reputation and its relationships with its customers and VARs as a result of Capital 4's breaches of contract, defamation, trademark infringement, and unfair competition, and the impossibility of estimating with any precision the cost of that harm, warrant the issuance

of an injunction ordering Capital 4 to cease its wrongful conduct and provide 3Com with the information it has requested.

### 1.    Breach of Contract

The nature of Capital 4's breaches of contract is such that injunctive relief is necessary in order to adequately redress the harm. New York courts have found that injunctive relief is entirely appropriate as a remedy for breach of contract. The Second Circuit has repeatedly held that where, as here, monetary damages will not adequately compensate the harmed party for the breaching party's conduct, injunctive relief is available. See, e.g., Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co. Ltd., 339 F.3d 101, 114 (2d Cir. 2003) (affirming decision to issue a preliminary injunction enjoining defendants from continuing with integration that, because of their joint ventureship, would likely breach their contract with plaintiff and "restoring [plaintiff] to a pre-breach posture" was the "only available remedy"); Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999) (affirming grant of a preliminary injunction prohibiting defendant from further breaching the terms of his employment contract, and finding irreparable injury because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come"); Tom Doherty Associates, Inc. v. Saban Entm't, Inc., 60 F.3d 27, 38 (2d Cir. 1995) (affirming preliminary injunctive relief against defendant who breached a contractual obligation to offer plaintiff a right of first refusal for the publication of children's books based on defendant's characters because such breach threatened losses that would "be very difficult to quantify at trial"); Murphy Door Bed Co., Inc. v. Interior Sleep Systems., Inc., 874 F.2d 95 (2d Cir. 1989) (applying New York law and affirming the district court's permanent injunction against defendants from further use of the Murphy name because such use after termination of their agreement with plaintiff was a breach of contract).

- 34 -

The case of <u>Register.com, Inc. v. Verio, Inc., 356 F.3d 393 (2d Cir. 2004)</u> presents a situation analogous to the one in which 3Com now finds itself.  Plaintiff Register.com was in the business of registering domain names and selling web-related services such as web site development.  Defendant Verio, Inc., a competing web site developer, devised a software program to access information on new registrants on Register.com and then solicited their website development business by explicitly mentioning their recent registration through Register.com.  The solicitation contravened the contractual agreement that Verio had acknowledged in connection with its use of Register's services.  As a result of the solicitations, Register.com began to receive complaints from registrants who incorrectly believed that Register or an affiliate had initiated the solicitation.  After demanding that Verio cease and desist, Register sought an injunction, claiming that Verio's use of Register's name was harming Register's goodwill.

The Second Circuit Court of Appeals affirmed the district court's issuance of a preliminary injunction against Verio based on its breach of contract, finding it was "impossible to estimate 'with any precision the amount of the monetary loss which has resulted and which would result in the future from the loss of Register.com's relationships with customers and co-brand partners' by reason of Verio's actions." <u>Id.</u> at 404 (citing <u>Register.com, Inc. v. Verio, Inc., 126 F. Supp. 2d 238, 248 (S.D.N.Y. 2000)</u>).  The Court further found that unless the injunction was granted, Register would suffer irreparable harm through loss of reputation, goodwill and business opportunities.  <u>See id.</u>

3Com is faced with even more severe ongoing irreparable harm to its reputation and its goodwill from Capital 4's numerous breaches of contract.  By utilizing 3Com's marketing tools, logo, and trademark to solicit business under 3Com's name or make it appear that 3Com is the

contracting party, and by subsequently failing to provide service to those customers as promised, Capital 4 has created a perception that 3Com is failing to live up to its contractual obligations, which tarnishes its reputation and alienates its customers. The number of current and potential future customers affected by this perception and the potential resulting future loss of revenue is not quantifiable. Moreover, Capital 4's September 18 Letter to 3Com's VARs will have a similar effect on 3Com's future business with the VARs. Such damage to 3Com's reputation as a result of Capital 4's breaches of the Licensing and Operations Agreements are far reaching and simply cannot be calculated in monetary terms. Accordingly, a preliminary injunction enjoining Capital 4 from any further use of 3Com's marketing tools, logos, or trademarks, in addition to enjoining Capital 4 from any further discussion regarding the Agreements or from any further contact with the VARs, is necessary to properly redress the damage caused.

3Com is similarly entitled to an injunction requiring Capital 4 to provide information which 3Com has requested to enable it to evaluate and address the situation. Capital 4 has refused to provide 3Com with information to which it is contractually entitled of which it is in dire need to gage the scope of the problem, assess the viability of various solutions and begin to remedy the damage that Capital 4's numerous breaches of contract have caused to 3Com's reputation. Accordingly, injunctive relief requiring Capital 4 to produce the relevant and requested information is warranted, as the only means of redressing the ongoing harm.

### 2.     Trademark and Unfair Competition

The harm suffered by 3Com due to Capital 4's trademark violations and unfair competition also warrants injunctive relief. "For injunctive relief to be granted, there is no requirement that plaintiff show that customers were actually deceived by the alleged misrepresentation or that there was an actual diversion of business. Plaintiff need only demonstrate that the false representations 'have a tendency to deceive.'" See Geisel v. Poynter

- 36 -

Prods., Inc., 283 F.Supp. 261, 268 (D.C.N.Y. 1968).  Further, "in trademark cases, a showing of

likelihood of confusion as to source of sponsorship establishes the requisite likelihood of success

on the merits as well as the risk of unreasonable harm."  Kraft General Foods, Inc. v. Allied Old

English, Inc. 831 F. Supp. 123, 127 (S.D.N.Y. 1993).  Thus 3Com need only show that "an

appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply

confused, as to the source of the goods in question."  Id.  That standard is met here, particularly

where 3Com has presented evidence of actual confusion in the marketplace as a result of Capital

4's misconduct.

Capital 4's wrongful use of 3Com's marks on unauthorized contracts to which 3Com is

not a party and of which it had no knowledge, and its failure to provide Public Access Services

to those customers, is causing confusion and deception in the marketplace by leading an

unknown number of customers to believe incorrectly that they have entered into contracts with

3Com which are not being honored.  See, e.g., Kadant, Inc. v. Seeley Machine, Inc., 244 F.

Supp.2d 19, 33 (N.D.N.Y. 2003) (where plaintiff can demonstrate likelihood of confusion, there

is a presumption of irreparable harm and plaintiff is entitled to a preliminary injunction); Stein

Industries, Inc. v. Jarco Industries, Inc., 934 F.Supp. 55, 58 (E.D.N.Y. 1996) (finding that

plaintiffs had established irreparable harm to their reputation and goodwill where consumers had

confused defendant's product with plaintiffs' product); Kraft General Foods, Inc. v. Allied Old

English, Inc. 831 F. Supp. 123, 136 (S.D.N.Y. 1993) (internal citations omitted)  ("The existence

of a likelihood of confusion in a trademark case is strong evidence of irreparable harm because

damage to reputation is difficult to prove or quantify.")  3Com is entitled to immediate injunctive

relief to prevent further damage to its business.  See id. at 136 (issuing a preliminary injunction

in a case alleging trademark and Lanham act violations and unfair competition, because "[i]n this

type of case, the loss of goodwill and reputation resulting from defendant's activities [in selling a product under a name likely to cause confusion with plaintiff's product] simply cannot be compensated adequately by an award of money damages."); CBS, Inc. v. Springboard Int'l Records, 429 F. Supp. 563, 568 (D.C.N.Y. 1977) (granting an injunction based on violations of Lanham Act, where plaintiffs faced the very real prospect of irreparable harm to their reputations due to public disappointment in defendant's misleading use of plaintiffs' material, which disappointment would likely be turned toward plaintiffs based on a perception that plaintiffs had perpetrated the deception.).

### 3.    Defamation

Capital 4's defamation of 3Com also entitles 3Com to injunctive relief. The damage to 3Com's reputation, goodwill and business cannot be gainsaid. Capital 4 has gone, and continues to go, to great lengths to paint 3Com's picture in the marketplace as a company intent on avoiding its obligations and abandoning customers midstream. 3Com has received communications from angry customers who incorrectly believe that 3Com is or should be responsible for fulfilling obligations that are actually Capital 4's. Angry though they are, these customers are the ones which 3Com has an opportunity to help and thereby repair its reputation. There may be many more customers unknown to 3Com who have bought into Capital 4's campaign of lies and who will simply avoid doing business with 3Com in the future. The threat of such imminent and ongoing harm to 3Com's business from Capital 4's wrongful conduct entitles 3Com to an injunction. See Ecolab Inc. v. Paolo, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) (holding that "the possibility of loss of customers . . . constitute[s] irreparable harm" and issuing a preliminary injunction)

In the case of In re Alert Holdings, Alert sought injunctive relief (as well as damages) after its competitor solicited its business contacts and created the erroneous impression that Alert

- 38 -

could be going out of business, was unstaffed, unable to monitor its accounts and had abandoned

accounts. Its claim for injunctive relief was made on the basis of its fear of continuing losses and

damage to its reputation. 148 B.R.194 (S.D.N.Y. 1992). Like Alert, 3 Com is seeks this Court's

intervention to prevent Capital 4 from continuing to contact its customers and VARs and making

false and misleading representations as to 3Com's business capacity and its commitments to its

contracts with its customers. In the absence of such relief, 3Com will continue to suffer

irreparable harm based on Capital 4's false statements, designed to injure 3Com's goodwill and

business reputation. See Trojan Elec. & Machine Co., Inc. v. Heusinger, 162 A.D. 2d 859, 860

(3d Dept. N.Y 1990) (granting preliminary injunction to enjoin further publication of defamatory

statements where "the actions of defendants were calculated to injure plaintiffs' business").

##### D.    The Balance Of Equities Tips In Favor Of An Injunction Against Capital 4

The injunctive relief requested by 3Com will not impose a burden on Capital 4 that

exceeds the burden on 3Com in the absence of an injunction, because the injunction request by

3Com will merely require Capital 4 to comply with its contractual obligations, cease its tortious

and other illegal conduct, and provide 3Com with information that it needs to attempt to remedy

the mess that Capital 4 has left its customers in. An injunction ordering the performance of a

negotiated agreement and prohibiting the further commission of a tort is in the public interest, as

is providing the means to help remedy a situation which puts numerous innocent businesses at

risk. See, e.g., Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 618 F.2d 950, 954 (2d Cir.

1980) (issuing injunction to redress defendant's intentional copying of plaintiff's trade dress and

the presumed resulting confusion of consumers). Under the circumstances, the balance of the

equities favors entry of an injunction against Capital 4 as set forth below.

IV.    **CONCLUSION**

  For all the foregoing reasons, this Court should grant 3Com's motion for preliminary

injunction and order injunctive relief as:

   a. Enter an order requiring Capital 4 to abide by the surviving provisions of the License Agreement and the Operations Agreement that Capital 4 executed on November 10, 2006;

   b. Enter an order enjoining Capital 4 from further infringement and/or unauthorized use of the 3Com name and trademarks;

   c. Enter an order enjoining Capital 4, including its principals, officers, directors, employees, agents, servants, successors and assigns, as well as all those in active concert and participation with Capital 4, from further defamatory statements concerning 3Com;

   d. Enter an order enjoining Capital 4, including its principals, officers, directors, employees, agents, servants, successors and assigns, as well as all those in active concert and participation with it, from further unauthorized use of 3Com's trademarks;

   e. Enter an order enjoining Capital 4 from destroying or otherwise disposing of any of the data, computers, documents, or any information pertaining to the subject matter of this Complaint, (including but not limited to personal computers, laptops, telephones and/or handheld devices), and/or from assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in this paragraph;

   f. Enter an order requiring Capital 4 to provide an accounting on an expedited basis, with such an accounting to include the following:

     i. All copies of all third party access provider contracts and related documents with respect to customers identified on Schedule B to Amendment No. 1 to the First Contract Addendum to the License Agreement and Operations Agreement (the "Schedule B Customers").  Whitehouse Decl. Ex. 8 (Amendment No. 1 to the First Contract Addendum at Schedule B).

     ii. Any and all assignments required by Public Access Services providers to transfer from Capital 4 to 3Com control over the Public Access Services accounts of Schedule B Customers, and customers with Unauthorized Agreements.

     iii.      All contracts between Capital 4 and carriers.

     iv.      Contact information for all Capital 4 Lending Partners.

     v.      Copies of any agreements between Capital 4 and the VARs who have participated in the Power of $Zero program.

     vi.      Copies of all Unauthorized Agreements, Misbranded Agreements and any other agreements on 3Com Paper that were not processed through the 3Com portal.

     vii.      All documentation, including without limitation all carrier and Lending institution documentation related to the Unauthorized and Misbranded Agreements.

g.      Enter an order requiring Capital 4 to permit a forensic analysis of its computers, including but not limited to its networks, laptops, handheld devices and telephones, and to allow 3Com to commence such analysis within five (5) business days of the Court's issuance of the order;

h.      Enter an order requiring Capital 4 to redirect all Residual Payments from Lenders and/or Customers to 3Com for the Unauthorized Agreements; and

i.      Award 3Com such other and further relief as this Court deems just and proper.

Respectfully submitted,

3COM CORPORATION,

By its attorneys,

Daniel E. Rosenfeld (DR 4624)
KIRKPATRICK & LOCKHART PRESTON
   GATES ELLIS LLP
One Lincoln Street
Boston, MA 02111
(617) 261-3100

Douglas F. Broder (DB 8406)
KIRKPATRICK & LOCKHART PRESTON
   GATES ELLIS LLP
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

Dated: October 9, 2007