# EXHIBIT 5

**License Agreement**

This License Agreement (the "License Agreement") is made entered into on this 10th day of November, 2006 (the "Effective Date") by and between:

> Capital 4, Inc., a Texas corporation with its principal place of business located at 1010 North San Jacinto Houston, Texas 77002 ("Capital 4"), and
>
> 3Com Corporation, a Delaware corporation with its principal place of business located at 350 Campus Drive Marlboro, Massachusetts 01752-3064 ("3Com")

(collectively the "Parties", individually the "Party").

**Preamble**

WHEREAS, Capital 4 is the owner of all rights, title and interest in and under "POZ™ Solution" or "POZ™ Program", as the terms are defined herein below; and,

WHEREAS, 3Com desires to obtain and secure from Capital 4, and Capital 4 is willing to grant to 3Com, a non-exclusive, restricted, and non-transferable license (i) to use, exploit, and commercialize the "POZ™ Solution" or "POZ™ Program in the Territory, as the term is described herein below, upon the terms and conditions acceptable to the Parties hereto; and

WHEREAS, each Party's respective rights, duties, and obligations, as set forth in the previously executed Strategic Alliance Agreement dated January 31, 2005, and the Rules of Engagement Addendum dated March 10, 2005 (the "Prior Agreements") are hereby merged into this License Agreement and that certain Operations Agreement of even date therewith, which supersede the Prior Agreements.

NOW, THEREFORE, in consideration of the foregoing recitals and the provisions hereinafter set forth, and for other good and valuable consideration the receipt of which is hereby acknowledged, and intending to be legally bound hereby, the Parties hereto hereby agree as follows:

**Section I.    Definitions**

As used in this License Agreement, the following terms are defined:

1.1    <u>Power of $Zero™ Solution or Power of $Zero™ Program ("POZ™ Solution" or "POZ™ Program")</u>

POZ™ Solution or POZ™ Program means the Customer and VAR oriented financial processes made available to 3Com by Capital 4, in accordance with this Agreement, which assists 3Com and 3Com VARs in the marketing and sales of 3Com Products.

1.2    Power of $Zero™ Marketing Tools ("POZ™ Marketing Tools")

POZ ™ Marketing Tools means the processes and methodologies which were solely created and developed by Capital 4, and which remain the exclusive property of Capital 4, which may be used in connection with demonstrating and effecting the POZ™ Solution and the POZ™ Program.  POZ™ Marketing Tools include: (a) the ability to provide the Customer with a financial solution, enabling the Customer to "reduce to $Zero™" all of its telecommunication expenses, or to provide technologies to Customers at $Zero™ additional costs; (b) access and use of Capital 4's POZ™ Customer Relationship Management ("CRM") tool to assist in demonstrating and effecting the POZ™ Solution and the POZ™ Program; and (c) POZ™ Sales Representatives Training Course and School specifically designed to teach the POZ™ sales representatives all of the fundamentals on how to sell the POZ™ Program.  POZ™ Marketing Tools also include existing sales presentations, customer evaluations, profitability evaluations, telecommunication configurations, and financial analysis and credit evaluations, as developed solely by Capital 4 to be used as part of the POZ™ Solution and the POZ™ Program, and may be utilized in the creation and acceptance of POZ™ Solution. The above notwithstanding, POZ Marketing Tools shall not include any of the above to the extent created or otherwise developed by 3Com including, without limitation, sales presentations, customer evaluations, profitability evaluations, telecommunication configurations, and financial analysis and credit evaluations (collectively the "Developments"). During the term of this Agreement, 3Com shall not use, attempt to use or permit to be used any such Developments (i) for the benefit of any other third party; (ii) in any manner which may injure or cause loss to Capital 4; or (iii) in any manner other than for the benefit of 3Com and Capital 4 pursuant to this Agreement.  In the event Capital 4 shall exercise its rights in accordance with the terms and conditions set forth in Section 4.3, 3Com hereby agrees to grant to Capital 4 a royalty free perpetual license to use the Developments only in connection with renewed POZ™ Customer Agreements. During the Term of this Agreement, Capital 4 hereby agrees not to use, attempt to use or permit to be used any such Developments (i) for the benefit of any other third party; (ii) in any manner which may injure or cause loss to 3Com.

1.3    Power of $Zero™ Documentation ("POZ™ Documentation")

POZ™ Documentation means all documentation, instructions, training materials, and user guides, including POZ™ Customer Agreements, POZ™ Funding Agreements, POZ™ Warranty Agreements, POZ™ CRM Software Codes, POZ™ Credit Applications, POZ™ Vendor Contracts, POZ™ Billing Solutions, POZ™ Sales Representative Employment Agreements, and POZ™ VAR Agreements, relating to the POZ™ Solution and the POZ™ Program, whether in printed or electronic format, which was or is solely created and provided by Capital 4 to 3Com.

1.4    Power of $Zero™ Property ("POZ™ Property")

POZ™ Property means the POZ™ Marketing Tools, including the POZ™ Solution, the POZ™ Program, and the POZ™ Documentation.

1.5    <u>3Com Value Added Reseller ("3Com VAR")</u>

3Com VAR means an individual or entity recruited by 3Com as a reseller of 3Com products and/or the POZ™ Solution under the POZ ™ Program.

1.6    <u>"Territory"</u>

Territory means worldwide wherever 3Com does business.

1.7    <u>"POZ Customer Agreement" or "3Com Power of $Zero Customer Agreement"</u>

Shall mean all POZ™ contracts presented by the 3Com VAR to the Customer, and executed by the Customer, prior to and after the Effective Date of the License Agreement, which documents the Customer's rights, duties, and obligations under the 3Com POZ Solution or the 3Com POZ Program.

1.8    <u>"POZ™ Funding Agreement"</u>

The POZ™ Funding Agreement is the Financial Contract executed by the Customer, assigned to a funding source and used to Monetize a portion of the Customer's BMRR in order to create the Monetized Funds.

1.9    <u>"Monetized Funds"</u>

Monetized Funds are the funds issued by the Funding Source to Capital 4, 3Com, the 3Com VAR and Customer, as the case may be, related to each POZ Funding Agreement and POZ™ Customer Contract and which represents the discounted present value of a portion of the Customer's Net Usable BMRR. The amount Monetized may vary with each Customer.

1.10    <u>"Fee to 3Com VAR"</u>

Fee to 3Com VAR means the amount paid by 3Com or Capital 4 from the Monetized Funds to a 3Com VAR for each POZ™ Customer Contract as set forth in the VAR Partner Agreement between 3Com and VAR.

1.11    <u>"Cash Payment to Customer"</u>

Cash Payment to Customer shall mean, if applicable, the payment made by 3Com, Capital 4 or the Funding Source from the Monetized Funds to a Customer, which selects the Cash Option in accordance with the POZ Documentation.

1.12 "Licensor's Fees"

Licensor's Fees means the fees paid in consideration for the license(s) granted herein that are generated from each executed POZ Customer Agreement which remain the sole property of Capital 4.

1.13 "VAR Reconciliation Report"

The VAR Reconciliation Report represents a funding allocation statement that identifies the Fee to the 3Com VAR, the Cash Payment to Customer, the Licensor's Fee, and any other disbursements that are to be made from the Monetized Funds. This VAR Reconciliation Report must be approved by 3Com for each transaction and becomes the basis for funding disbursement instructions to any funding source prior to the release of any funds.

1.14 "Net Monetized Funds"

Net Monetized Funds means the net funds from the Monetized Funds after payment is made to Capital 4 to be used for distribution by the Funding Source or 3Com of the Fee to 3Com VAR, 3Com, or, when applicable, the Cash Payment to Customer.

1.15 "Residual Funds"

Residual Funds means the non-monetized portion of the monthly payment obligation from the customer based on the Customer Agreement which shall remain the sole property of 3Com. Subject to the terms and conditions set forth in Section 4.3, in the event Capital 4 shall exercise its right to request and receive an assignment (to the extent such right is assignable) from 3Com of 3Com's rights to renew POZ™ Customer Agreements, 3Com hereby covenants and agrees to assign, unconditionally and irrevocably to Capital 4, and without the need for any further action by any Party, all rights, title and interest in and to the Residual Funds, associated with any such renewed POZ™ Customer Agreements.

1.16 Net Usable Billed Monthly Recurring Revenue ("net usable BMRR")

Net Usable BMRR is defined as the Customer's total monthly payment obligation under the POZ™ Customer Agreement (also noted in the Schedule A attached to the POZ™ Customer Agreement), less the following:

a) The monthly cost of purchasing an existing vendor services contract (the existing vendor contract buyout, amortized over the term of the POZ™ Customer Agreement).
b) The monthly cost of purchasing an existing lease contract (the existing lease buyout, amortized over the term of the POZ™ Customer Agreement).
c) Any straight "pass-through" expenses (e.g. non-provisionable dial tone elements as determined at the time that Customer executes the Customer Agreement).
d) Equipment Shortfall payments as defined in the POZ Documentation.
e) Any additional element of the Customer's total monthly payment obligation under the POZ™ Customer Agreement for which there is no available margin, and, consequently,

no allocation to Customer or 3Com VAR (as determined at the time that Customer executes the Customer Agreement).

1.17  "Available Funds"

The Available Funds includes the following: the funding proceeds, and the associated residual income stream, based upon the requirements of the POZ™ Customer Agreement and the applicable Customer POZ Funding Agreement.

1.18  "Intelligent Private Network"

Intelligent Private Network refers to a marketing representation for the underlying service provider network(s) used in connection with the delivery of voice and data services to the customer under the terms of the POZ Customer Agreement.

1.19  "Public Access Services"

Public Access Asset Services refers to all voice and data services obligations under the POZ Customer Agreement.

1.20  "Customer"

Customer means the end user who signs the POZ Customer Agreement for the provisioning of IP telephony equipment and services under the POZ Program.

**Section II.    License**

2.1  License to 3Com

For the fee set forth is Section 2.7, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, including the covenants and promises contained in this Agreement, and the performance obligations as set forth in section 2.9, Capital 4 grants unto 3Com, as Capital 4's Licensee, the non-exclusive, restricted, and non-transferable right (except as otherwise provided herein) to use the POZ™ Property in the Territory and with 3Com's VARs during the term of this Agreement, for the sole purpose of securing POZ™ Customer Agreements either directly or through 3Com's current and future POZ VARs.

2.2  Appointment of Licensee

Capital 4 appoints 3Com as a POZ™ authorized Licensee, and, subject to the terms and conditions of this Agreement, grants to 3Com the rights set forth herein below.

2.3  POZ™ Property Standards

3Com and Capital 4 shall cooperate with one another in the reasonable development of common processes to outsource the POZ™ provisioning and billing, implement third-party POZ™ usable

technologies, perfect the effective deployment of the POZ™ Program, and facilitate ongoing developments for the improvement of the POZ™ Program.

2.4    POZ™ Property Distribution

Capital 4 grants to 3Com the non-exclusive, restricted, and nontransferable (except as otherwise provided in this Agreement) right to use, market, reproduce, and distribute the POZ™ Property solely as an embedded component of the 3Com POZ™ Solution and the 3Com POZ™ Program, and only in the Territory.

2.5    Reproduction

2.5.1    3Com may sublicense its right to reproduce the POZ™ Property only to 3Com VARs in the Territory which agree to enter into a definitive POZ™ VAR Agreement, as set forth in the attached Exhibit A.

2.5.2    Notwithstanding the foregoing, during the term of this Agreement 3Com shall be prohibited, directly or indirectly, through an affiliate or otherwise, (i) from granting, licensing, selling, assigning, conveying or transferring all or any portion of its right, title and interest in and under the POZ™ Program, without the prior written approval of Capital 4, and (ii) from granting the same or similar licenses as provided in this Agreement to any person in the Territory.

2.6    3Com POZ™ VAR Agreement - Sublicense Agreement

Any distribution of the POZ™ Property shall be accomplished under the 3Com POZ™ VAR Agreement between 3Com and the 3Com VAR to whom the distribution is made, thus elevating the 3Com VAR to the status of "3Com POZ™ VAR". Each 3Com POZ™ VAR Agreement shall contain terms and conditions agreed to between the Parties hereto which shall be at least as protective of Capital 4's proprietary rights as the terms and conditions of this Agreement. All 3Com POZ™ VAR Agreements must acknowledge the applicable terms of this Agreement, and each 3Com POZ™ VAR Agreement shall explicitly restrict the 3Com VAR from accessing Capital 4's development tools of the POZ™ Property. 3Com will promptly notify Capital 4 of any known violation of a 3Com POZ™ VAR Agreement, and will take commercially reasonable efforts to enforce each 3Com POZ™ VAR Agreement with at least the same degree of diligence used in enforcing similar agreements governing end-users of 3Com's own products. If 3Com fails to take proper action to enforce the 3Com POZ™ VAR Agreements, or take action or proceeding against an alleged infringing party within ten (10) days after receipt of a written request from Capital 4 that such an enforcement action be initiated against a particular party, Capital 4 shall have the right to bring and control any such action at its own expense and by counsel of its own choice,

2.7    License Fees

2.7.1    For each POZ™ Customer Agreement accepted by 3Com, 3Com shall calculate the Licensor's Fees to be retained by Capital 4 from the Monetized Funds, by discounting a

portion of the net usable BMRR to its present value, identifying this information in the VAR Reconciliation Report, and submitting same to Capital 4 for its review.

     2.7.2    From the Monetized Funds, Capital 4 shall retain the following as its Licensing Fee:

20% of the net usable BMRR for all POZ™ Customer Agreements accepted by 3Com, subject to the following:

a) When 3Com POS reporting for any quarter after the Effective Date of this Agreement (as to 3Com's fiscal year) exceeds $8 million in equipment purchases under the POZ™ Program, the Licensing Fee shall be reduced from 20% of the net usable BMRR for all POZ™ Customer Agreements accepted by 3Com, to 10% of the net usable BMRR for all POZ™ Customer Agreements accepted by 3Com for the next quarter, as long as 3Com POS reporting for the current and subsequent quarters (as to 3Com's fiscal year) exceeds $4 million in equipment purchases under the POZ™ Program.    For purposes of this Agreement "3Com POS" shall mean the monthly audit trail, with all necessary information contained, that facilitates reporting on and validates for Capital 4 and 3Com the 3Com equipment purchases that resulted from any and all POZ activity within the reporting period.

     i.    In any quarter where this $8 million revenue benchmark is exceeded, 3Com may reconcile the projects in connection with the POZ™ Program that represented 3Com revenue above $8 million to a 10% License Fee and request from Capital 4 credit for the recalculated License Fee.

     ii.    Going forward from the quarter where this $8 million revenue benchmark was exceeded, the License Fee will remain at 10% of net usable BMRR unless other conditions contained herein occur.

b) After the fee percentage reduction as noted in the preceding paragraph occurs, if the 3Com POS reporting for the current and subsequent quarters after the Effective Date of this Agreement (as to 3Com's fiscal year) does not exceed $4 million in equipment purchases under the POZ™ Program in two or more consecutive quarters, then the Licensing Fee reverts to 20% for all subsequent quarters (as to 3Com's fiscal year), subject to the opportunity to reduce the fee by again achieving the $8 million per quarter target.

2.7.3    <u>Prepayment of License Fees</u>

Upon execution of the License Agreement, 3Com will make a prepayment to Capital 4 of License Fees in an amount of $5 million ("Prepayment") as follows:

a)    $2.5 million upon execution of the License Agreement, but not later than Nov. 10th ; and,

b)    $2.5 million upon the Actual Cut Date, as defined in the Operations Agreement, but not later than Feb1, 2007.

On the Actual Cut Date, but not later than February 1st, 2007, 3Com will receive an additional reduction of the License Fee to 15% (or to 5% if 3Com has reached the threshold for License Fee reduction as set forth in Section 2.7.2) until the Prepayment is recovered by applying the reduction portion to the outstanding balance of the Prepayment. Provided, however that in no event shall recovery of the Prepayment extend beyond three (3) years from the Effective Date. In the event complete recovery of the Prepayment has not been achieved on the second anniversary of the Effective Date, the License Fee will be further reduced to 10% (or to 0% if 3Com has reached the threshold for License Fee reduction as set forth in Section 2.7.2) until all outstanding Prepayments are recovered. If on the third anniversary of the Effective Date, there remains an outstanding balance of the Prepayment, then such outstanding balance shall immediately become due and payable to 3Com.

Use of proceeds is solely at Capital 4's discretion, except as with respect to Capital 4's obligations to pay the following from the proceeds:

> (i) All undisputed past due amounts for underlying wholesale service providers and retail service providers ('Redirects') will be brought current and remain current throughout the transition period defined in the License/Operations Agreement (currently targeted to be completed before February 1, 2007). Capital 4 will provide 3Com a report on status of all underlying service provider accounts monthly during this period.

> (ii) 3Com's A/R balance for previously purchased equipment will be paid current upon the receipt of the advance set forth in Section 2.7.1 (b). The 3Com account will be managed via split funding/assignment of proceeds throughout the remainder of the transition period.

2.8     Retention of License Fees by Capital 4

3Com agrees that Capital 4 will be paid the Licensor's Fee immediately upon the completion of the POZ™ funding as contemplated herein. All payments related to the Licensor's Fees will be paid to Capital 4 directly by the Funding Source(s) upon the Funding Source's receipt of disbursement instructions by 3Com, subject to the following:

> a.  The License Fee will be discounted to its present value at the reconciled discount rate actually used for that POZ™ Customer Agreement, if the Customer Agreement term matches the Funding Agreement term; or, at an appointed rate benchmark source's then stated discount rate based on the term of the POZ Customer Agreement, if the Funding Agreement term is less than the term of the Customer Agreement.
> b.  The Parties hereby agree that the primary Funding Source shall be used as a mutually acceptable rate benchmark source. The Parties agree to update the rate factors used for these calculations whenever the rate benchmark source publishes rate factor change notices.
> c.  The License Fee is not subject to any recourse, reductions, discounts or offsets without the expressed written consent of Capital 4, unless

Capital 4 is in material breach or default of its obligations pursuant to this Agreement, and such breach or default is not cured within thirty (30) days after receipt of written notice thereof.

2.9   Performance Obligations by 3Com

3Com agrees to the following for the use of the POZ™ Property:

i)   Upon execution of this agreement, 3Com agrees to enter into negotiations with at least one POZ funding source to create both an immediate term funding solution (as identified in the Quick Start Funding Solution framework provided to 3Com by Capital 4) and a Long-Term Funding Solution to support the contemplated expansion of the POZ Program by the Parties.

ii)   A Long-Term Funding Solution, mutually acceptable to the Parties hereto, must be established not later than February 1st, 2007.

iii)   Not later than February 1, 2007, 3Com agrees to take immediate action to enter into a direct sales recruiting relationship that will promote the sales force headcount across the POZ VAR Channel and to absorb the costs associated with sales force recruitment;

iv)   Not later than February 1, 2007, manage directly the disbursement of funds for the Fee to 3Com VAR, and, when applicable, Cash Payment to Customer.

v)   Not later than February 1, 2007, manage the receipt and disbursements related to the Residual Funds. 3Com will also make direct payments to all service providers;

vi)   Not later than February 1, 2007, 3Com will have completed the outsourcing to third party entities to whom all "POZ™ back office" functions can be outsourced;

vii)   After February 1, 2007, 3Com agrees to pay to Capital 4 all direct and indirect costs associated with any remaining "POZ™ Back Office" functions until such time 3Com is able to assume such responsibilities;

viii)   3Com will reach substantive completion in the development (or further development) of a POZ™ Solution centric CRM to be used by all 3Com POZ™ VARs in the pre and post sales processes that drive the POZ Program not later than May 1, 2007. All right, title and interest in the developed CRM shall rest solely with 3Com.

If, prior to the dates noted above, Capital 4 cannot confirm in writing to 3Com that 3Com has satisfactorily completed all applicable items as set forth in Section 2.9 above, then Capital 4 will provide notice to 3Com and allow not more than an additional sixty (60) days to complete each obligation. If any of these obligations are not completed by the expiration of the 60-day notice period, then the Parties agree that the License Fee shall be increased to thirty (30%) (or 20% in the event 3Com has reached the threshold for License Fee reduction as set forth in Section 2.7.2) percent until every and all of the obligations whose completion date and cure period has passed as set forth hereinabove are fulfilled by 3Com.

2.10   Disbursement of Licensor's Fees

2.10.1  Disbursement of Licensor's Fees Prior to Establishing a Mutually Acceptable Funding
        Program

On or before February 1, 2007, 3Com will provide process documentation and notice to Capital
4, indicating its readiness to assume responsibility and control of the disbursement of the Net
Monetized Funds through a mutually acceptable Funding Program which specifically provides
that the Funding Source shall remit the Licensor's Fee to Capital 4.  Until 3Com provides written
notice of its acceptance of the responsibility to assume control of the distribution of the Net
Monetized Funds through a mutually acceptable Funding Program which specifically provides
that the Funding Source shall, prior to any other disbursement, remit the Licensor's Fee to
Capital 4, all Available Funds shall be, and shall remain, the sole property of Capital 4.  During
this period, the License Fee due Capital 4 shall be retained by Capital 4 from the Available
Funds.  For this period, Capital 4 shall remit from the Available Funds the Fee to 3Com VAR
and to the equipment costs to 3Com.

2.10.2  Disbursement of Licensor's Fee After Establishing a Mutually Acceptable Funding
        Program

When 3Com accepts responsibility to assume control of the distribution of the Net Monetized
Funds through a mutually acceptable Funding Program which specifically provides that the
Funding Source shall remit the Licensor's Fee to Capital 4, all Available Funds (with the
exception of the Licensor's Fee) shall be, and shall remain, the sole property of 3Com.  During
this period, the Licensor's Fee due Capital 4 shall be distributed to Capital 4 from the Monetized
Funds, in accordance with the mutually acceptable Funding Program.

2.11   Audit Rights

       2.11.1  3Com shall keep full, true, and accurate records of 3Com's activities related to the
POZ Program under this Agreement.  These records shall include, but are not limited to, ledgers
and journals of account, customer orders, invoices, and purchase orders.  These records, as a
whole, shall include information which will allow, at a minimum, identification of suppliers,
customers, products sold regarding POZ™ Solution or POZ™ Program, as well as whether
3Com is operating within the scope of its license.

       2.11.2  The records described in Section 2.12.1 shall be available for audit by a
recognized independent accounting firm upon not less than ten (10) business days advance
written notice, for the term of this Agreement and for three (3) calendar years thereafter.

**Section III.    Branding, Trademarks, and Use of Intellectual Property**

3.1   POZ™ Branding

3Com's name and logo may be used, in accordance with 3Com's corporate policy and only with
prior written consent, in all POZ™ Documentation, to be seen or executed by a Customer, on all

internet and other public accessible platforms, as well as all written collateral used in the POZ™ Program. All invoices, correspondence, and communications generated in connection with the POZ™ Program and issued to the Customer may be branded with 3Com's name and logo, and the POZ™ trademark and logo.

3.2    3Com Intelligent Private Network

In connection with the POZ™ Program, 3Com may promote the POZ Solution through (i) the Intelligent Private Network; (ii) the VOIP and Analog-Based Network; and (iii) Public Access Services provisioning infrastructure owned and managed by 3Com through contracts with third-party providers, from which POZ™ Program related services are purchased by 3Com.

3.3    Branding, Title, Reciprocal Use of Trademarks, Confidentiality

    3.3.1    Proprietary Rights

Subject to the License granted herein, title and ownership of all proprietary rights in the POZ™ Property, including any copyright, patent, trade secret, trademark or other intellectual property rights, processes, methodologies, will at all times remain the property of Capital 4. 3Com agrees not to remove or obliterate any copyright, trademark or proprietary rights notices of Capital 4 from the POZ™ Property and shall reproduce all such notices on all documentation authorizing 3Com by Capital 4 use of the POZ™ Property. 3Com shall not modify, translate, disassemble, decompile, reverse engineer or cause or allow discovery of the source code of the POZ™ Property used in any way.

    3.3.2    Trademarks

Capital 4 hereby grants to 3Com a non-exclusive, limited license to use the applicable POZ™ Property trademarks and logos ("Trademarks") in connection with the exercise of its branding and license rights contained herein. 3Com agrees to cooperate with Capital 4 in facilitating Capital 4's monitoring and control of the nature and quality of such products and services. 3Com shall supply Capital 4 with specimens of use of the Trademarks prior to the use of Capital 4 Trademarks. All materials depicting Capital 4's Trademarks under this Agreement shall be reviewed and approved jointly by the Parties hereto prior to its preparation. 3Com understands and agrees that the use of any Trademark in connection with this Agreement shall not create any right, title, or interest, in or to the use of the Trademark and that all such use and goodwill associated with the Trademark will inure to the benefit of Capital 4. 3Com agrees not to register or attempt to register any Trademarks related to the POZ™ Property.

    3.3.3    Reciprocal Use of 3Com Trademarks

3Com hereby grants Capital 4 a non-exclusive, limited license to use and reproduce the 3Com trademarks and logos ("Trademarks") solely as required to effect its responsibilities as required under this Agreement, and only upon express written consent of 3Com.

3.4    Confidentiality

Each Party shall hold in confidence all materials or information disclosed to it in confidence hereunder ("Confidential Information") which are marked as confidential or proprietary, or if disclosed verbally, reduced to writing and marked confidential within thirty (30) days after the date of disclosure. Each Party agrees to take precautions to prevent any unauthorized disclosure or use of Confidential Information consistent with precautions used to protect such Party's own Confidential Information, but in no event less than reasonable care. The obligations of the Parties hereunder shall not apply to any materials or information which: (a) is now, or hereafter becomes, through no act or failure to act on the part of the receiving Party, generally known or available; (b) is known by the receiving Party at the time of receiving such information as evidenced by its records; (c) is hereafter furnished to the receiving Party by a third-party, as a matter of right and without restriction on disclosure; (d) is independently developed by the receiving Party without any breach of this Agreement; or (e) is the subject of a written permission to disclose provided by the disclosing Party. Notwithstanding any other provision of this Agreement, disclosure of Confidential Information shall not be precluded if such disclosure: Is in response to a valid order of a court or other governmental body of the United States or any political subdivision thereof; provided, however, that the responding Party shall first have given notice to the other Party hereto and shall have made a reasonable effort to obtain a protective order requiring that the Confidential Information so disclosed be used only for which the order was issued; is otherwise required by law; or is otherwise necessary to establish rights or enforce obligations under this Agreement, but only to the extent that any such disclosure is necessary. Except as otherwise provided herein, and subject to the terms and conditions set forth in this Agreement, 3Com shall not use, attempt to use or permit to be used any Capital 4's Confidential Information (i) for the benefit of 3Com or of any other third party; (ii) in any manner which may injure or cause loss to Capital 4; or (iii) in any manner other than for the benefit of Capital 4. Without the prior written consent of the other Party, neither Party will disclose to any third party (i) the fact that Confidential Information of the other Party has been made available to it or (ii) any of the terms, conditions, status, negotiations, timing or other facts with respect to this or any other agreements between the Parties unless, in each case, such disclosure (after consulting with the other Party in advance about such disclosure) is required by applicable law. Disclosure of any Confidential Information of the providing Party shall be restricted to those directors, officers, employees, agents, affiliates, advisors, consultants, accountants and attorneys of the receiving Party (each of the foregoing, a "Representative") who reasonably have a need to know such information for the purpose described in this Agreement. Such Representative(s) shall be notified by the receiving Party of the confidentiality obligations of this Agreement and of the proprietary and confidential nature of such Confidential Information, and the receiving Party shall be responsible for any breach by its Representative(s) of these obligations. In handling and maintaining the confidentiality of the Confidential Information of the providing Party, the receiving Party shall use the same degree of care as it employs with respect to its own information, but in all events shall use at least a reasonable degree of care.

**Section IV.    Term and Termination**

4.1    Term

    4.1.1    The initial term of this License Agreement is for a period of five (5) years from the Effective Date hereof ("Initial Term"). Thereafter, 3Com may, at its sole option and discretion, renew this License Agreement for an additional five (5) years ("Renewal Term") upon written notice to Capital 4, not less than thirty (30) days prior to the Expiration of the Initial Term, of 3Com's intent to exercise its option to renew this License Agreement for the Renewal Term. Together, the Initial Term and the Renewal Term shall be referred herein as the "Term".

    4.1.2    There is an absolute expectation that 3Com will use its market power to fully develop and deploy the POZ™ Program, including the establishment of processes to facilitate scalability, and, as long as it does so and continues to do so, this License shall remain in effect.

4.2    Termination.

    4.2.1    Termination by Consent or Bankruptcy.    This Agreement may be terminated (i) at any time by the written mutual consent of Capital 4 and 3Com, or (ii) at any time by either Party hereto in the event the other Party hereto files a petition of any type as to its bankruptcy, is declared bankrupt, becomes insolvent, makes an assignment for the benefit of creditors, goes into liquidation or receivership, or otherwise loses legal control of its business.

    4.2.2    No Discharge on Termination.    No termination of this Agreement for any reason shall relieve or discharge either Party from any duty, obligation, or liability that was accrued as of the date of termination (including, without limitation, the obligation to indemnify or to pay any amounts owing as of the date of termination).

    4.2.3    Breach. In the event of a material breach or default of this Agreement by either Party hereto, and if such breach or default is not cured within thirty (30) days after receipt of written notice thereof, the sole and exclusive remedy available to any Party is compensatory damages, attorneys' fees and costs awarded in accordance with the terms of this Agreement, and injunctive relief for specific performance to compel compliance with the terms of this Agreement.

    4.2.4    Effect of Termination. The expiration or termination of this Agreement shall not release either Party herein from the obligation to make payment of all amounts then or thereafter due and payable. Upon termination, any license or right granted to 3Com hereunder shall revert back to Capital 4, except that for six (6) months after the termination of this Agreement, 3Com shall be entitled to fill orders for the 3Com POZ™ Program received prior to termination for which commitments to customers have been made prior to notice of such termination; provided, however, that 3Com shall continue to fulfill all of its obligations hereunder, including the payment of License Fees for said six (6) months. The above notwithstanding, nothing contained herein shall limit 3Com's right or obligation to fulfill, until their termination, all existing POZ Customer Agreements entered into with Customers during the Term of this Agreement.

    4.2.5    Promptly after the termination or expiration of this Agreement, the receiving Party shall, and shall direct its Representative(s) to, (i) return to the providing Party all

Confidential Information furnished by the providing Party or any Representative(s) thereof pursuant to this Agreement, without retaining any copy thereof, and (ii) destroy all copies of any such Confidential Information prepared by the receiving Party or its Representative(s). Simultaneously with the return of the providing Party's Confidential Information, the receiving Party shall deliver to the providing Party a certificate of its chief executive officer or chief financial officer listing the Confidential Information being returned therewith, certifying the return or destruction thereof in accordance with this Section, and acknowledging on behalf of the receiving Party that it shall maintain the confidentiality thereof in accordance with this Section.

4.3    POZ™ Program Abandonment

In the event 3Com (a) notifies Capital 4 in writing that it intends to abandon the 3Com POZ Program, or (b) fails to generate sales of at least $500,000.00 in equipment regarding the POZ™ Program purchases per quarter, for two or more consecutive full 3Com fiscal quarters after the Effective Date, the Parties agree that such inaction shall constitute and be deemed constructive abandonment of the POZ™ Program. In the event 3Com abandons the POZ™ Program as contemplated herein, Capital 4 shall have the right but not the obligation to terminate this License Agreement, at its sole discretion. Notwithstanding the above, upon written notification of abandonment by 3Com, or Capital 4's exercise of its right to terminate for failure to generate sales, the outstanding balance on all Prepayment of License Fees shall immediately become due and payable to 3Com. No failure by Capital 4 to take any action or assert any rights arising from the abandonment of the POZ™ Program by 3Com shall be deemed to be a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

Upon termination, Capital 4 shall have the right, but not the obligation, to request and receive an assignment from 3Com of all the following:

    i.    3Com's rights to renew or enter into a new POZ™ Customer Agreements
   ii.    All 3Com POZ™ VAR Agreements

In the event Capital 4 shall exercise its right to request and receive an assignment from 3Com of 3Com's rights to renew or enter into new POZ™ Customer Agreements, 3Com hereby covenants and agrees to assign (to the extent assignable), unconditionally and irrevocably to Capital 4, and without the need for any further action by any Party, all rights, title and interest in and to the Residual Funds, and Available Funds associated with any such new or renewed POZ™ Customer Agreements.

4.4    POZ™ Program Termination

If this License Agreement expires by its own term, as a failure to renew, then
Capital 4 shall have the right, but not the obligation, to request and receive an assignment from 3Com of all the following:

    i.    3Com's right to renew or enter into a new POZ™ Customer Agreement, for all of the existing POZ™ Customer Agreements; and
   ii.    All 3Com POZ™ VAR Agreements.

4.5     Agreement not to Compete

4.5.1   3Com agrees that during the Term of this Agreement, or any extensions or renewals thereof, and for a period of three (3) years after termination of this Agreement as set forth in Section 4.2 hereof, 3Com shall not, directly or indirectly, (i) develop a program similar to the POZ™ Program on its own; (ii) propose, assist, advice, or collaborate with a third party in the development or implementation of a program similar to the POZ™ Program; (iii) allow any program of a third party similar to the POZ™ Program to be known as its own; or (iv) publicly endorse any program of a third party similar to the POZ™ Program, unless prior approval has been received from Capital 4.

4.5.2   Capital 4 acknowledges that 3Com may endeavor to sell its products through third parties who may market their solutions in a similar manner as the POZ Program and nothing contained herein shall be interpreted as a restriction on 3Com to enter into such a relationship or to sell its Products through such a third party program. 3Com agrees to provide to Capital 4 written notice of these third party relationships.

4.6     Survival. In addition to those rights and responsibilities that by their very nature survive expiration or termination of this Agreement, the following provisions of this Agreement shall survive expiration or termination: Section 2.7.3, 3.4, 4.2.2, 4.2.4, 4.5, Section V, and 6.3.

**Section V.     Warranties, Disclaimers Infringement by Third Parties, and Third Party Claims For Infringement**

5.1     Representations & Warranty

5.1.1   3Com hereby represents and warrants to Capital 4 that, as of the Effective Date:

(a)     it is a corporation organized and validly existing under the laws of Delaware;

(b)     this Agreement has been duly executed and delivered by 3Com and constitutes a valid and binding obligation of 3Com, enforceable against it in accordance with its terms;

(c)     it has the legal right, power and authority to enter into this Agreement; and

(d)     it shall be responsible for obtaining, at its sole expense, all approvals, if any, of governmental agencies and departments as required in connection with the execution of or performance under this Agreement.

5.1.2   Capital 4 hereby represents and warrants to 3Com that, as of the Effective Date:

(a)     it is a corporation organized and validly existing under the laws of Texas;

(b)     has the right and authority to enter into this Agreement and that this Agreement and the license granted hereunder does not and will not conflict with the terms of any agreement to which Capital 4 is a party;

(c)     this Agreement has been duly executed and delivered by Capital 4 and constitutes a valid and binding obligation of Capital 4, enforceable against it in accordance with its terms;

(d)     it has the legal right, power and authority to enter into this Agreement and grant the license, rights and privileges set forth herein;

(e)     it is the sole owner of the POZ™ Property, free and clear of all liens, encumbrances, claims and restrictions; and

(f)     it is not aware (i) that the POZ™ Property infringes any patent, trade secret, copyright or other intellectual property right held by a third party; or (ii) of any claims brought by a third party against Capital 4 with respect to a possible infringement of any patent, trade secret, copyright or other intellectual property right in connection with the POZ™ Property.

**EXCEPT AS SET FORTH HEREIN, ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXCLUDED HEREUNDER.**

5.2     Intellectual Property Indemnification

Capital 4 shall, at its expense, indemnify, hold harmless and, at 3Com's option and request, defend 3Com and its officers, employees, agents and direct or indirect customers from any claims, suits, losses, liabilities, damages, court judgments or awards no matter how determined and the associated costs and expenses (including attorney's fees), incurred because of actual or alleged infringement of the Capital 4 Property or other material provided hereunder of any patent, copyright, database right, utility model, trade secret, trademark, mask work right or other proprietary or intellectual property right(s) of a third party; provided, that Capital 4 is promptly notified and rendered reasonable assistance by 3Com (at Capital 4's expense). If Capital 4 agrees in writing that such claim or suit is fully covered by this indemnity provision, then Capital 4 shall be permitted to direct the defense or settlement of such claim except that Capital 4 may not enter into a settlement arrangement which would result in a significant adverse affect on 3Com or any payment or other consideration by 3Com without 3Com's prior written consent. Capital 4 may not enter into a settlement arrangement covered by this indemnification which would result in a significant adverse affect on 3Com or any payment or other consideration by 3Com, without 3Com's prior written consent.

5.3     Indemnity by 3Com and Limitation of Liability

3Com shall indemnify Capital 4, its officers, directors, agents, and employees, and hold them harmless against all third party liabilities, demands, damages, expenses, or losses including, but not limited to, attorney's fees, court costs, and the like, arising (1) out of the use or misuse by 3Com or its VARs of the POZ™ Property or information furnished under this Agreement, or (2) out of any sale, use, or other disposition by 3Com or its VARs of 3Com products.

EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS CONTAINED HEREIN, IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL OR PUNITIVE DAMAGES OR FOR LOSS OF REVENUE, OR LOSS OF BUSINESS OR LOST PROFITS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR OTHERWISE, EVEN IF ANY REPRESENTATIVE OF A PARTY HERETO HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE PARTIES AGREE THAT THESE LIMITATIONS SHALL APPLY EVEN IF ANY LIMITED REMEDY SPECIFIED HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

**Section VI.    Miscellaneous**

6.1    <u>No Assignment</u>

3Com may not transfer or assign this License Agreement, or any rights or obligations hereunder, without the prior written consent of Capital 4; provided, however, 3Com may, without the consent of Capital 4, assign its rights and obligations hereunder to a successor in interest in connection with the transfer of all or substantially all of 3Com's assets to such successor corporation through sale of assets, merger, or otherwise.

Capital 4 may not transfer or assign this License Agreement, or any rights or obligations hereunder, without the prior written consent of 3Com; <u>provided</u>, <u>however</u>, that Capital 4 shall have the right to assign this Agreement, in whole or in part, at any time to any of its affiliates or subsidiaries, without the prior written consent of 3Com. Any prohibited assignment shall be null and void. Capital 4 may, without the consent of 3Com, assign all (and no less than all) of its rights and obligations hereunder to a successor corporation in connection with the transfer of all or substantially all of Capital 4's assets to such successor corporation through sale of assets, merger, or otherwise.

In addition, and subject to the restrictions set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective, heirs, legal representatives, successors and assigns.

6.2    <u>Capital 4 as an Operating 3Com VAR</u>

Capital 4, as an operating VAR using the POZ Program, desires to have exclusivity in certain markets of interest to Capital 4. These markets include, but are not limited to, the State of Texas; provided, however, that such exclusivity shall be contingent upon mutually agreed upon

performance goals as set forth in the 3Com POZ Authorized Partner Agreement.

6.3     Governing Law; Submission to Jurisdiction

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.** Each Party hereby irrevocably submits to the exclusive jurisdiction and venue of any state court or United States federal court located in New York, New York and any appellate court from any thereof, and waives any immunity from the jurisdiction of such courts over any action, suit or proceeding (a "Proceeding") arising out of or relating to this Agreement. So long as either Party has any obligation under this Agreement, each Party shall maintain a duly appointed agent in New York, New York for the service of process or other legal summons for purposes of any Proceeding and, if it fails to maintain such an agent, any such process or summons may be served on it by mailing a copy thereof by registered mail, or a form of mail substantially equivalent thereto, addressed to such Party at its address as provided for notices hereunder.

6.4     Injunctive Relief

It is expressly agreed that a material breach of this License Agreement will cause irreparable harm to Capital 4 and that a remedy at law would be inadequate. Therefore, in addition to any and all remedies available at law, Capital 4 and/or Capital 4 Licensors shall be entitled to seek injunctive relief against 3Com in the event of any threatened or actual violation of any or all provisions in this License Agreement.

6.5     Independent Contractor

3Com is an independent contractor, and nothing in this License Agreement shall be deemed to create a joint venture, partnership, or agency relationship between the Parties. Except as otherwise contemplated in this Agreement, either Party has the right or authority to assume or create any obligation or responsibility on behalf of the other.

6.6     Force Majeure

Neither Party shall be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder on account of strikes, shortages, riots, insurrection, fires, floods, storms, earthquakes, acts of God, war, governmental action, labor conditions, or any other cause which is beyond the reasonable control of such party.

6.7     Amendments

This Agreement may be modified or amended only by a written instrument duly signed by the Parties hereto.

6.8     Severability

If any provision contained in this Agreement is determined to be void, illegal, or unenforceable, in whole or in part, then the other provisions contained herein shall remain in full force and effect as if the provision which was determined to be void, illegal, or unenforceable had not been contained herein.

6.9     Notices

All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission or mailed by registered or certified mail (return receipt requested), postage prepaid, to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice; provided, that notices of a change of address shall be effective only upon receipt thereof):

> (a)     To Capital 4, as follows:
>
>> Capital 4, Inc.
>> 1010 N. San Jacinto
>> Houston, Texas 77002
>> Facsimile: 713-237-1118
>> Attn. Dave Dawson, President
>
> (b)     To 3Com, as follows:
>
>> 3Com Corporation
>> 350 Campus Drive Marlboro
>> Massachusetts 01752-3064
>> Facsimile:_____
>> Attn.

6.10     Entire Agreement

This Agreement (including all Exhibits and Schedules which are attached and incorporated by reference for all purposes) constitutes the entire agreement between the Parties with respect to the subject matter hereof and, expect for the Operations Agreement of even date therewith between the Parties, supersedes and annuls all previous communications, agreements or understandings between them with respect to the subject matter hereof.

6.11     Waiver

No failure by either party to take any action or assert any rights arising from any breach or default of this Agreement shall be deemed to be a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

6.12     Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEROF, Capital 4 and 3Com have executed this Agreement through their respective duly authorized officers as of the Effective Date.

**CAPITAL 4:**

By: _____

Dave Dawson, President

**3COM CORPORATION:**

By: _____

Senior Vice President.

*License Agreement*