# EXHIBIT 6

## Operations Agreement

This Operations Agreement (the "Operations Agreement") is made by and entered into on this 10th day of November, 2006, (the "Effective Date") by and between:

> Capital 4, Inc., a Texas corporation with its principal place of business located at 1010 North San Jacinto Houston, Texas 77002 ("Capital 4"), and

> 3Com Corporation, a Delaware corporation with its principal place of business located at 350 Campus Drive Marlboro, Massachusetts 01752-3064 ("3Com")

(collectively the "Parties", individually the "Party"). Each Party's respective rights, duties, and obligations, as set forth in the previously executed Strategic Alliance Agreement dated January 31, 2005, and the Rules of Engagement Addendum dated March 10, 2005 (the "Prior Agreements") are hereby merged into the License Agreement of even date therewith (the "License Agreement"), a copy of which is attached hereto as Exhibit "A", and this Operations Agreement, which supersede the Prior Agreements.

**Section I.   Definitions**
As may be used in this Operations Agreement, the following terms are defined:

1.1   <u>Power of $Zero™ Solution or Power of $Zero™ Program ("POZ™ Solution" or "POZ™ Program")</u>

POZ™ Solution or POZ™ Program means the Customer and VAR oriented financial processes made available to 3Com by Capital 4, in accordance with this Agreement, which assists 3Com and 3Com VARs in the marketing and sales of 3Com Products.

1.2   <u>Power of $Zero™ Marketing Tools ("POZ™ Marketing Tools")</u>

POZ™ Marketing Tools means the processes and methodologies which were solely created and developed by Capital 4, and which remain the exclusive property of Capital 4, which may be used in connection with demonstrating and affecting the POZ™ Solution and the POZ™ Program. POZ™ Marketing Tools include: (a) the ability to provide the Customer with a financial solution, enabling the Customer to "reduce to $Zero™" all of its telecommunication expenses, or to provide technologies to Customers at $Zero™ additional costs; (b) access and use of Capital 4's POZ™ Customer Relationship Management ("CRM") tool to assist in demonstrating and effecting the POZ™ Solution and the POZ™ Program; and (c) POZ™ Sales Representatives Training Course and School specifically designed to teach the POZ™ sales representatives all of the fundamentals on how to sell the POZ™ Program. POZ™ Marketing Tools also include existing sales presentations, customer evaluations, profitability evaluations, telecommunication configurations, and financial analysis and credit evaluations, as developed solely by Capital 4 to be used as part of the POZ™ Solution and the POZ™ Program, and may be utilized in the creation and acceptance of POZ™ Solution. The above notwithstanding,

POZ™ Marketing Tools shall not include any of the above to the extent created or otherwise developed by 3Com including, without limitation, sales presentations, customer evaluations, profitability evaluations, telecommunication configurations, and financial analysis and credit evaluations (collectively the "Developments"). During the term of this Agreement, 3Com shall not use, attempt to use or permit to be used any such Developments (i) for the benefit of any other third Party; (ii) in any manner which may injure or cause loss to Capital 4; or (iii) in any manner other than for the benefit of 3Com and Capital 4 pursuant to this Agreement. In the event Capital 4 shall exercise its rights in accordance with the terms and conditions set forth in Section 4.3 of the License Agreement, 3Com hereby agrees to grant to Capital 4 a royalty free perpetual license to use the Developments only in connection with renewed POZ™ Customer Agreements. During the Term of this Operations Agreement, Capital 4 hereby agrees not to use, attempt to use or permit to be used any such Developments (i) for the benefit of any other third Party; (ii) in any manner which may injure or cause loss to 3Com.

1.3    Power of $Zero™ Documentation ("POZ™ Documentation")

POZ™ Documentation means all documentation, instructions, training materials, and user guides, including POZ™ Customer Agreements, POZ™ Funding Agreements, POZ™ Warranty Agreements, POZ™ CRM Software Codes, POZ™ Credit Applications, POZ™ Vendor Contracts, POZ™ Billing Solutions, POZ™ Sales Representative Employment Agreements, and POZ™ VAR Agreements, relating to the POZ™ Solution and the POZ™ Program, whether in printed or electronic format, which was or is solely created and provided by Capital 4 to 3Com.

1.4    Power of $Zero™ Property ("POZ™ Property")

POZ™ Property means the POZ™, including the POZ™ Solution, the POZ™ Program, and the POZ™ Documentation.

1.5    3Com Value Added Reseller ("3Com VAR")

3Com VAR means an individual or entity recruited by 3Com as a reseller of 3Com products and/or the POZ™ Solution under the POZ™ Program.

1.6    "Territory"

Territory means worldwide wherever 3Com does business.

1.7    "POZ Customer Agreement" or "3Com Power of $Zero Customer Agreement"

Shall mean all POZ contracts presented by the 3Com VAR to the Customer, and executed by the Customer, prior to and after the Effective Date of the License Agreement, which documents the Customer's rights, duties, and obligations under the 3Com POZ Solution or the 3Com POZ Program.

1.8     "POZ™ Funding Agreement"

The POZ™ Funding Agreement is the Financial Contract executed by the Customer, assigned to a funding source and used to Monetize a portion of the Customer's BMRR, as the term is defined in the License Agreement, in order to create the Monetized Funds.

1.9     "Monetized Funds"

Monetized Funds are the funds issued by the Funding Source to Capital 4, 3Com, the 3Com VAR and Customer, as the case may be, related to each POZ™ Funding Agreement and POZ™ Customer Contract and which represents the discounted present value of a portion of the Customer's Net Usable BMRR, as the term is defined in the License Agreement. The amount Monetized may vary with each Customer.

1.10    "Fee to 3Com VAR"

Fee to 3Com VAR means the amount paid by 3Com or Capital 4 from the Monetized Funds to a 3Com VAR for each POZ™ Customer Contract as set forth in the VAR Partner Agreement between 3Com and VAR.

1.11    "Cash Payment to Customer"

Cash Payment to Customer shall mean, if applicable, the payment made by 3Com, Capital 4 or the Funding Source from the Monetized Funds to a Customer, which selects the Cash Option in accordance with the POZ™ Documentation.

1.12    "VAR Reconciliation Report"

The VAR Reconciliation Report represents a funding allocation statement that identifies the Fee to the 3Com VAR, the Cash Payment to Customer, the Licensor's Fee, and any other disbursements that are to be made from the Monetized Funds. This VAR Reconciliation Report must be approved by 3Com for each transaction and becomes the basis for funding disbursement instructions to any funding source prior to the release of any funds.

1.13    "Available Funds"

The Available Funds includes the following: the funding proceeds, and the associated residual income stream, based upon the requirements of the POZ™ Customer Agreement and the applicable Customer Funding Agreement.

1.14    "Public Access Services"

Public Access Services refers to all voice and data service obligations under the POZ™ Customer Agreement.

1.15   "3Com POZ™ Program"

3Com POZ™ Program means the 3Com branded POZ™ Solution promoted by 3Com and 3Com's authorized POZ™ VARs.

1.16   "Back Office Services"

Back Office Services shall include the following functions:
  i.     Pre and post sales credit and funding accounting services for the POZ™ Program
  ii.    Sales support and training for the 3Com VARs
  iii.   Deal Approval
  iv.    Distribution and POS reporting
  v.     Technical support for the POZ™ VAR
  vi.    Provisioning and project management
  vii.   Core network engineering, support, maintenance
  viii.  Billing and collection.
  ix.    Service provider payment processing
  x.     Contracts administration and dispute resolution

1.17   "Actual Cut Date"

The Actual Cut Date is February 1st, 2007 on which 3Com shall notify Capital 4 of its readiness to assume full responsibility for at least the following obligations:
  i.    Service provider payment processing for all Public Access Services in connection with 3Com Customer Agreements entered into after the Actual Cut Date.
  ii.   Disbursement of Net Monetized Funds
  iii.  Billing and collection
  iv.   Payment of Back Office Fee pursuant to section 2.4

1.18   "Net Monetized Funds"

Net Monetized Funds means the net funds from the Monetized Funds after payment is made to Capital 4 to be used for distribution by the Funding Source or 3Com of the Fee to 3Com VAR, 3Com, or, when applicable, the Cash Payment to Customer.

1.19   "Residual Funds"

Residual Funds means the non-monetized portion of the monthly payment obligation from the customer based on Customer Agreements which were entered into prior to the Actual Cut Date.

1.20   "Customer"

Customer means the end user who signs the POZ Customer Agreement for the provisioning of IP telephony equipment and services under the POZ Program.

**Section II.   Operations - General**

2.1   Cooperative Development of the 3Com POZ™ Program
In accordance with this Operations Agreement and the License Agreement, 3Com and Capital 4 shall cooperate with one another to (i) promote and develop the 3Com POZ Program; and (ii) develop common processes to outsource the 3Com POZ Program, POZ provisioning and billing, to perfect the effective deployment of the 3Com POZ Program, and facilitate ongoing developments for the improvement of the 3Com POZ Program.

2.2   Long-Term Funding Solution

3Com will use its worldwide market presence and financial strength to negotiate a long-term funding solution for all 3Com POZ™ Customer Agreements. 3Com agrees to complete this effort not later than February 1st, 2007 and to assume responsibility and control of the disbursements related to the Net Monetized Funds, payment of Fees to 3Com VARs, and when applicable, Cash Payment to Customer.

2.3   Outsourcing of POZ™™ Property Functionality

Upon execution of this agreement, 3Com shall have full authority to outsource some or all of the Back Office Services of the 3Com POZ™ Program currently being provided by Capital 4, to qualified companies, including Capital 4, under 3Com Vendor Contracts. Until such time as all Back Office Services have been completely outsourced by 3Com, and each service is properly functioning, Capital 4 shall be retained as a support partner, and shall continue to perform such functions as provisioning, billing, customer care, and VAR technical and sales support ("Back Office Services"). 3Com shall strive to complete this transitioning process by February 1, 2007.

2.4   Back Office Services

   2.4.1   Fee Payment

On the Actual Cut Date and subject to the provision in Section 2.4.2, 3Com shall begin paying Capital 4 a fee of $150,000.00 per month (the "Back Office Fee") in consideration for providing the Back Office Services.

   2.4.2   To the extent there has been a partial transition of Back Office Services prior to Actual Cut Date including, without limitation, those set forth in Section 1.1.7, 3Com shall be obligated to pay to Capital 4 only a proportionate amount of the Back Office Fee for the actual Back Office Services provided, equal to the direct and indirect costs to Capital 4 for managing those remaining functions as evidenced by Capital 4 documentation.

   2.4.3   On May 1, 2007, 3Com shall begin paying Capital 4 an increased Back Office Fee equal to Capital 4's direct and indirect costs of managing those remaining functions plus fifty percent (50%) per month (the "Increased Back Office Fee") in consideration for Capital 4's

continuing to provide any remaining Back Office Services in a manner sufficient to support the POZ™ Program.

2.4.4   No later than February 1st, 2007, 3Com shall provide Capital 4 with written notice of its intent to assume some or all of the remaining Back Office Services provided by Capital 4. Capital 4 will continue to perform said remaining Back Office Services and assist 3Com in the transfer of all remaining Back Office Services not assumed by 3Com by February 1st, 2007 to 3Com or 3Com's designated vendor. Once transition of the Back Office Services is complete, Capital 4 shall no longer be entitled to receive the Back Office Fee.

2.5   Additional Capital 4 Obligations.

2.5.1   Public Access Service Offering.

Capital 4 shall provide, and shall be solely responsible and liable for providing all: (1) Public Access Services to be delivered under the 3Com Power of $Zero Program; (2) obligations under the POZ VAR Agreements; and (3) the 3Com Power of $Zero Customer Agreements entered into prior to the Actual Cut Date. Notwithstanding the foregoing, Capital 4 shall not be liable nor warranties the quality of services or specific performance by third party service providers of Public Access Services. Upon 3Com's notice to Capital 4 of 3Com's dissatisfaction with the quality or performance of any or all of the Public Access Services providers, Capital 4 shall make commercially reasonable efforts to correct the deficiencies as notified by 3Com within thirty (30) calendar days from the date of such notice. Should those deficiencies of poor quality of service or specific performance by third party providers of Public Access Services outside of Capital 4's control not be rectified to 3Com's satisfaction, 3Com's sole remedy shall be to either (i) instruct Capital 4 to replace the faulty Public Access Service provider; or (ii) assume responsibility for those 3Com Power of $Zero Customer Agreements affected by such failure in the performance of Public Access Services associated therewith. Should 3Com exercise the option set forth in Section 2.5.1(ii) hereof, 3Com shall be entitled to the remaining Residual Funds, and assume the obligations associated with the affected 3Com Power of $Zero Customer Agreements. Notwithstanding the foregoing, Capital 4's liability shall be limited to the Total 3Com Exposure, as defined in Section 4.3.3(a)(7) of this Agreement, and only with respect to those affected 3Com Power of $Zero Customer Agreements. Capital 4 shall satisfy the Total 3Com Exposure through a reduction in the License Fee payment in accordance with Section 4.3.3 (d).

2.5.2   Collection and Payment for Services.

Capital 4 shall invoice the Customer for the delivery of Public Access Services sold through the 3Com Power of $Zero Program prior to the Actual Cut Date. In addition, Capital 4 shall be responsible for all subcontracting and payments to all Public Access Service providers associated with 3Com Power of $Zero Customer Agreements entered into prior to the Actual Cut Date. Upon 3Com's notice to Capital 4 of Capital 4's failure to perform any or all of the obligations contemplated in this Section 2.5.2, 3Com shall be entitled to assume the obligations associated with the affected 3Com Power of $Zero Customer Agreements. Should 3Com exercise its option set forth above, 3Com shall be entitled to the remaining Residual Funds associated with the

affected 3Com Power of $Zero Customer Agreements. Notwithstanding the foregoing, Capital 4's liability shall be limited to the Total 3Com Exposure, as defined in Section 4.3.3(a)(7) of this Agreement, and only with respect to those affected 3Com Power of $Zero Customer Agreements. Capital 4 shall satisfy the Total 3Com Exposure through a reduction in the License Fee payment in accordance with Section 4.3.3 (d).

2.5.3    Prohibition on Contact with 3Com VARS.

Capital 4 is prohibited from contacting 3Com VARs, Partners engaged in the 3Com POZ recruiting process, or 3Com POZ™ Program Customers unless 3Com grants written authorization, in its sole discretion, identifying those specific 3Com VARs with whom Capital 4 can engage with respect to the 3Com Power of $Zero™ Program. Capital 4 agrees not to approach any known 3Com VAR unless 3Com grants such written authorization. Even after such authorization is granted, the Parties agree that 3Com will retain primary business interface with any 3Com VAR that is enrolled or is considering enrolling in the 3Com POZ™ Program and Capital 4's contact with any 3Com VAR shall be limited solely to provisioning of services, if any, related to the 3Com POZ™ Program.

2.5.4    Confusion in the Marketplace.

Capital 4 agrees, after the Effective Date of this Agreement, to not take any action, either directly or indirectly, that would reasonably lead 3Com VARS, 3Com Customers or the general public to the impression that Capital 4 is affiliated with 3Com or the 3Com POZ™ Program, except as in Capital 4's capacity as an authorized 3Com POZ VAR. Should Capital 4 breach this covenant, 3Com agrees to notify Capital 4 and allow reasonable responsive action to correct or prevent such alleged confusion. Upon execution of the License Agreement, 3Com agrees that Capital 4 will update customer centric documentation to properly reflect 3Com and Customer as the only parties to the 3Com Power of $Zero Customer Agreement, subject to 3Com's approval of such documentation.

2.5.5    Execution of Amendments with Existing Public Access Service Providers.
Capital 4 shall, within thirty (30) days from the Effective Date of this Operations Agreement, complete amendments with all wholesale Public Access Service Providers of the 3Com POZ™ Program, where applicable and allowed under the service provider agreements, designating 3Com as a third party beneficiary and under additional terms as mutually agreed between the Parties.

2.5.6    Except as otherwise contemplated in Section 2.5.1, Capital 4 acknowledges and agrees that the obligations set forth in this Section 2.5 constitute "material obligations" pursuant to Section 4.2.

**Section III.    Training and Support; VAR Recruitment, Customer Support**

3.1    3Com POZ Program Sales Training and Support

3Com will provide for the development and expansion of sales training and sales support to the 3Com POZ Program, and training of Sales Representatives. All training agenda must first be submitted to Capital 4 for review, comments, and suggestions.

3.2     3Com POZ Program VAR Training and Support

3Com will provide for the development and expansion of all necessary training to the 3Com POZ Program VARs, to include all aspects of the POZ Program. All training agenda must first be submitted to Capital 4 for review, comments, and suggestions.

3.3     3Com POZ Program Recruiting

3Com shall use commercially reasonable efforts to actively recruit one or more 3Com VARs that agree to sign the 3Com POZ VAR Agreement in each of the major markets in the Territory. 3Com's goal is to attain 3Com POZ VAR participation level of at least eighteen (18) active markets (with one or more active 3Com POZ VARs in each market) not later than the end of 3Com's fourth (4th) fiscal quarter, ending on May 31st, 2007. For each fiscal year thereafter, 3Com and Capital 4 shall develop mutually agreed upon performance goals to be included in an annual 3Com POZ Program Business Plan, which shall be completed at least thirty (30) days prior to the end of 3Com's fiscal year.

3.4     3Com POZ Program VAR Recruiting Criteria

Once selected, a 3Com VAR shall be allowed to deploy the 3Com POZ™ Program when all mutually agreed upon applicable 3Com POZ documentation, including the POZ™ Documentation is executed.

3.5     Ownership of 3Com POZ Program VAR Relationship

Once a 3Com VAR has executed all applicable 3Com POZ Documents, including the 3Com POZ VAR Agreement, 3Com shall be the sole owner of the 3Com POZ VAR Agreement, except as otherwise provided, or provided in the applicable termination provisions.

3.6     3Com POZ Program Sales Reporting

Unless otherwise agreed between the parties, 3Com shall provide Capital 4 with monthly and quarterly POZ Sales Reporting, accounting for all POZ™ Customer Agreements accepted by 3Com, including a summary of all VAR Reconciliation Reports and all License Fees, as the term is defined in the License Agreement.

3.7     3Com POZ Program Pre-Sales and Post Sales Support, and Project Reconciliation

3Com shall, within a commercially reasonable time, establish, fund, and manage a department to provide all administrative support functions reasonable required to run the 3Com POZ Program including those related to front-end sales processing and support for the 3Com POZ Program VARs, Customer credit approval and support, project evaluation, VAR and Customer funding

reconciliations, and reconciliation and remittance of payments from funded projects, including payments to Customers (if applicable) or others, in connection with any 3Com POZ Program Customer Agreements submitted. The department shall also include the ability to provide adequate technical, billing, and service support to the 3Com POZ Program and to the 3Com POZ VARs.

3.8    3Com POZ Program VAR Support Center

3Com shall provide a commercially reasonable VAR Support Center to provide technical, billing, and service support to the 3Com POZ Program and to the 3Com POZ VARs.

3.9    3Com POZ Program Partner Express Extended Warranty

3Com shall offer 3Com POZ Partner Express Services to the 3Com POZ VAR , under the terms and conditions similar to those set forth in the current POZ Partner Express Service Agreement.

3.10    CRM Development

3Com shall provide for or contribute to the development of CRM platforms that will fully support the reporting, visibility, and production goals of the 3Com POZ Program. Pursuant to the terms and conditions set forth in the License Agreement, Program Abandonment, as contemplated in Section 4.3 of the License Agreement and expiration of the License Agreement, are conditions precedent to continued access to the CRM by Capital 4.

3.11    Deal Approval

For all Customer POZ™ Agreements entered into prior to 3Com outsourcing all POZ™ Back Office Services, 3Com and Capital 4 must approve each POZ™ transaction prior to execution by the Customer. As such, 3Com will ensure that an approval process is developed that automates and streamlines this requirement. Capital 4 and 3Com will designate authorized approval authorities to fulfill this purpose.

3.12    VAR Reconciliation Report Process

Until such time as all POZ™ Back Office Services have been outsourced by 3Com, Capital 4 shall have the right to review the VAR Reconciliation Report before it becomes the basis of the funding disbursement instructions to the funding source. 3Com will provide for a mutually acceptable and automated solution to this requirement, developed collaboratively with Capital 4, allowing Capital 4 review of such VAR Reconciliation Reports in accordance with Section 2.7 of the License Agreement, prior to and after the completion of 3Com's outsourcing of all POZ Back Office Services. Capital 4 shall respond to 3Com, in writing, with any objections or requested changes within two (2) business days of receiving a VAR Reconciliation Report for review. Failure to respond within two (2) business days shall constitute a waiver by Capital 4 to raise any further objections to the VAR Reconciliation Report in question.

**Section IV.    Termination and "Go Dark" Solution**

4.1     Term

The term of this Operations Agreement expires upon successful completion of all, but not less than all, outsourcing of Back Office Services and the establishment of the Long Term Funding Solution.

4.2     Termination for Cause

Either Party may terminate this Agreement: (i) upon written notice to the other Party if such Party fails to perform or otherwise breaches any of its material obligations under this Operations Agreement (after thirty (30) calendar days written notice of such breach and opportunity to cure, if curable); (ii) except for the terms and conditions set forth in Section 4.3 below, if either Party files a petition in bankruptcy, is unable to pay its debts when due, becomes insolvent, or dissolves; or (iii) if the other Party undergoes a material change of ownership that in the terminating Party's reasonable discretion, may have an adverse impact on the terminating Party's business or rights under this Operations Agreement. Within ten (10) days of the expiration or termination of this Agreement, each Party shall promptly notify the other Party of all of such other Party's Confidential Information in its possession, and shall promptly return all such Confidential Information, or provide written certification (by affidavit) as to its destruction.

4.3     "Go Dark" Solution

    4.3.1   In order to further protect the POZ™ Program by preventing the interruption, temporary suspension or cancellation of services provided by Public Access Assets Service providers to POZ™ Customers under the POZ™ Customer Agreements, existing prior to and during the term of this Operations Agreement, and until the expiration of all POZ™ Customer Agreements, prior to and during the term of this Operations Agreement, and only in connection with Capital 4's obligations as set forth in these POZ™ Customer Agreements, Capital 4 will make commercially reasonable efforts to (a) timely fulfill its obligations as contemplated in the POZ™ Customer Agreements, unless and only to the extent that the same shall be contested in good faith due to alleged breaches of covenants by Customers, or any other circumstances beyond the control of Capital 4; (b) do all things necessary to preserve and maintain its rights, under the POZ™ Customer Agreements in which failure to do so could reasonably be expected to have a Material Adverse Effect on either Capital 4 or 3Com; and (c) cause the POZ™ Property to be protected, maintained and kept in good standing as may be reasonably necessary to conduct its business properly and efficiently. For purposes of this Agreement, "Material Adverse Effect" shall mean (a) any material adverse effect on the business, condition (financial or otherwise), operations, or properties of Capital 4 or 3Com, or (b) any material adverse effect on the ability of Capital 4 to perform its obligations under this Operations Agreement or the License Agreement.

    4.3.2   Should Capital 4 become insolvent, declare bankruptcy, or otherwise fail to comply with any of the covenants set forth in Sections 4.3.1 above and 2.5.1, 2.5.2, and 2.5.3 of this Operations Agreement, Capital 4 shall provide immediate written notice and/or allow notice to be provided by Public Access Assets Service providers, as the case may be, (collectively the

"Notice") to 3Com asserting the occurrence of any such event or eminent event. Capital 4 shall immediately commence negotiations in an effort to demonstrate to 3Com that it has negotiated acceptable terms with any affected Public Access Asset Service provider to ensure the uninterrupted service to the POZ™ Customers, under the terms and conditions of the existing POZ™ Customer Agreements. If an event of eminent interruption of service is not remedied by Capital 4 through negotiation of acceptable terms with the Public Access Asset Service provider(s), or, in the event that Capital 4 is unable to secure a reasonable cure period from the underlying service provider(s), 3Com, at its sole discretion, may assist Capital 4, financially or otherwise, under terms and conditions agreed upon by the Parties, to remedy or cure any such default under the Public Access Assets Service agreements.

    4.3.3    3Com and Capital 4 shall cooperate with one another to implement the following actions immediately following commercially reasonable indications: (i) of Capital 4's intent to declare itself insolvent; or (ii) that Capital 4 is otherwise temporarily unable to honor its obligations under the existing POZ™ Customer Agreements:

    (a)    Capital 4 shall produce a residual analysis and portfolio report (the "Report") to 3Com. The Report will identify:

1. All existing Public Access Asset Service Providers;

2. All existing POZ™ Customers;

3. All Residual Funds associated with the existing POZ™ Customer Agreements and the source of the funds;

4. All required payments to the Public Access Asset Service Providers associated with the existing POZ™ Customer Agreements;

5. For any projects in process, current carrying costs and estimated post-conversion costs;

6. Net Contract Value as calculated by: (Total POZ™ Customer Agreement Remaining Payments) minus (Total Funding Source Remaining Payments) minus (Total estimated Public Access Asset Service Provider Payments) for each POZ™ Customer Agreement; and

7. Total 3Com Exposure is calculated as: Total Net Contract Value of the affected POZ Customer Agreements. If the Total 3Com Exposure is a deficit, 3Com shall have the right to an additional administrative fee not to exceed 5% of such deficit..

    (b)    Capital 4 shall assign any and all services performed by Capital 4 in accordance with the terms of this Operations Agreement,

                      including but not limited to, functionality of the POZ™ Property and POZ™ Back Office Services, to 3Com or any person or entity designated in writing by 3Com; and

(c)        Capital 4 shall assign all rights to all Residual Funds associated with the existing Capital 4 POZ™ Portfolio to 3Com, directing all funding sources or customers, as the case may be, to remit the Residual Funds payments directly to 3Com until the expiration of each POZ™ Customer Agreement term.

(d)        3Com shall assume all of the obligations of any and all Public Access Assets Service agreements entered into by Capital 4 in connection with 3Com Power of $Zero Customer Agreements. 3Com shall satisfy payment of such obligations with the Residual Funds associated with Capital 4's POZ portfolio; provided, however, that the Total 3Com Exposure, as identified in the 3Com Report, shall remain Capital 4's obligation to 3Com and 3Com shall be entitled to withhold from the Licensor's Fees an amount sufficient to satisfy the deficit, if any, on a monthly basis, equal to the Net Contract Value of each 3Com Power of $Zero Customer Agreement divided by the number of months remaining for each such agreement (the "Hold Back"). Notwithstanding the foregoing, the Hold Back shall not exceed fifty (50%) percent of the Licensor's Fees for any given month, net of any prepayment facility allocation as contemplated in the License Agreement. Capital 4 may elect to satisfy the Total 3Com Exposure (if a deficit) through a mutually acceptable alternate proposal.

(e)        For projects in process, 3Com agrees to use the estimated post conversion costs in calculating the Total 3Com Exposure, after an additional grace period of ninety (90) days from the date of the Notice under to complete any outstanding projects in progress.

4.4    Effect of Termination by 3Com for Cause.
In addition to any other rights to which 3Com may be entitled as set forth in this Agreement or in law, in the event that this Agreement is terminated by 3Com pursuant to Section 4.2 or 4.3 above, Capital 4 shall cooperate with 3Com in facilitating the assignment to 3Com of the following: (a) all affected POZ™ VAR and 3Com Customer Agreements in the possession of Capital 4 and which Capital 4 is a Party, and (b) all rights to the Residual Funds associated with the affected POZ Customer Agreements, and (c) cease direct communications with all 3Com POZ™ VARs even if prior written authorization was granted.

4.5    Survival. In addition to those rights and responsibilities that by their very nature survive expiration or termination of this Agreement, the following provisions of this Agreement shall survive expiration or termination: Section 2.5.1, 2.5.2, 2.5.3, 2.5.4, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 4.3, 5, 6 and 7.

**Section V.    Indemnification**

5.1    Mutual Indemnification

Each Party, (the "Indemnifying Party") shall defend, indemnify and hold harmless the other Party and all of its directors, officers, employees, shareholders, principals, partners, representatives, and agents (each an "Indemnified Party") from and against any third party claims, losses, judgments, costs, or expenses (collectively the "Claims") in connection with any Claim by a third party arising out of or resulting from: (a) the gross negligence or willful misconduct of the Indemnifying Party; or (b) a material breach of the terms or conditions of this Agreement. Neither Party's indemnification obligation shall extend to claims to the extent resulting from the negligence or willful misconduct of the Indemnified Party.

In all cases, the Indemnified Party shall provide prompt written notice of a Claim to the Indemnifying Party. The Indemnifying Party shall have sole control of the defense and settlement of such Claim, provided that the Indemnifying Party shall not settle any such Claim without the prior written consent of the Indemnified Party, which shall not be unreasonably withheld, delayed, or conditioned. The Indemnified Party shall reasonably cooperate with the Indemnifying Party in the defense and settlement of such claim.

5.2    Limitation of Liability.

EXCEPT FOR THE PARTIES' INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 5, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL, OR PUNITIVE DAMAGES OF ANY KIND, ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT, INCLUDING LOSS OF PROFIT, OR LOSS OF BUSINESS OPPORTUNITY, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**Section VI.    Warranties**

6.1    Warranty.

The Parties represent and warrant that the services each performs pursuant to this Agreement shall be completed in a professional, workmanlike manner, with the degree of skill and care that is required by current, good and sound professional procedures and practices, and in conformance with the highest industry standards for the completion of such services prevailing at the time.

6.2    Each Party represents that (a) it has full right and power to enter into and perform according to the terms of this Agreement; (b) its performance of activities pursuant to this Agreement shall not violate any agreement or obligation between it and a third Party; (c) it shall comply with all applicable local, state and federal laws, statutes and regulations; (d) its products or services (including any related Intellectual Property), when used in accordance with the terms of this Agreement, do not infringe any copyright, trademark, or to the best of its knowledge, any

U.S. patent issued as of the Effective Date, held by any third Party; and (e) it has all government licenses, permits, or other authorizations necessary to conduct its business.

6.3  EACH PARTY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

**Section VII.  Miscellaneous**

7.1  No Assignment.

Neither Party may transfer or assign this Operations Agreement, or any rights or obligations hereunder, without the prior written consent of the other Party; provided, however, that either Party may, without the consent of the other Party, assign its rights and obligations hereunder to a successor in interest in connection with the transfer of all or substantially all of its assets to such successor corporation through sale of assets, merger, or otherwise.

In addition, and subject to the restrictions set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective, heirs, legal representatives, successors and assigns.

7.2  Governing Law; Submission to Jurisdiction.

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.** Each Party hereby irrevocably submits to the exclusive jurisdiction and venue of any state court or United States federal court located in New York, New York and any appellate court from any thereof, and waives any immunity from the jurisdiction of such courts over any action, suit or proceeding (a "Proceeding") arising out of or relating to this Agreement. So long as either Party has any obligation under this Agreement, each Party shall maintain a duly appointed agent in New York, New York for the service of process or other legal summons for purposes of any Proceeding and, if it fails to maintain such an agent, any such process or summons may be served on it by mailing a copy thereof by registered mail, or a form of mail substantially equivalent thereto, addressed to such Party at its address as provided for notices hereunder.

7.3  Independent Contractor.

3Com is an independent contractor, and nothing in this License Agreement shall be deemed to create a joint venture, partnership, or agency relationship between the Parties. Except as otherwise contemplated in this Agreement, either Party has the right or authority to assume or create any obligation or responsibility on behalf of the other.

7.4  Force Majeure.

Neither Party shall be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder on account of strikes, shortages, riots, insurrection, fires, floods, storms, earthquakes, acts of God, war, governmental action, labor conditions, or any other cause which is beyond the reasonable control of such Party.

7.5     Amendments.

This Agreement may be modified or amended only by a written instrument duly signed by the Parties hereto.

7.6     Severability.

If any provision contained in this Operations Agreement is determined to be void, illegal, or unenforceable, in whole or in part, then the other provisions contained herein shall remain in full force and effect as if the provision which was determined to be void, illegal, or unenforceable had not been contained herein.

7.7     Notices.

All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission or mailed by registered or certified mail (return receipt requested), postage prepaid, to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice; provided, that notices of a change of address shall be effective only upon receipt thereof):

    (a)     To Capital 4, as follows:

        Capital 4, Inc.
        1010 N. San Jacinto
        Houston, Texas 77002
        Facsimile: 713-237-1118
        Attn. Dave Dawson, President

    (b)     To 3Com, as follows:

        3Com Corporation
        350 Campus Drive Marlboro
        Massachusetts 01752-3064
        Facsimile:
        Attn.

7.8     Entire Agreement.

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and, expect for the License Agreement of even date therewith between the Parties,

supersedes and annuls all previous communications, agreements or understandings between them with respect to the subject matter hereof.

7.9    Waiver.

No failure by either Party to take any action or assert any rights arising from any breach or default of this Agreement shall be deemed to be a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

7.10    Counterparts.

This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEROF, Capital 4 and 3Com have executed this Operations Agreement through their respective duly authorized officers as of the Effective Date.

**Capital 4:**

By: _____
Dave Dawson, President

**3Com Corporation:**

By: _____

_Senior Vice President_ .
(Print)