UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3COM CORPORATION,

        Plaintiff,

-against-

CAPITAL 4, INC., F. DAVIS DAWSON, and ISH VILLA-LOBOS,

        Defendants.

Civ. No.

DECLARATION OF GLENN EWING IN SUPPORT OF 3COM CORPORATION'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

     I, Glenn Ewing, declare under penalty of perjury that the following is true and correct:

     1.    I am the Vice President, Business Partner Development for 3Com Corporation.

     2.    I have held that position since September 1, 2007, and prior to that time I held the position of Director, Channel Development for 18 months.

     3.    Except as otherwise noted, I have personal knowledge of the facts stated herein.

     4.    In or about 1999, 3Com was a network and telecommunications equipment supplier to a company called Infinitel, Inc.

     5.    I learned from Capital 4 that F. Davis Dawson and Ish Villa-Lobos had formed Capital 4 in or about 2000 and merged Infinitel into it, and that Dawson and Villa-Lobos jointly own and exercise sole control over Capital 4.

     6.    In or about 2000, 3Com became a network and telecommunications equipment supplier for Capital 4, selling equipment to Capital 4 for use in Capital 4's "Power of

BOS-1128481 v4

$Zero" program through which Capital 4 provided network and telecommunications services and new equipment to customers.

7. Under the Power of $Zero program, Capital 4 sold network and telecommunications services to new customers under agreements that required the customer to pay a fixed monthly fee for a fixed period of time (usually six years) for a package of services. The services included local and long distance telephone, internet, and/or voice-over-internet services (collectively, "Public Access Services"), and, at the customer's option, lease of equipment, installation, and long term equipment servicing. The monthly fee for such services was based on the customer's reported actual monthly expenses for such services delivered by existing providers.

8. Capital 4 uses third party carriers such as Level 3, Big City, Texlink, Verizon, MCI, and Sprint to provide Public Access Services to its customers.

9. Under the Power of $Zero program, customers had the option to receive, at little or no additional cost to the customer, (1) new networking and telephone equipment; (2) a cash rebate; or (3) new networking and telephone equipment and a partial cash rebate. Thus, depending on the option selected, some customers received from Capital 4 new equipment as well as Public Access Services for a fixed monthly fee.

10. Capital 4 sold 3Com networking and telephone equipment as part of the Power of $Zero telecommunications packages sold to customers who elected an option with new equipment.

11. In order to finance the cost of the new equipment and/or cash rebates provided to customers, Capital 4 monetized the value of the contracts it entered into with

customers by arranging with a financial institution (the "Lender") for a loan to the customer of the discounted present value of a portion of each customer contract.

12. I understand from my discussions with Capital 4 that Capital 4 monetized the value of the contracts by presenting the Lender with an invoice for the value of the equipment to be provided as part of the transaction. The Lender then made a loan to the customer of the present value of the lease and the customer became obligated to the Lender to make monthly payments on the loan.

13. Where new equipment was not part of the transaction, the customer's existing equipment was used to secure the loan from the Lender. If the customer's existing equipment was leased rather than owned, this required Capital 4 to buy out the lease.

14. It is my understanding based on discussions with Capital 4 that the customer's monthly payment to the Lender constituted a portion of the fixed monthly fee the customer was paying under the Power of $Zero program, which portion was referred to as the monetization percentage. Thus, if 80% of the customer's fixed monthly fee was attributable to the lease payment due to the Lender, the transaction was considered 80% monetized. In such circumstances, 20% of the customer's fixed monthly fee remained to pay for the Public Accesses Services contracted for under the customer's Power of $Zero agreement with Capital 4.

15. According to what I learned from Capital 4, the proceeds obtained by monetization were available for some or all of the following purposes: (a) to pay for the new equipment being provided in the transaction or to buy out a lease of the existing equipment; (b) to fund any cash rebate the customer had elected to receive; (c) to cover the cost of installation, warranty and service of new equipment; (d) to pay any commissions owed to third party resellers; (e) to fund the cost of Public Access Services to the extent that the non-monetized

portion of the customer's fixed monthly fee was not sufficient to do so; (f) to cover Capital 4's operating expenses; (g) to contribute to profit to the extent all other expenses were paid.

16.  I observed the execution of a "Strategic Alliance Agreement" dated January 31, 2005 by representatives of Capital 4 and 3Com. A true and correct copy of the Strategic Alliance Agreement ("SAA") is attached as Exhibit 1.[1]

17.  On or about March 10, 2005, Capital 4 and 3Com entered into a "Rules of Engagement Addendum to the Strategic Alliance Agreement." A true and correct copy of the Rules of Engagement Addendum ("ROEA") is attached as Exhibit 2.

18.  Under the Strategic Alliance Agreement and Rules of Engagement Addendum, 3Com undertook to participate more actively in the Power of $Zero program by assisting Capital 4 to market the program and to establish relationships with other resellers of 3Com products ("3Com Value Added Resellers" or "3Com VARs") so that such 3Com VARs could also sell the Capital 4 Power of $Zero program.

19.  The parties operated under the Strategic Alliance Agreement and Rules of Engagement Addendum until the fall of 2006. During this period, Capital 4 entered into numerous Power of $Zero contracts with customers under which it promised to provide customers Public Access Services and, for those customers who so elected, new 3Com equipment, for a fixed monthly fee (the "Capital 4 POZ Customer Agreements"). 3Com was not a party to the Capital 4 POZ Customer Agreements.

20.  The Capital 4 POZ Customer Agreements were executed on paper bearing the Capital 4 logo. Capital 4's use of 3Com's logos, marks and/or names in connection with the Power of $Zero program, including, among other things, in marketing materials, contracts and

---

[1] 3Com does not have in its possession an executed copy of the Strategic Alliance Agreement, however, I believe the attached version is the one that was executed by the parties.

supporting documentation, was governed and limited by the Strategic Alliance Agreement and Rules of Engagement Addendum. See ROEA ¶ 6.c., attached as Exhibit 2. 3Com did not consent to Capital 4's use of 3Com's logos, marks and/or names on any Capital 4 Power of $Zero Customer Agreements.

21. In or about late 2005 or early 2006 during negotiations of the terms of a new agreement between Capital 4 and 3Com, Villa-Lobos directed Dawson to provide, and Dawson provided 3Com with aggregate financial data on the Power of $Zero program and detailed financial data on a sample of seven customers. Dawson specifically represented to 3Com's management that the aggregate financial data was accurate and that the sample data was representative of Capital 4's Power of $Zero portfolio.

22. Later in the negotiations, Dawson also represented to 3Com that Capital 4 was operating at a loss of about $300,000 per month for net Public Access Services expenses, but that these liabilities were being reduced at a rate of about $30,000 per month, such that in 10 months Capital 4 would no longer be operating at a loss.

23. After 3Com entered into the License and Operations Agreements with Capital 4 on or about November 10, 2006, 3Com began entering into 3Com POZ Customer Agreements with customers. The 3Com POZ Customer Agreements were executed on paper branded with the 3Com name and logo ("3Com Paper").

24. In or about late July, 2007, 3Com learned that Capital 4 was seriously delinquent on many of its outstanding payment obligations to third party Public Access Services providers. 3Com made this alarming discovery when it began receiving reports from 3Com VARs who stated that they had received inquiries from Power of $Zero customers who had been

warned by their Public Access Service providers that they were in danger of having their service terminated due to non-payment.

25.  Numerous Power of $Zero customers were being threatened with shut off of their Public Access Services.

26.  3Com learned that Capital 4 had, without 3Com's approval of the transactions, entered into additional agreements with new Power of $Zero customers on 3Com Paper bearing the heading "3Com Power of $Zero Customer Agreement" (the "Unauthorized Agreements").

27.  To the best of my knowledge, 3Com did not give Capital 4 approval to enter into agreements on 3Com paper with the following customers: Arkay Packaging Corporation, Individual Assurance Co., d/b/a Life, Health & Accident, Words Mail Service of Texas, USA Brokerage, Inc., Lord of the Streets Episcopal Church, Tara Energy, West Georgia Family Medicine, Lake Windcrest Golf, Absolute Best Care Home Health, Southern Patio, Greater Birmingham Association of Builders, Hawkeye Insurance, Drake Interiors, and KCOH Radio CP4INF0123.

28.  3Com's approval process for proposed Power of $Zero agreements includes a review by 3Com of a "Reconciliation Report," provided by Capital 4 which discloses the monetization level for the transaction and analyzes the profitability of the transaction.

29.  Capital 4 failed to provide a Reconciliation Report for any of the Unauthorized Agreements.

30.  3Com further learned that Capital 4 had also entered into POZ agreements with customers in which Capital 4 executed agreements on its own behalf on 3Com Paper (the

"Misbranded Agreements"). 3Com had never authorized the use of 3Com Paper for deals to which 3Com was not even purported to be a party.

   31.  I have been told by Laurie Bakke of Huntington Financial and Bill Stephanos of 3Com that Capital 4 employees have at times used business cards branded with 3Com's name and logo without 3Com's knowledge or consent. I have been contacted by customers who were confused by this, thinking that they had been visited by and had discussions with 3Com employees, when in fact the individuals were employees of Capital 4.

   32.  Specifically, I learned that Dawson's statements regarding the scope and nature of Capital 4's monthly losses of $300,000 for net Public Access Services outflows and the then current actions that he claimed were reducing such liabilities by $30,000 per month were false and were known to Dawson to be false at the time they were made. More particularly, based on information 3Com has recently obtained, those liabilities far exceeded the amounts asserted by Dawson and those liabilities were increasing, not decreasing, at the time the statements were made.

*[signature follows on next page]*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on this 8th day of October, 2007.

_____
Glenn Ewing