# EXHIBIT 1

## STRATEGIC ALLIANCE AGREEMENT

This Strategic Alliance Agreement ("Agreement") is made by and between 3Com Corporation ("3Com"), a Delaware corporation with its principal place of business at 350 Campus Drive Marlboro, MA 01752-3064, and Capital 4, Inc. ("Capital 4") a Texas corporation with its principal place of business at 1010 North San Jacinto, Houston, TX 77002 (collectively, "the Parties" and individually, the "Party").

## RECITALS

**Whereas**, 3Com is in the business of developing and selling telephony systems;

**Whereas**, Capital 4 is in the business of developing and utilizing the Power of $Zero model of selling, which allows Capital 4 to secure long term, financial agreements with credit worthy companies, in order to provide local lines, long distance services, internet access, new/used equipment, and repair service, (hereinafter "Public Access Services");

**Whereas**, the Parties see the benefit of working together in marketing 3Com's telephony systems to displace equipment sourced from 3Com competitors in the market, and to increase the sales and leasing of 3Com's telephony systems to customers on a global basis; and

**Whereas**, the Parties see the benefit of working together in utilizing the Power of $Zero model of selling in marketing 3Com's telephony systems to displace equipment sourced from 3Com competitors in the market, and to increase (by and through the use of other Re-sellers) the sales and leasing of 3Com's telephony systems to customers on a global basis.

## AGREEMENT

**Now, therefore,** for and in consideration of the of the recitals set forth above, the mutual promises, covenants, and conditions contained herein, the Parties agree as follows:

**1.      Purpose of this Agreement.**
This Agreement is intended to summarize the current business understandings between the Parties, and to define the terms under which, in consideration of Capital 4 promoting and using 3Com voice products ("3Com Products") in all of Capital 4's Public Access Services offerings and operations, where new telephone equipment is needed, 3Com agrees to: (1) assist Capital 4 in marketing the Public Access Service which Capital 4 provides; and (2) assist Capital 4 in establishing agency relationships with other Re-sellers of the 3Com Products, allowing those Re-sellers to utilize the Power of $Zero model of selling in marketing 3Com's telephony systems.

**2.      Term and Termination.**
    a.   The term of this Agreement shall begin upon the Effective Date and continue for three (3) years thereafter (the "Term") unless otherwise rightfully terminated, in

accordance with the terms of this Agreement. This Agreement may be extended for subsequent one (1) year terms upon mutual written agreement of the Parties.

b. Either party may terminate this Agreement at its convenience, at any time, with or without cause by sending the other party written notice of such intent. Once this Agreement is terminated, Capital 4 may continue all agency relationships with 3Com Re-sellers that have been established by Capital 4, as of the date of termination.

c. Either party may terminate this Agreement: (i) upon written notice to the other party if such party fails to perform or otherwise breaches any of its material obligations under this Agreement (after twenty (20) business days written notice of such breach and opportunity to cure, if curable); (ii) if either party files a petition in bankruptcy, becomes insolvent, or dissolves; or (iii) if the other party undergoes a material change of management or ownership that in the terminating party's sole discretion, may have an adverse impact on the terminating party's business or rights under this Agreement.

d. Within ten (10) days of the expiration or termination of this Agreement, each party shall promptly notify the other party of all of such other party's Confidential Information in its possession, and shall promptly return all such Confidential Information, or provide written certification (by affidavit) as to its destruction.

3. **Capital 4 Obligations.**

a. **3Com Product.** Capital 4 agrees to promote and use 3Com Products in all of Capital 4's Public Access Service offerings and operations for the term of this Agreement, provided, however, new telephone equipment is required to be installed. If the 3Com Products, including installation, require special authorization from 3Com, then such 3Com Products must be purchased from and performed by a 3Com authorized Re-seller, or by 3Com directly.

b. **Exclusivity.** The relationship that 3Com has with Capital 4 is exclusive; precluding Capital 4 from agreeing to participate in a similar commercial relationship of any kind with any telephone equipment provider or any competitor of 3Com during the term of this Agreement.

c. **Notice to 3Com Re-sellers.** Should this Agreement expire or terminate for any reason, Capital 4 shall give all 3Com Re-sellers, with whom Capital 4 has engaged (1) regarding enrolling in Capital 4's Public Access Service program; or (2) establishing agency relationships to utilize the Power of $Zero model of selling in marketing 3Com's telephony systems, written notice of such expiration or termination within ten (10) business days of the expiration or termination effective date.

4. **3Com Obligations.**

a. **Marketing.** 3Com agrees to assist Capital 4 in (1) marketing the Public Access Service, which Capital 4 provides, to 3Com Re-sellers; and (2) allowing Capital 4 to establish agency relationships with other Re-sellers of the 3Com Product, allowing those Re-sellers to utilize the Power of $Zero model of selling in marketing 3Com's telephony systems.

b. **Authorization to Contact 3Com Re-Sellers.** 3Com shall provide Capital 4 with written authorization, as it's sole discretion, identifying those specific 3Com Re-sellers with whom Capital 4 can engage, regarding (1) enrolling those 3Com Re-

sellers in the Capital 4 Public Access Service program, and (2) establishing agency relationships with those 3Com Re-sellers, allowing those Re-sellers to utilize the Power of $Zero model of selling in marketing 3Com's telephony systems. Capital 4 agrees not to approach any known 3Com Re-seller unless it has been specifically identified by 3Com. Even after such authorization, the Parties agree that until a written agency relationship established, 3Com will retain primary business interface to any 3Com Re-seller that is considering enrolling in the Capital 4 program. Thereafter, Capital 4 shall retain the primary business interface solely with respect to the Capital 4 Public Access Service program and the agency relationship to use the Power of $Zero model of selling in marketing 3Com's telephony systems. Any written agency relationship established between Re-Seller and Capital 4 must clearly state that Capital 4 shall be fully liable for any and all issues related to Capital 4's Public Access Service program and the Power of $Zero model of selling.

5.    **Mutual Obligations.**

  a. **Agreement for 3Com Re-Seller.** The Parties will endeavor in good faith to mutually compose and agree upon the terms of a precise agreement, which will enable 3Com Re-sellers to enroll in the Capital 4 Public Access Service program, and allow Capital 4 to establish agency relationships with those 3Com Re-sellers, allowing those Re-sellers to utilize the Power of $Zero model of selling in marketing 3Com's telephony systems.

  b. **Grey Marketing Procedures.** The Parties will endeavor in good faith to mutually agree on creating, implementing, and adhering to procedures and processes to preclude the creation of any grey market for 3Com equipment that may be displaced by Capital 4; or by 3Com Re-sellers' enrollment in the Capital 4 Public Access Service program, or by Capital 4's establishment of an agency relationship with 3Com Re-sellers, allowing those Re-sellers to utilize the Power of $Zero model of selling in marketing 3Com's telephony systems.

  c. **Quarterly Business Reviews and Strategy sessions.** The Parties mutually agree to meet at least quarterly to review the business performance under this Agreement, and to develop expansion plans and strategies for developing and implementing future business and marketing plans.

  d. **Escalation Process.** Should a dispute arise between the Parties, the dispute shall be promptly escalated to the two representatives designated below (the "Representatives"), who shall use commercially reasonable efforts to discuss the escalated issue and come to a mutually agreeable solution to resolve the issue within two (2) business days.

Representative from Capital 4: _____

Representative from 3Com: _____

The designated Representatives from each party may be changed by that party upon reasonable notice to the other party.

*Strategic Alliance Agreement – Page 3 of 10*

e. **Cooperation**.  The Parties shall endeavor in good faith to provide the reciprocal, cooperative, and proactive engagement of their marketing, business development, sales, and consulting teams.  The Parties shall discuss, and may mutually agree upon and develop, additional communication strategies with respect to this Agreement.

6. **Press Releases.**
Except as may be required by law, neither party shall, without the other party's prior written consent, which shall not be unreasonably withheld: (a) make any news release, public announcement, denial or confirmation of this Agreement or its subject matter; or (b) in any manner advertise or publish the fact that they have contracted hereunder.  Notwithstanding the above, Capital 4 and 3Com shall publicize their relationship throughout the term in accordance with a mutually agreed upon joint public relations plan.  The Parties shall jointly prepare and mutually approve press releases and other public announcements, which may describe specific services, products, and go-to-market cooperation.  The initial press release announcing this Agreement shall be mutually agreed upon before, or promptly after, the Effective Date, and shall be issued as soon as practicable following the Effective Date.  Each party shall use commercially reasonable efforts to cause its senior executives to participate in all initial press releases. Except as expressly authorized in this Section ("Press Releases"), neither Capital 4 nor 3Com shall make or release any press release or other public announcement with respect to this Agreement, nor disclose, advertise, or publish the existence or the terms or conditions of this Agreement, financial or otherwise, without the prior written consent of the other party.

Unless agreed otherwise in writing, each Party shall bear their own individual marketing costs and expenses.

7. **Warranties.**
   a. The Parties represent and warrant that the services each performs pursuant to this Agreement shall be completed in a professional, workmanlike manner, with the degree of skill and care that is required by current, good and sound professional procedures and practices, and in conformance with the highest industry standards for the completion of such services prevailing at the time.
   b. Each Party represents that (a) it has full right and power to enter into and perform according to the terms of this Agreement; (b) its performance of activities pursuant to this Agreement shall not violate any agreement or obligation between it and a third party; (c) it shall comply with all applicable local, state and federal laws, statutes and regulations; (d) its products or services, when used in accordance with the terms of this Agreement, do not infringe any copyright, trademark, or to the best of its knowledge, any U.S. patent issued as of the Effective Date, held by any third party; and (e) it has all government licenses, permits, or other authorizations necessary to conduct its business.
   c. EACH PARTY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

8.  **Personnel; Property.**

    a.  **No Solicitation.**  Each Party agrees that during the term it shall not solicit or attempt to induce any of the other Party's employees or independent contractors who are directly involved in the relationship set forth in this Agreement, to terminate or breach an employment, contractual, or other relationship with such Party. Notwithstanding the foregoing, nothing in this Agreement shall prevent either Party from talking to, or entering into agreements with, the other Party's employees or independent contractors who approach such Party responding to advertising that the Party has circulated to the general public.

    b.  **Taxes.**  Each Party shall be responsible for its own tax liabilities and tax reporting resulting from any activities related to this Agreement.

    c.  **Insurance.**  During the term, each Party shall carry and maintain liability insurance coverage to satisfactorily protect its obligations hereunder.  Upon a request, a Party shall provide the other a Certificate of Insurance evidencing its insurance coverage.

9.  **Indemnity.**

    a.  Each Party, (the "Indemnifying Party") shall defend, indemnify and hold harmless the other Party and all of its directors, officers, employees, shareholders, principals, partners, representatives, and agents (each an "Indemnified Party") from and against claims, losses, judgments, costs, or expenses (collectively the "Claims") in connection with any claim by a third party arising out of or resulting from: (a) actual or alleged infringement or misappropriation by the Indemnifying Party of the copyright, patent, trademark, or other intellectual property right of such third party; (b) negligence or willful misconduct of the Indemnifying Party; (c) the services performed or actions taken by the other party in connection with this Agreement, or (d) breach of the terms or conditions of this Agreement.  Neither Party's indemnification obligation shall extend to claims to the extent resulting from the negligence or willful misconduct of the Indemnified Party.

    b.  3Com shall not be liable for any aspect of the Public Access Services or any claims or transactions relating to Capital 4's performance of the Public Access Services for the 3Com Re-sellers or their customers.  Capital 4, (the "Indemnifying Party") shall defend, indemnify, and hold harmless 3Com and all of its directors, officers, employees, shareholders, principals, partners, representatives and agents (each an "Indemnified Party") from and against claims, losses, judgments, costs, or expenses (collectively "Claims") in connection with any claim by a third party arising out of, or resulting from, such Public Access Services.

    c.  In all cases, the Indemnified Party shall provide prompt written notice of a Claim to the Indemnifying Party.  The Indemnifying Party shall have sole control of the defense and settlement of such Claim, provided that the Indemnifying Party shall not settle any such Claim without the prior written consent of the Indemnified party, which shall not be unreasonably withheld, delayed, or conditioned.  The Indemnified Party shall reasonably cooperate with the Indemnifying Party in the defense and settlement of such claim.

10.  **Ownership of Information**

*Strategic Alliance Agreement – Page 5 of 10*

Each Party shall retain all right, title, and interest in, and to its own information and content exchanged and shared under this Agreement, its own promotional and marketing materials, and its own website (excluding the other Party's content). Nothing herein shall be construed as giving one Party the right, title, or interest in the other Party's information.

11. **Confidentiality.**

   a. **Confidential Information.** This Section 11 shall govern the exchange, protection, and disclosure of confidential or proprietary information pursuant to this Agreement. Each Party (the "Disclosing Party") may from time to time during the term of this Agreement disclose to the other Party (the "Receiving Party") certain information regarding the Disclosing Party's business, including without limitation its assets, liabilities, capitalization, structure, market, customers, price strategy, price lists, profitability, operations, manner of doing business, processes, patents, copyrights, trademarks, data, technical documentation, business practices, Trade Secrets, and other strategic information that is confidential to the Disclosing Party (collectively the "Confidential Information").   (Trade Secrets, as used herein, shall mean all Confidential Information which derives economic value, actual or potential, from not being generally known to, yet being readily ascertainable by proper means, other persons who can obtain economic value or benefit from its use or disclosure; and is the subject of efforts that are reasonable, under the circumstances, to maintain its secrecy.) The Parties each regard all of its Confidential Information to be proprietary and strictly confidential, and require that all such information remain secret, confidential, and proprietary to that Party in all possible respects.  In order to be protected as "Confidential Information" pursuant to this Section 11, such information, if disclosed in writing, shall be marked or identified as "confidential" or a similar designation; or, if orally or visually disclosed, shall be identified as "the confidential information of the disclosing party" at the time of disclosure, and then summarized in writing and provided to the recipient in such written form or via a transmittal sheet provided for this purpose within thirty (30) days after such oral or visual disclosure.

   b. **Protection of Confidential Information.** The Receiving Party may only use the Confidential Information received from the Disclosing Party for the purpose of performing under this Agreement, and shall not use the Confidential Information for any other purpose. The Receiving Party may only disclose the Confidential Information of the Disclosing Party to the employees and contractors of the Receiving Party who have a need to know such Confidential Information for purposes of the Receiving Party's performance under this Agreement, and may only make such disclosure to employees and contractors who are under a written duty of confidentiality, which sufficiently allows the Receiving Party to comply with its obligations imposed by this Section, and protects the Confidential Information provided by the Disclosing Party.  The Receiving Party shall protect the Disclosing Party's Confidential Information from unauthorized use, access, or disclosure in the same manner as the Receiving Party protects its own Confidential Information of a similar nature, but with no less than reasonable care.   The obligations of confidentiality shall continue for a period of five (5) years after the date of disclosure. The confidentiality obligations under this Section 11 shall survive the termination of this Agreement.  The Receiving Party shall immediately notify the Disclosing Party

*Strategic Alliance Agreement – Page 6 of 10*

of any violation of this Agreement by virtue of the disclosure of Confidential Information, and shall cooperate with the Disclosing Party to regain possession of any Confidential Information. Nothing in the Agreement shall be deemed to constitute an implied license in favor of the Receiving Party as to any proprietary rights of Confidential Information provided by the Disclosing Party, including, without limitation, patents, copyrights, trademarks, or Trade Secrets. This Agreement creates a relationship of trust and confidence between the Disclosing Party and the Receiving Party, and will be construed and enforced accordingly. If the Receiving Party (including its agents or representatives) breaches or threatens to breach any portion of this Agreement, the Disclosing Party may enforce this Agreement in an action for damages or injunctive relief, or both, it being specifically recognized, understood, and agreed by the Parties that the Disclosing Party's remedies at law may be inadequate to fully protect its interests. If an action for Temporary Restraining Order, Temporary Injunction, or Permanent Injunction is filed, the Receiving Party hereby irrevocably waives any requirement that the Disclosing Party post any bond or any other security.

c. **Agreement to Not Compete.** The Parties agree that Capital 4's Power of $Zero Model of selling, which consists of specific positioning of the compounding value of the services and the associated marketing and quote tools, was developed only for the use by Capital 4 or its authorized agents. 3Com agrees that it learned of the Power of $Zero Model of selling from Capital 4, and agrees that 3Com will not directly develop the Power of $Zero Model of selling during the term of this Agreement and for one (1) year following termination or expiration of this Agreement. The Parties further agree that this restriction (1) applies only to 3Com voice products, and (b) does not apply to any leasing arrangements that 3Com may establish for its voice products.

d. **Exceptions.** The Receiving Party's obligations with respect to any Confidential Information received from the Disclosing Party shall terminate if and when the Receiving Party can document that such Confidential Information: (a) was already lawfully known to the Receiving Party at the time of disclosure by the Disclosing Party; (b) is disclosed to the Receiving Party by a third party who had the right to make such disclosure without any confidentiality restrictions; (c) is, or through no fault of the Receiving Party has become, generally available to the public; (d) is independently developed by the Receiving Party without use of, or reference to, the Disclosing Party's Confidential Information. In addition, the Receiving Party will be allowed to disclose Confidential Information of the Disclosing Party to the extent that such disclosure is (i) approved in writing by the Disclosing Party, (ii) necessary (i.e. there are no reasonable alternatives that would avoid disclosure) for the Receiving Party to enforce its rights under this Agreement; or (iii) required by law or by the order or a court of similar judicial or administrative body, provided that the Receiving Party notifies the Disclosing Party of such required disclosure promptly and in writing and cooperates with the Disclosing Party, at the Disclosing Party's request and expense, in any lawful action to contest or limit the scope of such required disclosure.

**12.    Attorneys' Fees.**

In any action to enforce this Agreement, the prevailing Party shall be entitled to recover all court costs and expenses, and reasonable attorneys' fees, in addition to any other relief to which it may be entitled.

**13.    Severability.**
In the event any provision of this Agreement shall be deemed to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.   The Parties agree to replace any invalid provision with a valid provision, which most closely approximates the intent and economic effect of the invalid provision.

**14.    Limitation of Liability.**
EXCEPT FOR THE PARTIES' INDEMNIFICATION OBLIGATIONS IN SECTION 9, THE CONFIDENTIALITY OBLIGATIONS UNDER SECTION 11, NEITHER PARTY SHALL HAVE ANY LIABILITY WITH RESPECT TO ITS OBLIGATIONS UNDER THIS AGREEMENT OR OTHERWISE FOR CONSEQUENTIAL, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL, OR PUNITIVE DAMAGES OF ANY KIND, ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT, INCLUDING LOSS OF PROFIT, OR LOSS OF BUSINESS OPPORTUNITY, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**15.    Assignment.**
Neither Party shall assign this Agreement without the prior written approval of the other Party, which shall not be unreasonably withheld.   Any attempted assignment or transfer without such consent shall be null and void.

**16.    Waiver or Delay.**
A waiver of any default hereunder, or of any term or condition of this Agreement, shall not be deemed to be a continuing waiver or a waiver of any other default or any other term or condition, but shall apply solely to the instance to which such waiver is directed.

**17.    Notices.**
All notices, requests, and other communications hereunder shall be in writing, and shall be addressed to Capital 4 or to the undersigned 3Com representative, and shall be considered given when (a) delivered personally, (b) sent by confirmed facsimile, (c) delivered by nationally-recognized overnight courier with written verification receipt, or (d) delivered by postage prepaid first class, certified mail, return receipt requested.

**18.    Governing Law and Forum Selection.**
This Agreement shall be construed in accordance with, and all disputes hereunder shall be governed by, the laws of the State of New York.

**19.    Injunctive Relief.**
Each Party acknowledges and agrees that the obligations and promises under this Agreement are of a unique, intellectual nature giving them particular value.   Each Party further

*Strategic Alliance Agreement – Page 8 of 10*

acknowledges and agrees that each Party's breach of any of the promises or agreements contained in this Agreement may result in irreparable and continuing damage to the other Party for which there will be no adequate remedy at law and, in the event of such breach, such Party will be entitled to seek injunctive relief, or a decree of specific performance, or both, and such other and further relief as may be proper (including monetary damages if appropriate).

**20.    Compliance with Laws.**
General:  Capital 4 and 3Com shall comply fully with all applicable federal, state and local laws in the performance of this Agreement.
Export Control:  Each Party agrees that it will comply with all applicable export control laws.

**21.    Counterparts.**
This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**22.    Construction.**
This Agreement has been negotiated by the Parties and their respective counsel and will be interpreted fairly in accordance with its terms and shall not be construed in favor of, or against, either party.

**23.    Relationship of the Parties**
In all matters relating to this Agreement, the Parties shall act as independent contractors. Neither Party shall represent that it has any authority to assume or create any obligation or warranty, expressed or implied, on behalf of the other Party, or to represent the other Party as agent or employee, or in any other capacity.  Neither Party shall have any obligation, expressed or implied, except as set forth herein.

**24.    Entire Agreement; Modification.**
This Agreement, including its exhibits, is the complete, final, and exclusive statement of the terms of the Agreement between the Parties, and supersedes any and all other prior and contemporaneous negotiations and agreements, whether oral or written, between them, relating to the subject matter hereof.  This Agreement may not be varied, modified, altered, or amended except in writing signed by the Parties.

Executed and effective on this ____ day of _____, 2004.

_____          _____
3Com Corporation.                Capital 4, Inc.
By:      _____         By:    F. David Dawson
Title:   _____         Title:  President