the Financing Agreement with Main Street would no longer be provided. In a letter dated September 27, 2007, 3Com's provisioning partner, Capital 4, advised Bank & Trust that, "some or all of your telecom services (Local, Long Distance, Toll Free, Internet/Data & Cellular) . . . may be interrupted due to non-payment." Subsequently, and through the cooperation of Metropark, Bank & Trust managed to replicate its telecom and data services through other vendors. Presently, the cost for obtaining those telecom and data services is approximately $6,000.00 per month. Consequently, Bank & Trust is now faced with the prospect of having to remit payments to Main Street for all remaining payments alleged due under the 3Com Power of $Zero™ Solution Customer Agreement, and the Financing Agreement with Main Street, even though Bank & Trust is not receiving services, and has properly invoked the Good Cause provision to terminate these agreements.

<u>The Remaining Plaintiffs</u>

4.11    Like the two examples set forth above, all of the remaining Plaintiffs were approached by 3Com or one of the 3Com POZ VARs (identified below), and sold the 3Com Power of $Zero™ Solution. Relying upon 3Com's promotional materials, each Plaintiff was required to execute a 3Com Power of $Zero™ Solution Customer Agreement. A copy of portions of the Agreements provided to each Plaintiff is attached as **Exs. C-1 to C-11**.[3] Within weeks, *and as a requirement of the 3Com Power of $Zero™ Solution*, each Plaintiff was required to sign a "Rental Agreement", "Business Communications Equipment Lease", "Business Communication Rental Agreement" or similar document (the "Financing Agreement") with either Defendant DLL, Main Street, or another Financing Company. A copy of the executed Financing Agreement for each Plaintiff is attached as **Exs. D-1 to D-11**. Specifically:

- Plaintiff Texas Network of Youth Services purchased the program through NLI on or about June 22, 2005, and signed a Financing Agreement with DLL on July 5, 2005.
- Plaintiff Grace Products purchased the program through NCC on or about July 8, 2005, and signed a Financing Agreement with DLL on July 11, 2005.
- Plaintiff Temsco, Inc. purchased the program through NCC on or about June 1, 2005, and signed a Financing Agreement with DLL on July 6, 2005.

---

3    The documents attached as Exhibits C-1 to C-11 are intended to be those Agreements which each Plaintiff executed when it agreed to purchase the 3Com Power of $Zero™ Solution. However, not all of the Plaintiffs received or were timely provided with a fully-executed copy of their Agreement, or those fully-executed Agreements have not yet been located. Moreover, some of the Agreements evidence that they were printed web pages, where the logos and some of the text appear altered due to the printing format. Finally, many of the Agreements are single page documents which incorporate by reference additional documents, including the web-page document titled, "How Does the Power of $Zero™ Solution Work?" *See* Exs. E-1, and E-2

- Plaintiff Evans, Ewan & Brady Insurance Agency, Inc purchased the program on or about August 26, 2005, and signed a Financing Agreement with DLL on August 26, 2005.

- Plaintiff Comport Network Services and Solutions purchased the program through NCC on or about July 15, 2005, and signed a Financing Agreement with DLL on July 25, 2005.

- In order to become a 3Com Power of $Zero™ Solution VAR, Plaintiff North Central Communications purchased the program on or about April 1, 2005, and signed a Financing Agreement with DLL on April 18, 2005.

- Plaintiff Zepplin, Inc. d/b/a All Import Auto Parts purchased the program through NCC on or about April 28, 2005, and signed a Financing Agreement with DLL on May 13, 2005.

- Plaintiff Cornerstone Land Surveying purchased the program through Metropark on or about May 2, 2005, and signed a Financing Agreement with DLL on May 2, 2005.

- In order to become a 3Com Power of $Zero™ Solution VAR, Plaintiff Solution Pros f/k/a Bohn & Johnson purchased the program on or about December 16, 2005, and signed a Financing Agreement with DLL on December 7, 2005.

- Plaintiff Litchfield Family Practice Center, LLP Company purchased the program through Metropark on or about June 8, 2006, and signed a Financing Agreement with MSNB on July 24, 2006.

- Plaintiff The Bank & Trust Company purchased the program through Metropark on or about April 6, 2006, and signed a Financing Agreement with MSNB on April 21, 2006.

4.12     While the 3Com Power of $Zero™ Solution Customer Agreements are similar, they are not all identical. One of these agreements includes all of the terms on a few pages (*see, e.g.,* **Ex. C-6**), while the remaining agreements incorporate by reference a printable document posted on the web portal, titled "How Does the Power of $Zero™ Solution Work?" or "How Does the 3Com Power of $Zero™ Solution Work?" Samples of these documents, provided by Plaintiff Evans, Ewan & Brady Insurance Agency, Inc. and Plaintiff Litchfield Family Practice Center, LLP. are attached as **Exs. E-1 and E-2.**

4.13 The common denominator between all Plaintiffs as to each of the 3Com Power of $Zero™ Solution Customer Agreements is that every Agreement contains a choice of law and forum selection clause requiring:

> The Agreement shall be governed by, construed, and enforced in accordance with, and subject to, the laws of the State of Texas. The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the courts of the State of Texas and of the United States of America located in the State of Texas, Harris County for any actions, suits, or proceedings *arising out of or relating to the Agreement*. The parties shall not commence any action, suit, or proceeding arising out of or relating to the Agreement in any court other than those specified.

*See* Exs. C-6, p. 3, ¶ 19; E-1, p. 7, ¶ 52; E-2, p. 4, ¶ 52. Similarly, every Agreement contains a clause, providing that the Agreement, "supersedes and all prior agreements, arrangements or understandings between the parties relating to this transaction, and no oral understandings, statements, promises, or inducements contrary to the terms of the Agreement exist." *See* Exs. C-6, p. 3, ¶ 18; E-1, p. 7, ¶ 52; E-2, p. 4, ¶ 52.

4.14 Any claim (asserted by DLL or any other Financing Company) based upon the Financing Agreements, all executed within weeks, if not days, of when each Plaintiff executed the 3Com Power of $Zero™ Solution Customer Agreement, clearly constitute an "action arising out of or relating to" the 3Com Power of $Zero™ Solution Customer Agreements. Accordingly, despite the choice of law and non-exclusive forum selection clause in the DLL Financing Agreements, Plaintiffs' claims based upon both agreements (which are essentially one) must be litigated in Houston, Harris County, Texas. For these reason, and because DLL has instituted legal proceedings against certain Plaintiffs in Pennsylvania, Plaintiffs seek a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, preventing DLL from prosecuting the DLL Pennsylvania Lawsuits.

### Background --Capital 4 and 3Com Develop the 3Com Power of $Zero™ Solution

4.15 Through the 1990s, Capital 4 operated as a traditional "inter-connect" - selling, installing, and maintaining telephone equipment for small to medium-sized businesses in Harris County and the surrounding area. Up until late 2007, Capital 4 conducted its business as a 3Com "Voice Authorized Partner" – meaning that Capital 4 had met certain requirements, in order to be authorized by Defendant 3Com to sell and service 3Com telephone systems. Thus, Capital 4 operated as a 3Com Value Added Reseller ("3Com VAR"), like so many 3Com VARs throughout

the country, authorized to sell and service 3Com manufactured telephone equipment throughout the United States. Between 2002 and 2004, Capital 4 used the Power of $Zero™ Solution to sell 3Com telephone systems in the Harris County and surrounding areas. During this time-frame, Capital 4 began selling a more significant volume of 3Com equipment, purchased and installed at each customer's location. At this same time, and as a consequence of the offering under the Power of $Zero™ Solution, Capital 4 began providing its customers with telecom and data services (a/k/a "Public Access Services") through retail, redirect, and wholesale relationships established with telecom and data service providers, such as SBC n/k/a AT&T, Sprint, Red River, ANI Networks, Big City Networks, etc.

4.16    By late 2004, 3Com had taken notice of the volume of 3Com equipment Capital 4 was purchasing and delivering to its customers. Ewing, the 3Com representative assigned to Capital 4's account, began working directly with Capital 4 to promote the idea of allowing 3Com to privately brand, use, and develop the Power of $Zero™ Solution – in order to implement the program through 3Com's entire channel of 3Com VARs.

4.17    In early 2005, 3Com and Capital 4 entered into a business and contractual relationship, in which 3Com agreed to assist Capital 4 in marketing the Public Access Service which Capital 4 provides; and assist Capital 4 in establishing relationships with other 3Com VARs in order to utilize the Power of $Zero™ to sell 3Com telephone equipment.

4.18    Subsequently, 3Com and Capital 4 further defined their business and contractual relationship, evidencing their mutual intent to develop and promote the 3Com Power of $Zero™ Program. Accordingly, they began determining the processes by which 3Com and Capital 4 would: market the Public Access Services offered in conjunction with the Power of $Zero™ Solution; develop a comprehensive administrative system, necessary to implement the marketing of the Power of $Zero™ Solution by 3Com VARs; establish a direct relationship in order to use the Power of $Zero™ Solution in marketing 3Com Products; and allow 3Com to utilize the Power of $Zero™ Solution in marketing 3Com Products directly.

4.19    At the March 2005 "3Com Live" Event held in Las Vegas, and as part of 3Com's decision to develop and promote the 3Com Power of $Zero™ Program as its own, 3Com executives made a presentation to eight NBX Voice Dealers concerning the "3Com Power of $Zero™ Solution." At that presentation, Ewing described how 3Com intended to deploy the 3Com Power of

$Zero™ Solution throughout its VAR channel in order to increase its volume of 3Com equipment sales. Metropark was one of several VARs that attended the presentation and ultimately began marketing the 3Com Power of $Zero™ Solution. Metropark's customers include the following Plaintiffs: Cornerstone Land Surveying, Litchfield Family Practice Center; and Bank & Trust Company.

4.20   From 2005 through 2006, 3Com, Ewing, and Capital 4 further developed the 3Com Power of $Zero™ Solution. The program became entirely "3Com Branded' so that ultimately, all of the documentation and promotional materials presented to, and viewed by, each prospective customer indicated that the 3Com Power of $Zero™ Solution was a pure 3Com offering. It was 3Com's and Ewing's expressed intent and directive that Capital 4's existence and presence in the sales process be transparent, and that the potential customers (including Plaintiffs) perceive that the transaction it was entering came directly from 3Com - through its local 3Com VARs.

4.21   In this regard, 3Com developed promotional literature, describing how the 3Com Power of $Zero™ Solution had been used by the YMCA and Glazier Foods in Houston, Texas to "reduce expenses to zero." **Exs. B-1 and B-2.** Similarly, 3Com and Ewing actively worked with Capital 4 and its software developers, establishing a 3Com branded web portal, through which each prospective customer could obtain information on the details of the 3Com Power of $Zero™ Solution, as well as background on the local 3Com VAR which was marketing the 3Com Power of $Zero™ Solution. Within this web-portal, 3Com posted a video sales presentation it had produced, specifically worded and designed to promote and market the 3Com Power of $Zero™ Solution as 3Com's own unique product in the marketplace. In connection with marketing the 3Com Power of $Zero™ Solution, each prospective customer received password access to the web portal, in order to view the proposed transaction, view all related documents, and view this video sales presentation as a detailed explanation of the program.

4.22   3Com and Ewing continued to work directly with Capital 4, and 3Com invested in the further development of a 3Com branded web portal and Customer Relationship Management (CRM) software, designed to be used by 3Com VARs and their customers in connection with the sale of the 3Com Power of $Zero™ Solution. 3Com and Ewing directed how the web portal and the CRM should "look and feel", crafting the perception that each potential customer (including Plaintiffs) would have, navigating through the customer side access to the web portal. 3Com and Ewing also

designed how the CRM could be viewed, to assure that 3Com and Ewing had full "visibility" into every facet of every transaction entered in the CRM. Thus, at all times, 3Com and Ewing were able to examine and review all promotional materials, documentation, prospective agreements, executed agreements, and all other material being used by each of the 3Com VARs, and being presented to each prospective customers (including Plaintiffs).

4.23   In connection with the branding and promotion of the 3Com Power of $Zero™ Solution, 3Com and Ewing also directed that certain Capital 4 employees who were working directly with 3Com VARs to promote the 3Com Power of $Zero™ Solution (and interacting with each 3Com VAR's potential customers) be given 3Com business cards, so that the potential customers would perceive that the 3Com Power of $Zero™ Solution was a 3Com product, and would not be confused by Capital 4's involvement in the transaction. Moreover, in its communications, promotional materials, and product literature, 3Com referred to Capital 4 as its "Administrative Partner", "Provisioning Partner", or "Member of the 3Com Power of $Zero™ Partnership," thus actively working to create the impression that the customer was engaging in a transaction with 3Com.

4.24   Through 2005 and 2006, 3Com and Ewing requested certain modifications to the Customer Agreements under which the 3Com Power of $Zero™ Solution was sold - adding, requiring, or approving language and logos, designed to lead prospective customers to believe that they were entering a 3Com agreement, authorized by 3Com, and which 3Com supported and would stand behind.

4.25   During this period, 3Com and Ewing recruited 3Com VARs to market the 3Com Power of $Zero™ Solution. And, 3Com and Ewing leveraged the potential revenue generation encompassed within the 3Com Power of $Zero™ Solution to recruit non-3Com VARs (seller/distributors of competitive products, such as NEC and Avaya), in order to cause each to become a 3Com VAR as a condition of being able to promote and sell the 3Com Power of $Zero™ Solution. Consequently, NLI, Metropark, and Solution Pros in Kansas City, Missouri ("Solution Pros") all became "authorized" by 3Com and Capital 4 to sell the 3Com Power of $Zero™ Solution. In addition, North Central Communications, Inc. in Dallas, Texas ("NCC") became a 3Com VAR, solely in order to sell the 3Com Power of $Zero™ Solution. Capital 4 also continued to market the 3Com Power of $Zero™ Solution, in conjunction with 3Com. (Metropark, NLI, Solution Pros, NCC, and Capital 4 are collectively referred to as the "3Com POZ VARs".) (There were other

3Com VARs selling the program, including Genesis Telecom in Houston, Texas; Beacon Technologies in Nashville, Tennessee; DJJ in New York, New York; DJJ Technologies in Atlanta, Georgia; and Advanced Technology Solutions in Savannah, Georgia.)[4] 3Com made it absolutely clear that it was 3Com, not Capital 4, which decided which 3Com VARs were to be "selected" to market and promote the 3Com Power of $Zero™ Solution.

4.26    Integral to the viability of the 3Com Power of $Zero™ Solution was the fundamental requirement that the customer's telecom and data services be replaced by a service configuration (be it VoIP or some combination of hardware/software, and telecom/data delivery services) which could be provided at a reduced cost, creating a significant "delta" as compared to the customer's current expense for such services. In this regard, Capital 4 and 3Com cooperated in the development, testing, and launch of 3Com's "soft switch", part of 3Com's Nationwide Intelligent Private Network ("IPN"). The soft switch, a VCX SIP Telephony Server located and Level 3 in Houston, Texas was intended to be a 3Com Server and central point for all 3Com Power of $Zero™ Solution customers, and Level 3 was intended to be the bandwidth delivery company. In agreeing to market and promote the 3Com Power of $Zero™ Solution, 3Com POZ VARs relied upon the representation that 3Com's "soft switch", part of its IPN, could, in fact, be utilized to deliver telecom and data services at a fraction of the customer's existing cost (a significant component of the 3Com Power of $Zero™ Solution). 3Com POZ VARs continued to market the 3Com Power of $Zero™ Solution, including the deployment of 3Com VCX or NBX "boxes". Unfortunately, the "soft switch", the VCX or NBX boxes, and the IPN all ultimately proved to be flawed, necessitating that each customer's service configuration could not be "optimized" to the extent required by the program

4.27    Nevertheless, 3Com and Ewing developed and marketed literature, indicating that the 3Com Power of $Zero™ Solution relied in part on 3Com's proprietary equipment (e.g. the "soft switch", and the VCX or NBX boxes) and the IPN, thus leading potential customers (including Plaintiffs) to believe that the 3Com Power of $Zero™ Solution was reliable because the necessary telecom and data services were being delivered through 3Com's proprietary hardware and software configurations.

4.28    By mid 2006, 3Com indicated that it was ready to promote the 3Com Power of $Zero™ Solution nationally. 3Com embarked upon a contract negotiation with Capital 4, under

---

[4]    There were and are other 3Com POZ VARs that have marketed (and may continue to market) the 3Com