# United States District Court
# Southern District of New York

Case Number 07-CIV-8707 (JSR) (JDF)

3Com Corporation,

                                        Plaintiff,

vs.

Capital 4, Inc., *et al.*

                              Defendants.

_____/

# Memorandum of Law on behalf of Deposition Witnesses In Opposition to Plaintiff's Motion to Disqualify Their Counsel Ronald P. Gossett

**Ronald P. Gossett (Admitted *pro hac vice*)**
**Gossett & Gossett, P.A.**
4700 Sheridan Street
Hollywood, FL  33021
(954) 983-2828

# Table of Contents

Table of Authorities............................................................. iii

Argument......................................................................... 1

    What Was Really Happening, In Other Words, The Truth..................... 2

    What the Customer Was Told, In Other Words, The Lie...................... 5

    Why the Fraud?.......................................................... 10

    Disqualification of Counsel Generally................................... 12

    Standing................................................................ 13

    Merits.................................................................. 15

    Exhibit R is Privileged Document........................................ 18

Conclusion...................................................................... 21

ii

# Table of Authorities

**Statutes:**

**Rules:**

**Cases:**

*Bd. of Educ. v. Nyquist,*
    590 F.2d 1241, 1246 (2d Cir.1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Behunin v. Dow Chem. Co.,*
    642 F.Supp. 870, 872 (D.Colo.1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Commerce Commercial Leasing, LLC v. Broward Title Company*,
    Case Number 04-CV-04280, 2005 WL 1244919 (E.D.Pa. 2005). . . . . . . . . . . . . . .  2

*Evans v. Artek Sys. Corp.,*
    715 F.2d 788, 791 (2d Cir.1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*EZ Paintr Corp. v. Padco, Inc.,*
    746 F.2d 1459, 1463 (Fed.Cir.1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Federal Trade Commission v. NorVergence, Inc.,*
    2005 WL 3754864 (D.N.J. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*First Wisconsin Mortgage Trust v. First Wisconsin Corp.,*
    584 F.2d 201, 208-09 (7th Cir. 1978)(en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Fisher Studio v. Loew's, Inc.,*
    232 F.2d 199, 204 (2d Cir. 1956). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*Glen & Co. v. Popular Leasing USA, Inc.*,
    819 N.Y.S.2d 210, 2006 WL 1506137 (N.Y.Sup. 2006). . . . . . . . . . . . . . . . . . . . .  2

*Gov't of India v. Cook Indus., Inc.,*
    569 F.2d 737, 739 (2d Cir.1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Hempstead Video, Inc., v. Inc. Village of Valley Stream,*

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

409 F.3d 127, 132 (2d Cir.2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re EPIC Holdings,*
985 S.W.2d 41, 51-52 (Tex.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re George,*
28 S.W.3d 511 (Tex. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 17

*In re Yarn Processing Patent Validity Litig.,*
530 F.2d 83 (5th Cir. 1976).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*International Bus. Mach. Corp. v. Levin,*
579 F.2d 271, 283 (3rd Cir.1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Murchison v. Kirby,*
201 F.Supp. 122 (S.D.N.Y. 1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Occidental Hotels Management B.V., v. Westbrook Allegro, LLC,*
440 F.Supp.2d 303, 308-309 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Quark, Inc. v. Power Up Software Corp.,*
812 F.Supp. 178, 180 (D.Colo.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Reardon v. Marlayne, Inc.,*
83 N.J. 460, 416 A.2d 852, 862 [(1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Reardon v. Marlayne, Inc.,*
83 N.J. 460, 416 A.2d 852, 862 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Shire Laboratories, Inc. v. Nostrum Pharmaceuticals, Inc.,*
2006 WL 2129482 (D.N.J. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Skidmore v. Warburg Dillon Read LLC,*
No. 99 Civ. 10525(NRB), 2001 WL 504876, at *2 (S.D.N.Y. May 11, 2001). . . . 12, 13

*Susquehanna Patriot Commercial Leasing Co., Inc. v. Holper Industries, Inc.,*
928 A.2d 278 (Pa. Super. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Other Authorities:

iv

John P. Gyorgy, Comment, *Access to Work Product of Disqualified Counsel,*
46 U. CHI. L.REV. 443, 458 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Note, *First Wisconsin Mortgage Trust v. First Wisconsin Corporation:*
*The Work Product Order Subsequent to Attorney Disqualification,*
65 VA. L.REV. 973, 973 n. 3 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Note, *The Availability of the Work Product of a Disqualified Attorney:*
*What Standard?,*
127 U. PA. L.REV. 1607, 1611 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Rule 4-1.5(g), RULES REG. FLA. BAR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

§ 26.9(b)(3)(B)(vii) of the Texas Administrative Code,. . . . . . . . . . . . . . . . . . . . . . . . 5

v

# Argument

Deposition witnesses, Comport Network Services and Solutions, LLC, Evans, Ewan & Brady Ins. Agency, Inc., Grace Products Corp., North Central Communications, Inc., Temsco, Inc., Texas Network of Youth Services, Inc., and Zepplin, Inc., all entities organized and existing under the laws of the State of Texas, all located within the State of Texas, and none located within the State of New York, respond in opposition to Plaintiff's motion to disqualify their chosen counsel to represent them at their depositions set by Plaintiff's counsel, to take place solely within the State of Texas, and in support thereof, state:

## I.     Overview of Witnesses' Relationship to Case

Each of the witnesses represented by Gossett & Gossett, P.A., and Ronald P. Gossett, (hereafter, "Witnesses") are victims of a telephone equipment leasing fraud perpetrated by the RICO Enterprise, created and run by Plaintiff and Defendant, and named by them as "Power of $Zero™ Partnership." (*See Witnesses' Exhibit 1, p. 11, ¶ 2 for the naming of the RICO Enterprise, and Witnesses' Exhibit 2 for the original creation of the RICO Enterprise, later replaced by Plaintiff's Exhibit A to Plaintiff's Memorandum.*) The Witnesses are the entirety of the plaintiffs located within Texas[1], of a suit filed in Texas state court against 3Com Corporation, (hereafter, "3Com") although never served, and now voluntarily dismissed without prejudice. In an apparent effort to abuse the discovery process in the case at bar[2],

---

[1]Two additional plaintiffs are located in Missouri, and two additional plaintiffs are located in Litchfield, Illinois.

[2]After reviewing the complaint, answer, affirmative defenses, counterclaim, "reply" to counterclaim, affirmative defenses to the counterclaim, and the subpoenae served on each of the Witnesses, the undersigned wrote counsel for 3Com on April 11, asking for a brief explanation of the requested discovery so that the time-consuming and costly process of

1

3Com subpoenaed each one of those 7 Texas entities, and only those 7 Texas entities, for a deposition duces tecum to be taken in this case. The documents sought, and the listed area of questioning of the corporate Witnesses, had very little relationship to the issues raised by the pleadings reviewed by counsel for the Witnesses.

With only a slight variation in the facts, the fraud perpetrated on the Witnesses (and many others) by the RICO Enterprise "Power of $Zero™ Partnership" is identical to the telecom/leasing fraud cases stemming from the collapse of another telecommunications company, NorVergence, Inc., a New Jersey based company. That fraud is discussed in *Susquehanna Patriot Commercial Leasing Co., Inc. v. Holper Industries, Inc.*, 928 A.2d 278 (Pa. Super. 2007), and details of the fraud can be found in *Federal Trade Commission v. NorVergence, Inc.,* 2005 WL 3754864 (D.N.J. 2005). Here is how the fraud worked in the case at bar[3]:

## What Was Really Happening, In Other Words, The Truth

Through deception, described in detail below, Capital 4, Inc., (hereafter "Capital 4")

---

applying for a protective order in each of the three federal district courts in Texas could be avoided. 3Com's counsel chose not to answer the letter.

[3]A business owned by counsel for the witnesses was one of the victims of the NorVergence based leasing fraud. *See Commerce Commercial Leasing, LLC v. Broward Title Company*, Case Number 04-CV-04280, 2005 WL 1244919 (E.D.Pa. 2005). That case was ultimately settled, and the settlement made confidential. Witnesses' counsel also successfully defended two Florida victims of the NorVergence based leasing fraud, in suits brought by Popular Leasing USA, Inc., and recovered attorneys' fees. De Lage Landen Financial Services, Inc., which is involved in the present fraud perpetrated on the witnesses, was one of several leasing companies which participated in the fraud committed by NorVergence (which had labeled the leasing companies its "leasing company partners"). *See Glen & Co. v. Popular Leasing USA, Inc.*, 819 N.Y.S.2d 210, 2006 WL 1506137 (N.Y.Sup. 2006).

2

was having its customers borrow money from its pre-arranged source, secured by an equipment rental agreement, and having the borrowed money turned over to Capital 4 (or under certain options, having a small portion of it paid over to the customer and the balance turned over to Capital 4). Capital 4 would then pay its wholesale cost of a 3Com manufactured telephone system to 3Com, and have the telephone system installed at the customer's office, pocketing the balance of the money with the hope that it would be sufficient to pay other telephone service providers to provide the services which Capital 4 promised the customers it would provide. The customers would sign documents at the direction of 3Com, including an equipment rental agreement (described by Capital 4 as a "funding agreement") which would obligate the customer to repay the lender regardless of whether the equipment or services were ever delivered.

For its part, De Lage Landen Financial Services, Inc., (hereafter, "De Lage Landen") knew, from the terms of the master program agreement (Witnesses' Exhibit 4) that the contract between Capital 4 and each fraud victim was for more than the retail cost of the equipment. The master program agreement contained clauses whereby the obligation of De Lage Landen to fund "soft costs," defined in the master program agreement as including "service ... and buyout and trade-ups from prior contracts," was to be less than 40% of the total transaction cost on contracts with transaction costs of less than $150,000. (Witnesses' Exhibit 4, ¶ 8.) For this reason, the master program agreement also provided that Capital 4 was to provide De Lage Landen with "[a]n invoice ... with an itemization of Soft Costs ... and all pertinent details ... as DLL might require." (Witnesses' Exhibit 4, ¶ 3.)

3

A report from Capital 4 to De Lage Landen from the federal action between them[4] shows the failure of the parties to abide by this limitation in the master program agreement, and the magnitude of the fraud perpetrated:

| Customer Name | Gross Funding Amount | Equipment Cost |
|---|---|---|
| Danners, Inc. | $57,923.00 | $8,668.00 |
| Design Tech | $150,000.00 | $21,349.00 |
| ENT of Georgia | $821,937.57 | $128,000.00 |
| House Pro Inc. | $40,830.00 | $7,156.00 |
| Progressive Lighting | $574,163.00 | $112,900.00 |
| SNC - Lavalin GDS | $500,000.00 | $152,000.00 |

This program was developed by Capital 4, which branded it as "Power of $Zero."

3Com saw a spike in orders from Capital 4 for telephone equipment 3Com manufactured, and wanted to know how the value-added retailer, Capital 4, was suddenly selling so many more 3Com systems. Capital 4 explained its fraudulent program to 3Com (almost assuredly not advising 3Com that it was fraudulent) and 3Com wanted to make certain that it would benefit from Capital 4's fraudulent scheme. It negotiated and entered into a strategic alliance agreement with Capital 4 through which Capital 4 agreed to use 3Com equipment exclusively for its fraud. (*See Witnesses' Exhibit 2.*) Later, 3Com wanted to directly share in the money generated by the fraud, and it replaced the strategic alliance agreement with a license agreement for which it paid Capital 4 $5,000,000 in advanced royalty fees. From then onward, 3Com was in control of the RICO Enterprise and the money generated from its

---

[4]*De Lage Landen Financial Services, Inc. v. Capital 4, Inc.*, Case Number 07-CIV-3262 (E.D.Pa.).

4

operations responsible only to pay Capital 4 royalties for the use of its fraudulent scheme, after recovering the royalties advanced.

Thereafter, 3Com represented to the fraud victims that 3Com was in partnership with De Lage Landen.   (See Witnesses' Exhibit 5, p. 3.)

## What the Customer Was Told, In Other Words, The Lie

Potential customers were told by agents for the RICO Enterprise "Power of $Zero™ Partnership" sometimes by Capital 4, Inc., (not licensed by the State of Texas to provide telephone services[5]), on behalf of itself and 3Com (also not licensed by the State of Texas to provide telephone services)[6], or by value-added retailers trained by Capital 4 to use the fraud

---

[5]Under § 26.9(b)(3)(B)(vii) of the Texas Administrative Code, Title 16, Part II, Chapter 26, Substantive Rules Applicable to Telecommunications Service Providers, it is unlawful to conduct a telephone services business subject to the jurisdiction of the public utility commission without proper commission authorization, registration, licensing, or certification, and can subject such an unlicensed business to administrative fines of not more than $25,000 per day.  Under State of Texas, Public Utility Commission Docket No. 21478, a Service Provider Certificate of Operating Authority ("SPCOA") was issued to "Capital 4."  On January 17, 2003, "Capital 4" made clear in a filing made under oath, that the corporate entity to which the SPCOA was to be issued was "Capital 4 Outsourcing, Inc."  Docket No. 27195, State of Texas, Public Utility Commission

[6]A "Strategic Alliance Agreement" was entered into between Capital 4 and 3Com on January 31, 2005. *See Witnesses' Exhibit 2.*  The SAG was amended by a Rules of Engagement Addendum signed by the parties on March 10, 2005, which provided that as long as Capital 4 used De Lage Landen Financial Services, Inc., as its financial source, Capital 4 would receive a 50% discount off of list prices for 3Com equipment.  These agreements were later replaced by a License Agreement dated November 10, 2006, (*Plaintiff's Exhibit A to Plaintiff's Memorandum*) through which 3Com took over as the lead agent for the RICO Enterprise, paying Capital 4 a $5,000,000 advance on future royalties to be earned through the fruits of the fraud.  This License Agreement was later amended, ultimately providing for the collapse of Capital 4.

5

to sell 3Com-manufactured telephone equipment[7], that the RICO Enterprise, through Capital

4, would provide the same telephone services the customer presently had, at or about the same

price the customer was presently paying, but with two very valuable features: (1) the customer's

telephone bills would be fixed at the same monthly rate for 5 or 6 years, and (2) the customer

would receive a new telephone system at the beginning of the contract for free.  See Witnesses'

Exhibit 5 for some such lies.

All kinds of smoke and mirrors were used by the Capital 4/3Com RICO Enterprise to

dissuade potential customers from relying upon the time-tested adage that "there is no such

thing as a free lunch."  In fact, a web site maintained by the RICO Enterprise had as its third

point a direct refutation of the adage, advising potential customers that "there is no catch," and

suggesting that the potential customer contact customer references.  *See Witnesses' Exhibit 1,*

*p. 11, ¶ 3.*  Here are some of the smoke and mirrors employed by the RICO Enterprise to

defraud potential customers, including the Witnesses, including an illusory right to cancel the

contract:

**1. What is the 3Com Power of $Zero™ Solution?**
The 3Com Power of $Zero™ Solution is a financial product under which your
company, as a customer ("You", "Your", or the "Customer"), can receive, *at*
*$Zero™ additional cost to You:* (1) the Equipment Option; (2) the Cash
Payment Option; or (3) the Equipment and One-Half Cash Payment Option. in
return for Your commitment to allow Capital 4, Inc. ("Capital 4", "We", "Us",
or "Our") to provide, maintain, and support Your Voice or Data Technology
Solutions, and Your local telephone or data lines, internet access facilities,
domestic and international long distance services, cellular services and all other
network access services (collectively the "Public Access Services").

**2. How does the 3Com Power of $Zero™ Solution work?**

---

[7]Two such value-added retailers became direct victims of the fraud; one such victim is
one of the Witnesses involved in this case.

6

The **Power of $Zero™ Partnership** has developed a product that, over a ten-year period, can effectively reduce all of Your expenses for Public Access Services to $Zero™. Using the 3Com Power of $Zero™ Solution, We financially leverage the difference between the price You now pay for those services, and Our cost to provide those same services. We then analyze Your monthly expense for Public Access Services, to verify that We can deliver those same services for less. We then calculate this delta for the life of the Agreement, and return it directly to You, in the form of the Equipment Option, the Cash Payment Option, or both.

\* \* \*

### 17. What exactly is a Funding Agreement?

The Funding Agreement is an agreement between You and Capital 4 Financial Services, a Program of De Lage Landen Financial Services. We use the Funding Agreement to financially leverage the difference in costs between what You pay for Public Access Services, and what it costs Us to provided [sic] those same services. The structure of the Funding Agreement provides for simple accounting treatment of the program's value while maintaining the Monthly Payment as an operational expense[8].

\* \* \*

### 32. Can I cancel the 3Com Power of $Zero™ Customer Agreement in its entirety?

Yes. You have the option to cancel the Agreement at any time. If Capital 4 fails to perform, and good cause ("Good Cause") exists. You may cancel the 3Com Power of $Zero™ Customer Agreement.

### 33. What do I have to do to cancel the 3Com Power of $Zero™ Customer Agreement for Good Cause?

To cancel the Agreement, you must demonstrate that Good Cause exists. To do so, You must timely, and as soon as practicable (on the day You became aware of a problem), provide Us with written notice (via e-mail or facsimile) of any alleged failure or deficiency in the goods or services; and You must allow Us commercially reasonable notice and opportunity to address and resolve the problem. If You have documented an alleged failure or deficiency, but You are

---

[8]In fact, the "Funding Agreement" was an equipment rental agreement under which the customer agreed to pay the lender the full monthly amount for which it was obligated to Capital 4 for telephone services, and which tried to incorporate the "Hell or high water provisions" of Article 2A of the UCC, which would require the customer to continue to pay regardless of whether the equipment or services were delivered.

7

not satisfied with Our responsive action, You must *immediately* provide Us with written notice (via e-mail or facsimile, *and* by certified mail) specifying: (1) the problem; (2) Our response, including an explanation of why Our attempts to resolve the problem are alleged insufficient. If We fail to fix the problem and make You a satisfied Customer within a commercially reasonable period (not to exceed 30 days) after receipt of this written notice of insufficiency, You may Invoke the Good Cause provision to cancel the Agreement (However, such cancellation shall not constitute a waiver of Our right to assert that Good Cause did not exist).

**34. What happens to my obligation under the Funding Agreement if the 3Com Power of Zero™ Customer Agreement Is terminated for Good Cause?**
If the Agreement is properly terminated for Good Cause We will pay to You, on a monthly basis, damages in an amount sufficient to satisfy and discharge Your remaining payment obligations to any third-party funding source that has advanced funds under a Funding Agreement. This extraordinary commitment speaks volumes about our core values in the unlikely event of chronic dissatisfaction.

*See Witnesses' Exhibit 1, pp. 11-13, ¶¶ 1, 2, 17, 32-34. [emphasis in original, except the emphasis of the name of the RICO Enterprise in ¶ 2].*

Customers were presented with a one-page "Customer Agreement," which provided that Capital 4[9] would "provide, maintain and support all of Customer's Public Access Services" (which were defined in the incorporated terms from the web site of the RICO Enterprise as "Voice or Data Technology Solutions and [the Customer's] local telephone or data lines, internet access facilities, domestic and international long distance services, cellular services and all other network access services.") *Witnesses' Exhibit 1, page 11, ¶ 1.* However, unknown to the customers, neither Capital 4, Inc., nor the RICO Enterprise, were licensed by the State of Texas to provide telephone services.

_____

[9]The RICO Enterprise used Capital 4's identity as well as "Power of $Zero™ Partnership" to perpetuate the fraud.

8

The one-page "Customer Agreement" had a schedule attached which broke down the customer's present monthly payment for telephone services into its component parts, then implied that this amount would be the amount the customer would pay for the same services from the Capital 4/3Com RICO Enterprise the "Power of $Zero™ Partnership." The one-page Customer Agreement gave the customer the choice of receiving equipment with a stated value, a cash payment or a combination of both, and required that the Customer would enter into a "Funding or Rental Agreement (the "Funding Agreement") under which the Customer shall obtain its phone system ("Voice Technology Solutions")."

Then the fraud was cemented—the Customer later received a document which was prepared by De Lage Landen Financial Services, Inc., (hereafter "De Lage Landen") which was specifically designed by the RICO Enterprise and De Lage Landen, to perpetuate the fraud—it contained the identification on the upper left-hand corner as "Capital 4 Financial Services[10], A Program of De Lage Landen Financial Services." The document implies that it is the expected Funding Agreement referenced in the Customer Agreement, when it is in fact designed by the conspirators to be an equipment rental agreement, seeking to gain the "Hell or high water" protection of Article 2A of the UCC. It requires each customer to pay the full monthly amount (which the customer believes to be for telephone services) ostensibly for leasing the "free" telephone system, and due to the "Hell or high water provisions" of Article 2A of the UCC, those payments must be made regardless of whether the RICO Enterprise ever delivers the

---

[10]Capital 4 Financial Services, LLC, had been a Texas limited liability company until December 3, 2004, when it forfeited its existence for non-payment of a franchise tax. Thereafter, on March 4, 2005, Capital 4, Inc., filed an "Assumed Name Certificate" with the Secretary of State of the State of Texas, authorizing Capital 4, Inc., to use the assumed name of Capital 4 Financial Services.

9

telephone equipment or services.

De Lage Landen Financial Services, Inc., has sued each of the Witnesses (and many others), with a total of 18 such defendants represented by Gossett & Gossett, P.A., and Ronald P. Gossett, in various courts in the Commonwealth of Pennsylvania.  Based upon allegations made by De Lage Landen in its standard complaint, it is clear that the master program agreement between De Lage Landen and the RICO Enterprise of Capital 4 and 3Com, the "Power of $Zero™ Partnership," attempts to carve out of the payments (which are mislabeled by the conspirators as "Lease Payments"), a "pass-through" payment to the unlicensed RICO Enterprise for providing telephone services.  From the pleadings filed in this case, *3Com Corp. v. Capital 4, Inc.*, Case Number 07-civ-8707 (S.D.N.Y. 2007)(Complaint, Plaintiff's Exhibit 10, Exhibit B), we get a sense of the magnitude of this fraud:

| Customer Name | Gross Funding Amount | Equipment Cost |
|---|---|---|
| Danners, Inc. | $57,923.00 | $8,668.00 |
| Design Tech | $150,000.00 | $21,349.00 |
| ENT of Georgia | $821,937.57 | $128,000.00 |
| House Pro Inc. | $40,830.00 | $7,156.00 |
| Progressive Lighting | $574,163.00 | $112,900.00 |
| SNC - Lavalin GDS | $500,000.00 | $152,000.00 |

## Why the Fraud?

No business would knowingly borrow an amount of money equal to five-years' cost of telephone services, and turn the money over to an unlicensed telephone service provider, agreeing to be liable to repay the money in full regardless of whether the telephone services were provided or not.  If the truth were told to the victims, there would be no victims, and no

10

money for the RICO Enterprise.

No business would agree to pay interest on the amount of its telephone bills for services yet to be provided. Telecommunication services have always been a pay-as-you-go industry. No business would agree to pay for future telephone services regardless of whether those services were ever provided. Without the fraud successfully worked on the Witnesses and hundreds like them, the RICO Enterprise "Power of $Zero™ Partnership" and its co-conspirator, De Lage Landen, would not have sold one contract.

## Fraud Discovered

Just like NorVergence, Inc., the RICO Enterprise became insolvent and stopped paying for telephone services which were provided by others. The victims of the leasing fraud, including each Witness, stopped paying for telephone services which were not being provided. Now, the leasing company co-conspirator of the RICO Enterprise is suing each Witness to recover the total amount of the contract for telephone services[11]. With the filing of all of the collection actions by De Lage Landen against the various defendants, including each Witness, each Witness has learned of the fraud perpetrated upon them.

Each Witness was named as a plaintiff in a suit filed on their behalf, but not served, against 3Com Corporation, by former counsel for the Witnesses, Simon Hughes. The suit was filed in state court in Harris County, Texas. The suit sought money damages from 3Com Corporation based upon certain provisions of the consumer fraud statutes and other laws of the

---

[11]In its complaint, De Lage Landen alleges a "pass-through" to the telephone service provider which is carved out of the damages claimed. There is no "pass-through" provision found in that portion of the telephone services contract. Witnesses' Exhibit 1, pp. 9-14.

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

State of Texas.  The suit has since been voluntarily dismissed without prejudice by Mr. Hughes.

Mr. Hughes apparently previously represented Capital 4, Inc.

After the filing of the suit, but before its service, Capital 4, Inc., rescinded its consent

to the representation of Capital 4, Inc., victims, including the Witnesses.  Each Witness has

subsequently retained Gossett & Gossett, P.A., and Ronald P. Gossett, as its chosen counsel,

to defend it against the suit filed by De Lage Landen Financial Services, Inc., in the

Commonwealth of Pennsylvania, to file suit against the RICO Enterprise, Capital 4, Inc., and

3Com Corporation, and to defend the depositions set by 3Com.

3Com now seeks to disqualify Ronald P. Gossett from representing the Witnesses based

upon its pure speculation that Gossett has received from Hughes work product created for

Capital 4, Inc., for which, amazingly, 3Com claims the attorney-client privilege has been

waived.  Because that is so difficult to comprehend, it should be restated:  3Com's attorney says

that Gossett should not be permitted to represent the Witnesses formerly represented by Hughes

because Hughes might have turned over to Gossett work product belonging to Capital 4

prepared by Hughes while he was Capital 4's attorney, for which Capital 4 has waived its

attorney/client privilege.  In support of this remarkable, and novel, position, 3Com relies upon

one Texas case, *In re George*, 28 S.W.3d 511 (Tex. 2000), which will be discussed more fully

hereinafter.

## Disqualification of Counsel Generally

As this court stated in *Occidental Hotels Management B.V. v. Westbrook Allegro, LLC,*

440 F.Supp.2d 303, 308-309 (S.D.N.Y. 2006):

"The authority of federal courts to disqualify attorneys derives from their

12

inherent power to 'preserve the integrity of the adversary process.' " *Hempstead Video, Inc., v. Inc. Village of Valley Stream,* 409 F.3d 127, 132 (2d Cir.2005) (citation omitted)."In a technical sense the only truly binding authority on disqualification issues is [Second] Circuit precedent, because our authority to disqualify an attorney stems from the Court's inherent supervisory authority." *Skidmore v. Warburg Dillon Read LLC,* No. 99 Civ. 10525(NRB), 2001 WL 504876, at *2 (S.D.N.Y. May 11, 2001). Although disqualification motions within the Second Circuit often look to state disciplinary rules for guidance, "such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video,* 409 F.3d at 132.

A federal court's decision of whether to disqualify counsel "must ultimately be guided by the goal of a trial process that lacks any hint of a taint." *Skidmore,* 2001 WL 504876, at *2. With rare exceptions, disqualification is generally ordered in two kinds of cases. *See Bd. of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979). First, where an attorney's conflict of interest in violation of Code of Professional Responsibility Canons 5 and 9 undermines the court's confidence in the attorney's representation of his client.[FN4] *See id.* Second, where the attorney is, at least potentially, in a position to use privileged information gained from the other side through prior representation, giving the present client an unfair advantage. *See id.* "[U]nless an attorney's conduct tends to taint the underlying trial by disturbing the balance of the presentations in one of the two ways indicated above, courts should be quite hesitant to disqualify an attorney." *Nyquist,* 590 F.2d at 1246 (internal quotation marks and citation omitted).

> FN4. Canons 5 and 9 provide that a lawyer should exercise independent judgment on behalf of his client, and should avoid the appearance of professional impropriety. *See Nyquist,* 590 F.2d at 1246.

Motions for disqualification require a high standard of proof on the part of the party seeking to disqualify former counsel. *See Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.1983). Disqualification motions are often brought for tactical reasons, and even when made in good faith, delay litigation. *See id.* at 791-92. In evaluating motions to disqualify counsel, a federal court balances a client's right to freely choose his counsel against the need to maintain the standards of the legal profession. *See id.* at 791 (quoting *Gov't of India v. Cook Indus., Inc.,* 569 F.2d 737, 739 (2d Cir.1978)).

As we shall see, Plaintiff makes no showing, let alone a "high standard of proof," that

Gossett must be disqualified to preserve the integrity of the adversary process. 3Com asserts

13

that all of the attorney/client privileged documents which might constitute work product of Mr.

Hughes while he was counsel for Capital 4, Inc., has lost its attorney/client privilege.

Therefore, there is no privileged document (which privilege would have been held by Capital

4, Inc., not 3Com) which should be kept from Gossett by Mr. Hughes.

## Standing

3Com does not have standing to seek an order protecting the work product belonging

to Capital 4, Inc.

After reciting the same considerations and standards as this court, cited above, the court

in *Shire Laboratories, Inc. v. Nostrum Pharmaceuticals, Inc.,* 2006 WL 2129482 (D.N.J. 2006)

found a lack of standing to seek disqualification unless the moving party is the former client:

> ... This Court recognizes that a party does not have standing to bring a
> Motion to Disqualify based on a material conflict of interest unless the party is
> either a former or current client. "As a general rule, courts do not disqualify an
> attorney on the grounds of conflict of interest unless the former client moves for
> disqualification." *In re Yarn Processing Patent Validity Litig.* 530 F.2d [83] at
> 89 [(5th Cir. 1976)]. "To allow an unauthorized surrogate to champion the rights
> of the former client would allow that surrogate to use the conflict rules for his
> own purposes where a genuine conflict might not really exist. *Id.* at 90.

*In re Yarn Processing Patent Validity Litig.* 530 F.2d 83 (5th Cir. 1976) cites this court's case

of *Murchison v. Kirby*, 201 F.Supp. 122 (S.D.N.Y. 1961) in support of its holding.  In denying

the motion for disqualification in *Murchison*, this court stated:

> The Court should first determine whether, even assuming the facts
> alleged by Phillips are true (concerning which the Court makes no finding),
> Phillips, as moving party, has the status to bring on this motion. Phillips does not
> claim that he was at any time represented by Adams or that Adams stands in a
> fiduciary relationship to him. We have, therefore, a situation where Phillips, as
> defendant, is seeking to disqualify Adams as attorney for plaintiffs solely on the
> ground that Adams violated the Canons of Ethics in matters not related in any
> way to any attorney-client relationship involving Phillips. While, of course, any

14

member of the public may present an accusation of breach of professional conduct against an attorney to the appropriate bar association or other organization having jurisdiction over attorneys, this does not mean that he may come into court in an action in which he is an interested party and seek to disqualify the opposing attorney, solely on the ground of violation of the Canons of Ethics.

*Murchison v. Kirby*, 201 F.Supp. at 123.

In *In re Yarn Processing Patent Validity Litig.* 530 F.2d 83, 89 (5th Cir. 1976), the court also cited the decision of the second circuit in *Fisher Studio v. Loew's, Inc.*, 232 F.2d 199, 204 (2d Cir. 1956), calling it "particularly noteworthy because the Court of Appeals in that case reversed the District Court insofar as it had disqualified attorneys from appearing against parties other than their former clients."

Clearly, 3Com does not have standing to prosecute its motion to disqualify Gossett, and therefore, the motion should be denied for lack of standing.

## Merits

Plaintiff relies upon the sole case of *In re George,* 28 S.W.2d 511 (Tex. 2000), in support of its motion as it relates to Gossett. That case does not support Plaintiff's motion and requested relief of disqualification.

*In re George* was a mandamus action in the Supreme Court of Texas to determine "whether [successor counsel] can have access to the work product of their client's previous attorney when that attorney has been disqualified for representing the opposing party in a prior, substantially related matter." Substituting the entities in this case for those in *In re George*, the issue would be whether Gossett could have access to the work product of Simon Hughes when Simon Hughes has been disqualified ***for representing 3Com*** in a prior, substantially related

15

matter.  Simon Hughes never represented 3Com, and disqualification of Hughes, sought without standing by 3Com, is based upon Hughes prior representation of Capital 4, Inc.[12]

*In re George* did not disqualify successor counsel, but rather, formulated a process through which the Texas courts were to determine whether work product of former counsel contained attorney/client confidential information that could not be disclosed to successor counsel.  In holding that successor counsel was presumptively entitled to obtain the pleadings, discovery, correspondence and all other materials in the public record or exchanged by the parties, the court reasoned:

> When an attorney is disqualified, most successor counsel will want access to two different types of material. First, successor counsel will need the pleadings, discovery, correspondence, and all other documents contained in the public record or exchanged by the parties. While counsel could obtain these documents from the court's file or by discovery on the opposing party, it is much more convenient to assume control of the previous counsel's existing file. Second, successor counsel will want access to the work product created by the disqualified attorneys. "Work product" in this sense refers to all of the materials the attorneys created in anticipation of litigation or for trial that has not been placed in the public record or shared with the other side.

> These two types of material are so different that they require separate rules. Pleadings, discovery, correspondence and other materials in the public record or exchanged by the parties are the essential documents necessary for successor counsel to understand the nature and subject matter of the case. Denying successor counsel convenient access to them burdens the abandoned client and the court without advancing any public policy. The disqualified attorney's work product, on the other hand, is more likely to contain confidential information. As a result, courts are much more concerned about turning over work product. *See, e.g., Reardon [v. Marlayne, Inc.,* 83 N.J. 460,] 416 A.2d [852,] at 862 [(1980)]*,* (denying access to all undisclosed work product, but allowing access to material already disclosed); *see also* Note, *First Wisconsin Mortgage Trust v. First Wisconsin Corporation: The Work Product Order*

---

[12]Perhaps 3Com would have standing to seek Hughes' disqualification if 3Com admitted that the "Power of $Zero™ Partnership" was a RICO Enterprise, and then asserted that the RICO Enterprise was represented by Hughes.

16

*Subsequent to Attorney Disqualification,* 65 VA. L.REV. 973, 973 n. 3 (1979) [hereinafter *Attorney Disqualification* ] ("Typically, litigants do not challenge turnover of materials that already have become part of the case."); John P. Gyorgy, Comment, *Access to Work Product of Disqualified Counsel,* 46 U. CHI. L.REV. 443, 458 (1979) [hereinafter *Work Product* ] (challenge to turnover will involve prepatory work not pleadings and court papers).

* * *

Access to work product, as we have said, is a much more serious matter. The purposes underlying the initial disqualification will often require a partial or total restriction on the successor counsel's access to the disqualified counsel's work product. *See First Wisconsin [Mortgage Trust v. First Wisconsin Corp.,* 584 F.2d 201,] at 208-09 [(7th Cir. 1978)(en banc)]; *International Bus. Mach. Corp. v. Levin,* 579 F.2d 271, 283 (3rd Cir.1978); *Behunin v. Dow Chem. Co.,* 642 F.Supp. 870, 872 (D.Colo.1986); *see also Work Product,* 46 U. CHI. L.REV. at 444; Note, *The Availability of the Work Product of a Disqualified Attorney: What Standard?,* 127 U. PA. L.REV. 1607, 1611 (1979) [hereinafter *What Standard?* ]; *Attorney Disqualification,* 65 VA. L.REV. at 982. Here, we hold that a restriction on work product is necessary to further the purposes behind this Court's disqualification order. Contrary to Anderson's assertions, we disqualified McKool and Pennington for at least two reasons. First, because Anderson's claims were substantially related to the prior representation, we believed there was a genuine threat that the lawyers would disclose confidential information learned in their prior representation. Disqualification was therefore necessary to protect Relators' confidential information. *See EPIC I, [In re EPIC Holdings,]* 985 S.W.2d [41], 51-52 [(Tex.1998)]. Second, we disqualified McKool and Pennington because, at trial, they impermissibly questioned the work of their prior firm. *Id.* at 52. We stated that "the legal system is ill-served by lawyers criticizing the work of their former associates" and "it is most unfair for a client to be forced to defend the work of the former associates of his opponent's counsel." *Id.*

Each of these grounds supports the further remedy of restricting Hartnett's access to McKool and Pennington's work product. If the work product contains confidential information, transferring the work product to Hartnett poses the same threat to Relators' confidential information as McKool and Pennington's presence in the case. Thus, a restriction on Hartnett's access to the work product is necessary to effectuate the purpose of disqualification. *See EZ Paintr Corp. v. Padco, Inc.,* 746 F.2d 1459, 1463 (Fed.Cir.1984); *Quark [Inc. v. Power Up Software Corp.,]* 812 F.Supp. [178], 180 [(D.Colo.1992)]; *Hallmark Cards, Inc. v. Hallmark Dodge, Inc.,* 616 F.Supp. 516, 521-22 (W.D.Mo.1985); *Reardon [v. Marlayne, Inc.,* 83 N.J. 460,] 416 A.2d [852], 862

17

[(1980)]. Similarly, restricting Hartnett's access to McKool and Pennington's theories for attacking their prior firm's work is necessary to preserve the integrity of the legal system. Without access to the tainted work product, however, Hartnett can attack Johnson and Gibbs' work without violating any ethical rules and without appearing to do so.

The process devised by the Supreme Court of Texas begins with a rebuttable presumption that the work product contains confidential information. "The presumption arises once the *former client* has established that the two representations are substantially related." *In re George*, 28 S.W.2d at 518. In the case at bar, the former client of Mr. Hughes, Capital 4, Inc., is not the movant. Additionally, the rebuttable presumption has already been rebutted ***by 3Com***. Its memorandum of law asserts that it "considered Capital 4's attorney-client privilege relating to its business concerning the Power of $Zero program to have been waived." *See 3Com's Memorandum of Law, p. 2.*

To further rebut this presumption requires Mr. Hughes to follow the process set out in *In re George*, should this court determine that 3Com has standing to bring the disqualification motions, and should this court determine to treat the motion to disqualify Gossett as a motion by 3Com to restrict access to the information for which it claims the attorney/client privilege has been waived, again presuming without conceding that 3Com has standing to bring such a motion.

The affidavit of Gossett filed in support of the position of the Witnesses asserts that Gossett received electronic files from Hughes on a USB drive; that those file were organized as shown in the right-hand pane of figure 1 below; that he has only opened the subfolders numbered 1001, 1002, and 1003, and only opened one letter in each subfolder, which letters were referenced in three letters he received from Plaintiff's counsel (needing to review the



**Figure 1**

letters sent by Mr. Hughes to 3Com in compliance with a condition precedent to bringing suit under Texas consumer fraud statutes to respond to counsel's letters); and he has opened nothing else.

## Exhibit R is Privileged Document

In an amazing twist of irony, 3Com basis its motion to disqualify Gossett on a document which 3Com obtained directly from one of Gossett's clients, which document 3Com had every reason to believe was attorney/client privileged, and was unintentionally disclosed.

19

Plaintiff's Exhibit R is email from Attorney Paul Jordan to his client Evans, Ewan & Brady Ins. Agency, Inc., concerning tactics employed in the defense of suit brought by De Lage Landen Financial Services, Inc., a conspirator with the RICO Enterprise run by 3Com. 3Com's counsel received the copy of the email directly from Evans, Ewan & Brady Ins. Agency, Inc., in response to a subpoena issued by 3Com's attorney and served on Evans, Ewan & Brady Ins. Agency, Inc., after which service of subpoena (and before receipt of the documents by 3Com) Gossett advised 3Com's attorney that he was representing Evans, Ewan & Brady Ins. Agency, Inc. *See Witnesses' Exhibit 3.*

The proper handling of the unintentionally disclosed attorney/client privileged document would have been to return it (along with all of the other similarly privileged documents likewise unintentionally disclosed) to Gossett without making copies, with a cover note indicating that the documents were received by 3Com from Evans, Ewan & Brady Ins. Agency, Inc. Instead, 3Com's counsel retained all such privileged documents, and sought disqualification of Gossett based, in part, thereon.

Any "fee splitting" arrangement between Gossett and Hughes would be subject to the Rules Regulating the Florida Bar (under whose supervision Gossett is admitted to practice law in the State of Florida). Rule 4-1.5(g), RULES REG. FLA. BAR, provides:

**(g) Division of Fees Between Lawyers in Different Firms.** Subject to the provisions of subdivision (f)(4)(D), a division of fee between lawyers who are not in the same firm may be made only if the total fee is reasonable and:

(1) the division is in proportion to the services performed by each lawyer; or

(2) by written agreement with the client:

20

(A) each lawyer assumes joint legal responsibility for the representation and agrees to be available for consultation with the client; and

(B) the agreement fully discloses that a division of fees will be made and the basis upon which the division of fees will be made.

Obviously, if Mr. Hughes is disqualified from representing the fraud victims because of his prior representation of Capital 4, Inc., there could be no division of fees between Gossett and Hughes because Hughes could not perform services, and could not assume joint responsibility for the representation of any of the clients. So, the existence of such an agreement would have no bearing on a motion to disqualify Gossett.

## Conclusion

3Com's motion should be denied for lack of standing, and for failure to carry its very high burden of proof to disqualify the Witnesses' chosen counsel.

### Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing has been mailed by United States mail, postage prepaid, this ____16th____ day of May, 2008, to: Daniel E. Rosenfeld, Esq., of the law firm of DLP Piper US LLP, Attorneys for Plaintiff, 33 Arch Street, 26th Floor, Boston, MA 02110; Thomas Vays, Esq., of the law firm of Winget, Spadafora & Schwartzberg, LLP, Attorneys for Defendant, 45 Broadway, 19th Floor, New York, NY 10006, and to Simon H. Hughes, Esq., of The Hughes Law Firm, PARK CITY, 13280 Northwest Freeway, No. F-400, Houston, TX

GOSSETT & GOSSETT, P.A. 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

77040, and served the same by attachment to email before 5:00 p.m., the same date.

**Gossett & Gossett, P.A.**
Attorneys for Deposition Witnesses
4700 Sheridan St., Building I
Hollywood, FL  33021
(954) 983-2828 • (954) 212-0439 Fax
rongossett@gossettlaw.com
Fla. Bar No. 210811


By:_____
        Ronald P. Gossett (RG6930)
              For the Firm

RPG/ms

D:\Clients\3Com\New York\Memorandum of Law on behalf of Deposition Witnesses In Opposition to Plaintiff's Motion to Disqualify Their
Counsel Ronald P. Gossett.wpd

22